**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| CELLULAR COMMUNICATIONS EQUIPMENT LLC, | § § § | |
| Plaintiff, | § § | CASE NO. 6:13-cv-507-LED |
| v. | § § | CONSOLIDATED LEAD CASE |
| HTC CORPORATION, *et al*., | § § | |
| Defendants. | § § § | |

**<u>DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF</u>**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................... 1

II.     LEGAL AUTHORITY ................................................................... 1

III.    ANALYSIS..................................................................................... 2

    A.     '019 Patent ........................................................................... 2

        1.      "processing means for arranging gaps in a time-slot frame according to the measurement pattern definitions" (Claim 11) ....................................................................... 2

        2.      "the processing means are also arranged to set for the measurement pattern definition a delay according to the measurement pattern definitions" (Claim 11).............................. 5

    B.     '174 Patent ........................................................................... 8

        1.      "a transmit power difference which is to be maintained" (Claims 1 and 18) / "maintaining a previously determined transmit power difference" (Claim 9) ............................................ 9

    C.     '820 Patent ......................................................................... 11

        1.      "the designating unit" (Claim 12) ............................... 11

    D.     '8923 Patent ....................................................................... 16

        1.      "a diverting unit configured to divert a message of the messages sent from the application program and destined for the communication network" (Claim 24) .................................... 17

        2.      "based on the message" (Claim 24)............................ 19

    E.     '9923 Patent ....................................................................... 21

        1.      "means for receiving a neighbor cell information message" (Claim 11) ................................................................. 22

        2.      "means for associating a specific value of said set of specific parameter values indicated by one of said index with the corresponding second parameter of a neighbor cell" (Claim 11) ................................................................. 25

IV.     CONCLUSION................................................................................ 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*,
   521 F.3d 1328 (Fed. Cir. 2008) ..................................................................... *passim*

*ATD Corp. v. Lydall, Inc.*,
   159 F.3d 534 (Fed. Cir. 1998) .................................................................................6

*Augme Techs., Inc. v. Yahoo! Inc.*,
   755 F.3d 1326 (Fed. Cir. 2014) ..................................................................1, 4, 28

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
   512 F.3d 1338 (Fed. Cir. 2008) .............................................................................6

*Blackboard, Inc. v. Desire2Learn Inc.*,
   574 F.3d 1371 (Fed. Cir. 2009) .........................................................................1, 4

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
   296 F.3d 1106 (Fed. Cir. 2002) ............................................................................24

*Cell & Network Selection LLC v. AT&T Inc.*,
   No. 6:13-CV-403, 2014 U.S. Dist. LEXIS 100248
   (E.D. Tex. May 2, 2014) .......................................................................................15

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
   358 F.3d 1371 (Fed. Cir. 2004) ............................................................................16

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*,
   438 F.3d 1374 (Fed. Cir. 2006) ............................................................................13

*Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*,
   412 F.3d 1291 (Fed. Cir. 2005) ...........................................................2, 4, 22, 23

*Every Penny Counts, Inc. v. Am. Express Co.*,
   563 F.3d 1378 (Fed. Cir. 2009) .......................................................................9, 19

*Function Media, L.L.C. v. Google, Inc.*,
   708 F.3d 1310 (Fed. Cir. 2013) ................................................................. *passim*

*Hyperion Solutions Corp., v. Outlooksoft Corp.*,
   422 F. Supp. 2d 760 (E.D. Tex. 2006) .................................................................19

*Ibormeith IP, LLC v. Mercedez-Benz USA, LLC*,
   732 F.3d 1376 (Fed. Cir. 2013) .....................................................................27, 29

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
  381 F.3d 1111 (Fed. Cir. 2004)................................................................5

*In re Katz Interactive Call Processing Patent Litig.*,
  639 F.3d 1303 (Fed. Cir. 2011)..............................................................25

*Lockheed Martin Corp. v. Space Sys./Loral, Inc.*,
  249 F.3d 1314 (Fed. Cir. 2001)................................................................5

*Mas-Hamilton Grp. v. LaGard, Inc.*,
  156 F.3d 1206 (Fed. Cir. 1998)..............................................................13

*Mass. Inst. of Tech. v. Abacus Software*,
  462 F.3d 1344 (Fed. Cir. 2006)........................................................12, 13

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB*,
  344 F.3d 1205 (Fed. Cir. 2003)................................................................1

*Merck & Co. v. Teva Pharms. USA, Inc.*,
  *395 F.3d 1364 (Fed. Cir. 2005)*......................................................28, 30

*Nikon Corp. v. ASM Litho. B.V.*,
  308 F. Supp. 2d 1039 (N.D. Cal. 2004) ....................................................6

*Noah Sys., Inc. v. Intuit Inc.*,
  675 F.3d 1302 (Fed. Cir. 2012).................................................... *passim*

*Northrop Gruman Corp. v. Intel Corp.*,
  325 F.3d 1346 (Fed. Cir. 2003)..............................................................29

*Novo Indus., L.P. v. Micro Molds Corp.*,
  350 F.3d 1348 (Fed. Cir. 2003)..............................................................16

*O2 Micro Int'l v. Beyond Innovation Tech. Co.*,
  521 F.3d 1351 (Fed. Cir. 2008)........................................................10, 19

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005)..........................................................5, 15

*Realtime Data, LLC v. Packeteer, Inc.*,
  No. 6:08cv144-LED-JDL, 2009 U.S. Dist. LEXIS 109438
  (E.D. Tex. Nov. 3, 2009) ................................................................9, 28

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
  775 F.2d 1107 (Fed. Cir. 1985)................................................................8

**Statutes**

35 U.S.C.

§ 112(6)..........................................................................................................................11
§ 112...............................................................................................................................2
§ 112, ¶ 2........................................................................................................................1
§ 112, ¶ 6................................................................................................................. *passim*

## TABLE OF EXHIBITS

Exhibit 1          Declaration of Dr. Robert Akl

Exhibit 2          U.S. Patent No. 6,810,019

Exhibit 3          U.S. Patent No. 7,941,174

Exhibit 4          U.S. Patent No. 8,055,820

Exhibit 5          Final Rejection, Application No. 12/289,825 (Feb. 2, 2011)

Exhibit 6          Non-final Rejection, Application No. 12/289,825 (Sept. 30, 2010)

Exhibit 7          Response to Office Action, Application No. 12/289,825 (May 10, 2011)

Exhibit 8          U.S. Patent No. 7,218,923

Exhibit 9          NEC Corp. of Am. v. Cellular Commc'ns Equip., LLC, IPR2014-01133, Patent
                   Owner's Preliminary Response Under 37 CFR § 42.107 (P.T.A.B. Oct. 23, 2014)

Exhibit 10         Plaintiff's First Supplemental Disclosure of Asserted Claims and Infringement
                   Contentions, Ex. F (Oct. 30. 2014)

Exhibit 11         Response to Office Action, Application No. 10/862,878 (June 2, 2006)

Exhibit 12         U.S. Patent No. 6,819,923

Exhibit 13         Response to Office Action, Application No. 09/831,689 (May 30, 2004)

## I.    INTRODUCTION

CCE asserts six patents acquired from Nokia Siemens Networks.  These patents were prosecuted before the Federal Circuit decided *Aristocrat* (2008), *Blackboard* (2009), *Noah* (2012), or *Augme Technologies* (2014), requiring patents claiming software functions disclose algorithms to perform those functions.  This standard, along with the Supreme Court's recent *Nautilus* decision, ensures innovation is not impeded by vague or purely functional claims.  CCE's patents fail to meet current standards.  They claim software functions without disclosing algorithms clearly linked to performing those functions and fail to inform one skilled in the art of the scope of the claims.  With that in mind, Defendants[1] submit their Responsive Claim Construction Brief.[2]

## II.    LEGAL AUTHORITY

Under 35 U.S.C. § 112, ¶ 6, a patentee may claim a means for performing a specified function without reciting in the claim itself any structure for performing the function.  But, means-plus-function elements do not cover every means for performing the function.  Rather, their scope is limited to the structure the specification that is "clearly link[ed]" to and necessary for performing the function.  *See Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1311 (Fed. Cir. 2012).  Computer-implemented means-plus-function limitations, moreover, "must disclose an algorithm for performing the claimed-function," in order to meet the definiteness requirements of 35 U.S.C. § 112, ¶ 2.  *Augme Techs., Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1337 (Fed. Cir. 2014).  Thus, the law requires a *quid pro quo*:  a patentee may claim generic means elements in purely functional terms only if the specification clearly discloses a corresponding structure for that function.  *See Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1219 (Fed. Cir. 2003).

---

[1] This brief is filed on behalf of AT&T Mobility LLC, HTC Corporation, HTC America, Inc., Exedea, Inc., NEC Casio Mobile Communications, Ltd., NEC Corporation of America, Inc., Sprint Solutions, Inc., Sprint Spectrum L.P., Boost Mobile, LLC, Dell Inc., T-Mobile USA, Inc., T-Mobile US, Inc., Pantech Co., Ltd., Pantech Wireless, Inc., LG Electronics, Inc., LG Electronics USA, Inc., Amazon.com, Inc., Microsoft Corporation, Cellco Partnership d/b/a Verizon Wireless, ZTE USA, Inc., and Apple Inc., (collectively, "Defendants").  Each Defendant joins the brief only with respect to the claims asserted against that Defendant.

[2] For an overview of relevant technology described in the Asserted Patents, Defendants invite the Court to review their Technology Tutorial filed on October 28, 2014.

## III.   ANALYSIS

As an initial matter, CCE has it wrong regarding the relevance of statements made during *Inter Partes* Reviews (IPRs) of the patents.[3]  By law, this Court's standard for claim construction differs from the Patent Trial and Appeal Board's required standard.  As a result, applying different constructions during an IPR is typical and uncontroversial.  This is particularly true here because, during an IPR, parties may not challenge a patent for indefiniteness under 35 U.S.C. § 112.

### A.   '019 Patent

The '019 Patent relates to a method and system that use measurement pattern definitions in wireless telecommunications networks.  The wireless terminals must periodically perform measurements of various network conditions.  They cannot perform these measurements, however, when they are transmitting data.  Measurement pattern definitions transmitted by the base stations to the terminals instruct the terminals when they can create gaps in their data transmissions to perform the necessary measurements.  (*See* Ex. 2 at 10:60–11:6.)

The parties agree that the terms are governed by 35 U.S.C. § 112, ¶ 6.  For both terms, the parties dispute whether the specification discloses the requisite structure that is clearly linked to and necessary for performing either of the functions.  Although the specification discloses a general purpose microprocessor, it does not identify any specific algorithm for performing the claimed functions.  That "total omission of structure" is fatal to the claim.  *See Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.,* 412 F.3d 1291, 1298 (Fed. Cir. 2005).

### 1.   "processing means for arranging gaps in a time-slot frame according to the measurement pattern definitions" (Claim 11)

| Defendants' Construction | Plaintiff's Construction |
|---|---|
| Indefinite<br><br>Function: "arranging gaps in a time-slot frame according to the measurement pattern definitions"<br><br>Structure:   no   corresponding   structure | Function: arranging gaps in a time-slot frame according to the measurement pattern definitions<br><br>Structure:   a   processor,   controller,   or application   specific   integrated   circuit (10:34-52;   Fig.   6)   configured   to   apply |

---

[3] AT&T, Sprint, T-Mobile, Verizon, and Apple did not participate in any way in the IPRs.

2

| (algorithm) disclosed | transmission gap length (TGL), transmission gap distance (TGD), transmission gap pattern length (TGPL), and/or transmission gap period repetition count (TGPRC) parameters (5:53-67; 6:1-19; 6:20-7:3; 7:31-9:5; Fig. 3; Fig. 4A; Fig. 4B; Fig. 5), and equivalents. |
|---|---|

Under § 112, ¶ 6, the specification must disclose an algorithm to transform the general purpose processor, controller, or circuit into a special purpose computer able to perform the claimed function. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1338 (Fed. Cir. 2008). CCE maintains that the corresponding structure for the "processing means for arranging gaps…" element includes the specification's generic "processor, controller, or application specific integrated circuit." (Dkt. No. 277 at 17.) The disclosure of a generic processor, controller, or application specific integrated circuit does not satisfy the requirements of § 112, ¶ 6, however, because the corresponding structure must include an algorithm that runs on the identified generic computer hardware. No such algorithm is disclosed. (*See* Ex. 1 at ¶¶ 61–71.) With no identifiable structure, CCE wrongly asserts that the measurement pattern definition itself is an algorithm. CCE concedes that transmission gaps are "typically defined by [the] TGL, TGPL, TGD, and TGPRC parameters," but boldly claims that Figure 3 shows "how these TGL, TGPL, TGD, and TGPRC are ***used*** to define transmission gaps." (Dkt. No. 277 at 15 (emphasis added).) However, Figure 3—below—shows gaps that were ***already arranged***; "***how***" these gaps were arranged in practice in actual transmissions is entirely missing.



Fig. 3

(Ex. 2 at Fig. 3.) The disclosure of various parameters that may be ***used*** by an algorithm does not disclose ***how*** the algorithm uses the parameters, *i.e.*, it does not disclose the algorithm necessary to

carry out the claimed function.  *See, e.g.*, *Augme Techs.*, 755 F.3d at 1338 ("[The specification] discloses inputs to and outputs from the code assembler instructions, but does not include any algorithm for how the second code module is actually assembled.").

CCE's bare conclusion that "a person skilled in the art would understand that a processor would 'arrang[e] gaps in a time-slot frame according to the measurement pattern definitions' by ***applying*** [***i.e., using***] the TGL, TGD, TGPL, and/or TGPRC parameters" fails as a matter of law. (Dkt. No. 277 at 16 (emphasis added).)  The viewpoint of a person of ordinary skill in the art is only relevant where ***some*** algorithm is disclosed.  *Default Proof*, 412 F.3d at 1302.  In this case, ***no*** algorithm is disclosed—only parameters used by the undisclosed algorithm.  (*See* Ex. 1 at ¶¶ 63–77.)  Here, regardless of what one of ordinary skill would understand about the parameters, the specification's failure to disclose any algorithm using the parameters to perform the claimed function of "arranging gaps into the time-slot frame according to the measurement pattern definitions" [4] renders Claim 11 indefinite.  *See Blackboard, Inc. v. Desire2Learn Inc.*, 574 F.3d 1371, 1385 (Fed. Cir. 2009) ("That ordinarily skilled artisans ***could*** carry out the recited function in a variety of ways is precisely why claims written in 'means-plus-function' form ***must disclose the particular structure*** that is used to perform the recited function . . . [to avoid any attempt] to capture ***any possible means for achieving that end***.") (emphasis added).

CCE's proposed structure of "a processor, controller, or application specific integrated circuit . . . configured to apply transmission gap length (TGL), transmission gap distance (TGD), transmission gap pattern length (TGPL), and/or transmission gap period repetition count (TGPRC) parameters . . ., and equivalents" must also be rejected because 1) it introduces a new function into the claim ("configured to apply …") instead of identifying the structure performing the function

---

[4] CCE's contention that one of ordinary skill in the art could derive an algorithm corresponding to the processing means using the parameters disclosed in the patent, is more aptly directed to the enablement inquiry, rather than indefiniteness, inquiry, *i.e.*, whether a person of ordinary skill in the art could make or use the claimed invention in light of the disclosed parameters.  This would have no bearing on the present indefiniteness inquiries.  *See Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1319 (Fed. Cir. 2013) ("[I]t is well established that proving that a person of ordinary skill could devise some method to perform the function is not the proper inquiry as to definiteness—that inquiry goes to enablement.").

that is actually claimed and 2) it imports limitations into the claim by attempting to claim the parameters associated with the measurement pattern definition from a preferred embodiment. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (improper to import limitations from the specification into the claims).

> 2. **"the processing means are also arranged to set for the measurement pattern definition a delay according to the measurement pattern definitions" (Claim 11)**

| Defendants' Construction | Plaintiff's Construction |
|---|---|
| Indefinite<br><br>Function: "set[ting] for the measurement pattern definition a delay according to the measurement pattern definitions"<br><br>Construction for the function: "adapt[ing] the value of the delay in the measurement pattern definition according to the measurement pattern definitions"<br><br>Structure: no corresponding structure (algorithm) disclosed | Function: to set for the measurement pattern a delay according to the measurement pattern definitions<br><br>Structure: a processor, controller, or application specific integrated circuit (10:34-52; Fig. 6) configured to apply a connection frame number (CFN) and transmission gap starting slot number (TGSN) parameter combination specific to the terminal (5:46-53; 6:1-19; 7:4-30; 7:31-9:5; Fig. 5), and equivalents. |

> a. **The correct function is "set[ting] for the measurement pattern definition a delay according to the measurement pattern definitions."**

CCE asks the Court to broaden the scope of Claim 11 by changing the function from "set[ting] a delay for the measurement pattern *definition*" to merely "set[ting] … a delay … [for] the measurement pattern." (Dkt. No. 277 at 19.) That is, CCE asks the Court to delete the word "*definition*" from the phrase "the measurement pattern definition" of the function. "[A]ll claim terms are presumed to have meaning in a claim." *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004). The function of a means-plus-function element, however, must include the express limitations in the claim. *See Lockheed Martin Corp. v. Space Sys./Loral, Inc.,* 249 F.3d 1314, 1324 (Fed. Cir. 2001) (the scope of the function may not be "improperly broadened by ignoring the clear limitations contained in the claim language."). CCE's proposal provides no justification for modifying the term's function to broaden Claim 11.

Moreover, the term "measurement pattern" does not appear in the claim and CCE's use of "***the*** measurement pattern" lacks proper antecedent basis.  There is no basis for re-writing the claim as CCE proposes.  *See Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342–43 (Fed. Cir. 2008) ("The subsequent use of definite articles 'the' or 'said' in a claim . . . refer back to the same claim term . . . .").  Claim 11's use of the definite article "the" prior to "measurement pattern definition" indicates that this term refers back to the earlier "measurement pattern definition," rather than introducing a whole new term.  The Court should reject CCE's proposed, modified function because it improperly broadens the scope of the means plus function element.

### b. The function should be construed as "adapt[ing] the value of the delay in the measurement pattern definition according to the measurement pattern definitions."

The recited function, "set[ting] for the measurement pattern definition a delay according to the measurement pattern definitions," means "adapt[ing] the value of the delay in the measurement pattern definition according to the measurement pattern definitions."  The function imposes two express limitations:  (a) the means must set for the measurement pattern definition a delay, and (b) the means must set the delay according to the measurement pattern definitions.  The specification explains the meaning of "sets for the measurement pattern definition a delay":

> It is ***essential*** for the terminal of the invention that it comprises a receiver 620 for receiving the measurement pattern definitions transmitted by the fixed network, and processing means 630 for arranging the gaps into the time-slot frame according to the measurement pattern definitions and for ***adapting the delay*** according to the measurement pattern definitions for the measurement pattern.

(Ex. 2 at 10:34–41 (emphasis added).)  Where a patent discloses an "essential" operation, that operation limits the claim language.  *See Nikon Corp. v. ASM Litho. B.V.*, 308 F. Supp. 2d 1039, 1100 (N.D. Cal. 2004) (*citing Sunrace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1305 (Fed. Cir. 2003)).  CCE claims this "essential" functionality is "a ploy to focus on a sliver of the patent specification."  (Dkt. No. 277 at 19.)  However, construing a term in light of an "essential" disclosure is a well-accepted, mandatory claim construction principle.  *See, e.g., ATD Corp. v.*

6

*Lydall, Inc.*, 159 F.3d 534, 542 (Fed. Cir. 1998) (limiting claim language based on a feature that was described as essential to the invention).  CCE's proposed structure also relies on this same "essential" passage:  "a processor, controller, or application specific integrated circuit (10:34-52; Fig. 6)".  (Dkt. No. 277 at 14.)  By CCE's own admission, the "essential" functionality described in this passage clearly defines the scope of the disputed term.  Thus, the Court should adopt Defendants' construction that incorporates the explicit essential disclosure from the specification.

### c. The "processing means" limitations lack the corresponding structure that 35 U.S.C. § 112, ¶ 6 requires.

The specification suffers from the same deficiencies discussed in Section III.1 with respect to "the processing means are also arranged to set for the measurement pattern definition a delay according to the measurement pattern definitions."  The specification does not disclose the algorithm.  Instead, it merely states, "the invention is preferably implemented by software."  (Ex. 2 at 10:43.)  This is insufficient to transform the disclosed generic hardware into a special purpose computer capable of performing the claimed function.  *See Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1312 (Fed. Cir. 2012).  CCE's conclusion that "a skilled artisan would understand that the algorithm disclosed for 'set[ting] for the measurement pattern a delay according to the measurement pattern definition' is ***application*** [***i.e., usage***] of a CFN and TGSN parameter combination specific to the terminal" fails as a matter of law.  (*Id.* at 19 (emphasis added).)  "Appl[ying]" parameters is not an algorithm.  And CCE cannot rely on skill in the art to supply the missing algorithm.  *See Noah,* 675 F.3d at 1312.  Claim 11 is indefinite because the patent lacks corresponding structure for this claimed function.

### d. CCE's proposed structure is improper and should be rejected.

Regardless, the Court should reject CCE's proposed structure because it improperly injects a different function into Claim 11.  *Compare* Ex. 2 at 12:22–24 ("to set for the measurement pattern definition a delay according to the measurement pattern definitions"), *with* Dkt. No. 277 at 17 ("to ***apply*** [***i.e., use***] a connection frame number (CFN) and transmission gap starting slot number (TGSN) parameter combination specific to the terminal (5:46-53; 6:1-19; 7:4-30; 7:31–

7

9:5; Fig. 5), and equivalents" (emphasis added)).)  CCE's proposed structure is improper because it incorporates a different function that eliminates the claim limitation requiring a delay be set for the measurement pattern definition.  Moreover, CCE's proposed structure also improperly imports the limitation requiring the measurement pattern definitions to be "specific to the terminal."  CCE argues that this is appropriate because of the alleged importance of this feature.  (Dkt. No. 277 at 17–18.)  However, "[i]t is settled law that when a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim[.]"  *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1122 (Fed. Cir. 1985).  In this case, the patentee was acutely aware of this "important" limitation during prosecution, as evidenced by the language of Claims 1, 2, 5, 6, 8, and 14.  The patentee chose to forgo this limitation for Claim 11 and CCE chose to forgo asserting claims with this limitation.  CCE must live with the patentee's choice.  The Court should reject CCE's proposed structure.

## B.      '174 Patent

The '174 Patent concerns the manner by which subscriber stations (which the '174 Patent refers to as user equipment or "UE") preserve transmit power in a Universal Mobile Telephone System ("UMTS").  (*See* Ex. 3 at 4:26–28.)  In UMTS, the UEs must increase or decrease their transmit power based on commands received from the base stations.  (*Id.* at 4:41–46.)  The UEs, however, cannot exceed a maximum transmit power level, *id.* at 4:50–51, and therefore a problem arises if a UE is instructed to increase its transmit power when it has already reached its maximum level.  (*Id.* at 4:29–60).  According to the '174 Patent, a UE in this situation must abort the message transmission, which is undesirable as it wastes resources.  (*Id.* at 5:54–6:6.)

This is the sole problem the '174 Patent purports to address, and its proposed solution requires the UE to reserve a certain amount of transmit power for use during the transmission.  (*See id.* at 4:41–67, 8:61–66, 9:23–46.)  The alleged invention requires an "unused transmit power" to exist between the total transmit power and the maximum transmit power.  (*See id.* at 6:40–51, 8:50–63.)  This reserve allows the UE to increase its transmit power in response to the base station's commands without exceeding its maximum transmit power.  (*See id.*)

8

1.   **"a transmit power difference which is to be maintained" (Claims 1 and 18) / "maintaining a previously determined transmit power difference" (Claim 9)**

| Defendants' Construction | Plaintiff's Construction |
|---|---|
| "an unused transmit power that is required to exist" (Claims 1 and 18) | Plain and ordinary meaning; no construction necessary. |
| "a previously determined unused transmit power that is required to exist" (Claim 9) | |

Defendant's construction—"an unused transmit power that is required to exist"—is how the '174 Patent's specification defines this disputed term: "[t]he transmit power difference, which can be termed the 'power headroom', *is required to exist* between the total transmit power for the two codes DCH and EDCH at the start of the transmission of an EDCH message and the maximum transmit power for the two codes DCH and EDCH.   The transmit power difference thus *corresponds to an unused transmit power* at the start of the message transmission of an EDCH message."   (Ex. 3 at 6:42–49 (emphasis added).)   Defendant's construction is directly from the specification's explanation of the alleged invention.

As described above, the '174 Patent's solution to the problem of aborting transmissions was a power reserve, or unused transmit power which is required to exist, to allow the UE to increase its transmit power.   (*See id.* at 6:40–51, 8:50–63.)   Defendants' construction, thus, is supported by the sole problem identified and the provided solution to remedy that problem in the '174 Patent.   *See Every Penny Counts, Inc. v. Am. Express Co.*, 563 F.3d 1378 (Fed. Cir. 2009) (construing claim consistent with proposed solution in specification); *Realtime Data, LLC v. Packeteer, Inc.*, No. 6:08cv144-LED-JDL, 2009 U.S. Dist. LEXIS 109438 at *27–28 (E.D. Tex. Nov. 3, 2009) (construing term to solve "fundamental problem" identified).

CCE mischaracterizes Defendants' construction as requiring the transmit power difference to be "maintained exactly," and excluding embodiments allowing for maintenance of more than that minimum amount of reserved power.   (Dkt. No. 277 at 21).   However, Defendants' construction—an unused transmit power that is required to exist—is explicit in that it only requires

that a predetermined amount of unused transmit power exist, and does not preclude the existence of additional amounts of unused transmit power.  Thus, CCE's criticism is wrong.

CCE's contention that Defendants' construction "obliterates" the elements "which is to be maintained" and "maintaining a previously determined" from the claim language is also without merit.  (Dkt. No. 277 at 21.)  CCE misrepresents the patent's disclosure by selectively quoting the sole embodiment.  The portions of the specification that CCE excluded are below in italics:

> *In order to solve this problem, it is proposed that a transmit power difference which is to be maintained by the subscriber station UE be determined by the base station NODE B.  The transmit power difference, which can be termed the "power headroom",* is required to exist between the total transmit power for the two codes DCH and EDCH at the start of the transmission of an EDCH message and the maximum transmit power for the two codes DCH and EDCH.  The transmit power difference thus corresponds to an unused transmit power at the start of the transmission of an EDCH message.

(Ex. 3 at 4:40–49.)  CCE's argument that this portion of the specification somehow only applies to the "transmit power difference" and excludes claim language in this disputed term is misleading.  Defendants' construction tracks the specification and claim language, and is entirely consistent with the sole problem identified and solution proposed by the patentee.  Thus, Defendants' construction does not ignore, eliminate or render redundant any claim language.

Finally, the Court should reject CCE's contention that these phrases require no construction.  The term "a transmit power difference which is to be maintained" is not commonly used and its meaning would not be readily apparent to lay persons.  *See O2 Micro Int'l v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360–61 (Fed. Cir. 2008).  As described above, the UE's transmit power is regulated by power control commands from the base station and not by the UE.  Yet the transmit power difference is required by all of the claims "to be maintained by the subscriber station," *i.e.*, the UE.  Given this, CCE's "plain and ordinary meaning" position for the proposed term is tenuous—especially in light of the specification's clear guidance that this term "corresponds to an unused transmit power" that is "required to exist."

The Court should construe "a transmit power difference which is to be maintained" as "an unused transmit power that is required to exist" and construe "maintaining a previously determined transmit power difference," as "a previously determined unused transmit power that is required to exist."

### C.  '820 Patent

The '820 Patent relates to a system and methods for increasing buffer status reporting efficiency and adapting buffer status reporting according to uplink capacity.  To convey its needs for resources to the network, a user device can report a data buffer status report.  (Ex. 4 at 8:66–9:5.)  The '820 Patent discloses two distinct types of buffer status reports—a long format and a short format.  (*Id.* at 1:53–55.)  In certain embodiments, a designating unit designates which format should be used.  (*Id.* at 1:60–2:2.)

### 1.  "the designating unit" (Claim 12)

| Defendants' Construction | Plaintiff's Construction |
| --- | --- |
| <u>Indefinite</u> | "the memory, processor, and computer program code configured to designate" (not subject to 112(6)). |
| This is a means-plus-function element to be construed in accordance with 35 U.S.C. § 112, ¶ 6. | Alternatively, should the Court determine this is a means-plus-function claim element subject to 35 U.S.C. 112(6): |
| <u>Function:</u> "designat[ing] the long buffer status reporting format when there is sufficient uplink bandwidth to communicate using the long buffer status reporting format." | <u>Function:</u> "designating the long buffer status reporting format when there is sufficient uplink bandwidth to communicate using the long buffer status reporting format" |
| <u>Structure:</u> no corresponding structure disclosed. | Structure: a VLSI circuit, semiconductor, or processor (7:15-24, FIG. 2) configured to assign a buffer status reporting format depending on the preselected condition detected and uplink bandwidth, and/or buffer priority, (FIGS. 2-4; 6:1-42; 7:58-8:1; 8:17-39; 10:29-44), and equivalents |

The term "the designating unit" and the claimed function that follows make it subject to the requirements of § 112, ¶ 6.  This is because it recites a function without providing sufficient

11

structure for performing that function.  The term itself simply consists of a nonce word ("unit") with an adjectival modifier ("designating") and thus cannot connote sufficient structure.  To address this deficiency, CCE seeks to have the Court remove "the designating unit" term from Claim 12 altogether via an unwarranted "correction" that CCE couches as the "correct construction."  Because the claim language and the specification raise a reasonable debate as to the proper correction, however, it would be improper for the Court to "correct" Claim 12.

### a.     The Term "Designating Unit" Is Subject To § 112, ¶ 6.

While claim elements that do not contain the term "means" are presumed not to be in means-plus-function form, this presumption can be rebutted if the claim term "recites 'function without reciting sufficient structure for performing that function.'"  *Mass. Inst. of Tech. v. Abacus Software*, 462 F.3d 1344, 1353 (Fed. Cir. 2006).  In particular, "nonce word[s]"—that is, "verbal construct[s] that [are] not recognized as the name of [the] structure and [are] simply a substitute for the term 'means for'"—cannot provide the legally-required structure.  *Id.* at 1354.

Claim 12 is subject to means-plus-function treatment because it recites a function without providing sufficient structure for performing that function.  Claim 12 merely recites the words "designating unit" followed by the function that it is to perform:  "designate the long buffer status reporting format when there is sufficient uplink bandwidth to communicate using the long buffer status reporting format."  Nothing in Claim 12 recites sufficient structure to perform this function.

The term "unit" is a generic "nonce" word that can refer to almost any element in a communications system, "is not recognized as the name of structure," and thus provides no information as to what structure or class of structures is contemplated.  Indeed, the specification emphasizes that the claimed "units," such as the "designating unit," are functional:  "[m]any of the *functional units* described in this specification have been labeled as units, in order to more particularly emphasize their *implementation independence*."  (Ex. 4 at 7:13–26 (emphasis added).)  The Federal Circuit has previously identified similar "generic structural terms" ("mechanism," "means," "element," and "device") as terms that do not connote sufficient structure and are subject to means-plus-function treatment.  *Mass.*, 462 F.3d at 1354–56 (Fed. Cir. 2006).

12

The fact that Claim 12 modifies its "unit" with the word "designating" does not change this result.  Adjectival modifiers undefined by the specification that lack a well-understood structural meaning in the art do not remove a claim element from means-plus-function treatment.  *See Mass.*, 462 F.3d at 1343; *see also Mas-Hamilton Grp. v. LaGard, Inc.*, 156 F.3d 1206, 1214 (Fed. Cir. 1998).  Here, the specification does not associate a structure or class of structures with the term "designating unit."  And this term is not commonly used in the communications field and has no generally known or accepted structural meaning or implication.  (Ex. 1 at ¶¶ 118–20.)  These words amount to nothing more than an undefined module, that is, a "unit," that performs some sort of "designating" function.  Thus, the term "designating unit" is subject to § 112, ¶ 6.

Besides relying on the presumption rebutted above, CCE simply concludes that § 112, ¶ 6 does not apply to "the designating unit" because there is no evidence that the patentee intended to draft Claim 12 using functional language.  CCE's only support for its conclusion is to analogize to Claim 23, which uses means-plus-function language, and to argue that the patentee "knew how to invoke § 112(6) when they intended to do so."[5]  (Dkt. No. 277 at 26.)  The Federal Circuit has stated, however, that "claim drafters can also use different terms to define the exact same subject matter."  *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006).  The specification, as discussed above, shows that the patentee intended "designating unit" to be a purely functional identification.  (*See* Ex. 4 at 7:13–26.)  Both the patentee and the Examiner operated with this understanding during prosecution.

While rejecting Claim 24 (Prosecution Claim 27), the Examiner drew a parallel between the functional "means" and "units" language, stating: "[a]pplicant's specification has described the functions of each of the 'means' for performing the specified functions as being performed by 'units.'"  (Ex. 5, Feb. 2, 2011 Final Rejection at 3.)  The Examiner also rejected Claims 12 and 24 as "being directed towards software per se."  (Ex. 6, Sept. 30, 2010 Rejection at 4–5.)  The patentee did not contest the Examiner's understanding of "unit" but narrowed the claim by replacing

_____

[5] To support its position, CCE also makes reference to Defendants' 4-2 Statement.  (Dkt. No. 277 at 27.)  Such a reference is improper and should not be relied upon by the Court. *See* P.R. 2-4.

"units" with actual structure, but for the "designating unit."  (*See* Ex.7, May 10, 2011 Response at 5–6.)

### b.   The '820 Patent Specification Fails To Clearly Link Sufficient Structure To The "Designating Unit" Function.

CCE argues that there is structure corresponding to the "designating unit."  Contrary to CCE's assertion, the specification fails to clearly link or associate any structure or class of structures with the "designating unit" or its function:  "designat[ing] the long buffer status reporting format when there is sufficient uplink bandwidth to communicate using the long buffer status reporting format."  Indeed, almost all the references to the term "designating unit" in the specification are explicitly functional: they describe the "designating unit" in terms of what it does, is "configured to" do, or "cooperates" or "collaborates with" other units to do.  (*See*, *e.g.*, Ex. 4 at 1:60–62, 1:64–2:2, 2:20–22, 6:21–35.)  The remaining references simply refer to element 260 of Figure 2, which is a generic, unadorned, square box that provides no structural information whatsoever.

Indeed, the only physical structures CCE identifies are (1) a VLSI circuit, (2) a semiconductor, and (3) a processor.  (Dkt. No. 277 at 27.)  But these generic structures can implement ***any*** of the many "functional units" described in the patent. (Ex. 4 at 7:13–36.)  None alone is sufficient structure to perform the claimed function.  (Ex. 1 at ¶¶ 124, 127.)  To suffice, these structures would have to be transformed into a specific-purpose device that can carry out the claimed function.  *See Aristocrat,* 521 F.3d at 1331–32.

CCE acknowledges that an algorithm is required in order for there to be sufficient structure for this function.  (Dkt. No. 277 at 27.)  To meet that requirement, however, CCE merely points to Figures 2-4 (and the accompanying description) as disclosing that algorithm.  (*Id.*)  But each of these high-level figures describes "one embodiment of the present invention," of which the "designating unit" is only a small portion.  (*See* Ex. 4 at 5:59–60, 7:50–51, 8:6–7.)  These figures and their accompanying descriptions fail to provide any structural details for the designating unit or any specific algorithm for performing its claimed function.  (Ex. 1 at ¶¶ 128–33.)  Although

CCE also highlights and quotes one other particular portion of the specification (Ex. 4 at 6:10-36), again that section fails to describe any algorithm that performs the claimed "designating" function. (Dkt. No. 277 at 27; Ex. 1 at ¶ 123.)  CCE has failed to establish that there is sufficient structure disclosed in the specification for "the designating unit's" function.  Claim 12 is indefinite and thus invalid.

        **c.**        **CCE's Proposed Construction For "The Designating Unit" Is A Complete Redraft That Finds No Support In The Specification Or Any Of The Intrinsic Record.**

CCE seeks to redraft the claim by replacing the term with a phrase that recites the structure it lacks, presumably in an attempt to avoid means-plus-function treatment under 35 U.S.C. § 112, ¶ 6.  However, "[t]he Federal Circuit consistently recognizes 'that courts may not redraft claims, whether to make them operable or to sustain their validity.'"  *Cell & Network Selection LLC v. AT&T Inc.*, No. 6:13-CV-403, 2014 U.S. Dist. LEXIS 100248 at *40 (E.D. Tex. May 2, 2014). That is exactly what CCE seeks to do here.  Specifically, CCE asserts that because "designating unit" is part of a "wherein" clause it must somehow refer back to, and should be construed as, a combination of the language found in various portions of Claim 12 (for example, "processor" first occurs in the first limitation, "memory" and "computer code configured to" in the second, and "designate" later as an action performed by the apparatus).

However, CCE does not even attempt to support its construction with the specification—the "single best guide to the meaning of a disputed term."  *Phillips*, 415 F.3d at 1315.  Notably, the only structural, non-functional disclosure in the specification tied to the "designating unit" is box 260 in Figure 2, labeled "Format Designating Unit <u>260</u>."  (*See* Ex. 4 at Fig. 2.)  Further, the '820 specification describes a "unit" as "functional" and is "implementation independen[t]."  (*Id.* at 7:13–26.)

CCE's file-history arguments are also unpersuasive.  CCE speculates that "[the applicant's Dec. 2, 2010] amendment clearly shows that 'the designating unit' is an artifact of prosecution, and the applicants never intended 'the designating unit' to constitute a new element or invoke § 112(6)."  (Dkt. No. 277 at 25.)  However, the patentee amended Claim 12, yet chose to claim the

functional "designating unit." There is no evidence to support an interpretation that this amendment was unintentional. Under Federal Circuit precedent, a patentee is bound by his choice and must endure any consequences—intended or not. *See Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004).

Finally, CCE argues that there was an "obvious, minor error" as a basis to redraft the claim. Absent a clear error on the face of the patent—which is not the case here with the term "designating unit"—the Court cannot correct the claim. *See, e.g., Tele-Cons, Inc. v.* GE, No. 6:10cv451 LED-JDL, 2012 U.S. Dist. LEXIS 106658, *42–45 (E. D. Tex July 31, 2012). Moreover, the Court can only correct such a clear error if "the correction is not subject to reasonable debate based on consideration of the claim language and the specification." *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1354 (Fed. Cir. 2003). Further, an easy way to correct the error would be simply to replace "*the* designating unit" with "*a* designating unit." Because CCE's correction argument, which seeks to redraft "the designating unit" "to refer back to the 'designating' element recited previously in the claim," is certainly subject to reasonable debate, the Court lacks the authority to make such a correction. (Dkt. No. 277 at 25); *see Novo Indus.*, 350 F.3d at 1358 (reversing because the district court did not have the authority to correct "a" to "and").

### D. '8923 Patent

The '8923 Patent relates to a mechanism and method for controlling the behavior of messages sent by applications within a terminal. The '8923 Patent praised the emergence of open development platforms as ushering in a new era of services and applications for the multimedia environment. However, the '8923 Patent was concerned that these open development platforms enabled fraudulent applications to misuse the communication environment. The '8923 Patent sought to eliminate this issue by "ascertaining [whether] the applications developed for the open platform behave in an appropriate and rightful manner." (Ex. 8 at 1:39–43.)

The alleged invention includes a diverting unit, which routes some of an application's outgoing messages to a separate controlling entity before they are sent out to the network. (*See id.*

at 10:62–65.)  This separate controlling entity houses the control mechanisms.  For instance, the controlling entity is configured with a set of predetermined parameters which determine whether the application that sent the outgoing message should behave in a certain manner.  (*See id.* at 10:66–11:5.)  The diverting unit can also be configured with parameters to accomplish a number of effects, including, but not limited to:  checking the rights of the application program to send messages to the network, adding an additional identifier to the message, or adding a digital signature for authentication to the message.  (*See id.* at 1:67–2:3, 2:58–62.)

> **1.     "a diverting unit configured to divert a message of the messages sent from the application program and destined for the communication network" (Claim 24)**

| Defendants' Construction | Plaintiff's Construction |
|---|---|
| "a diverting unit configured to redirect a message of the messages sent from the application program and destined for the communication network from the path it would have taken if not redirected onto an alternate path" | Plain and ordinary meaning; no construction necessary. |

Defendants' construction defines the scope of "diverting."  As explained above, the premise of the '8923 Patent is an application sending messages to the network.  In order to accomplish this operation, the application utilizes a network stack to simplify the process.  (*See, e.g.*, Ex. 4 at 4:2–4 ("The applications access the network through a protocol stack 220, which is a Session Initiation Protocol (SIP) stack in this environment.").)  Without the "diverting unit" redirecting one or more of the messages, the protocol stack sends the messages to the network.  (*See, e.g.*, *id.* at 5:5–8 ("If the response at step 6 from the application repository is negative, ***the protocol stack transmits the INVITE request directly to the network***, i.e. the INVITE *request is not sent to the trusted agent*." (emphasis added)).)  However, when the "diverting unit . . . divert[s] a message of the messages," the message is not transmitted to the network.  Instead, it is redirected on an alternate path to the controlling entity.  In other words, the message is no longer following the path it would have taken if it were not redirected.

17

A simple hypothetical using Figure 2 is illustrative.  The figure on the left includes a red arrow illustrating a message traversing its normal path (without redirection), such as the Invite request described at 5:5–8.  (*See, e.g.*, *id.* at 5:5–8 ("If the response at step 6 from the application repository is negative, the protocol stack transmits the INVITE request directly to the network, i.e. the INVITE ***request is not sent to the trusted agent***." (emphasis added)).)  The figure on the right includes a red arrow illustrating a message being redirected from the path it would have taken (*i.e.*, the normal path) if not redirected onto the alternate path.  If it weren't redirected, it would have followed the path illustrated on the left figure.



**"Normal" Path**



**"Alternate" Path**

CCE agrees that the diverting unit redirects the message.  During an IPR for the '8923 Patent, CCE argued that "***divert[ing]*** a message of the messages . . ." should be construed as "***redirecting*** a message of the messages . . . ."  (*See* Ex. 9 at 16 (emphasis added).)  The "broadest reasonable construction" standard applied in the IPRs puts a ceiling on the breadth that CCE can now claim before this Court.  If CCE argues for a broader construction here, as it has, that construction is by definition improper.  Thus, CCE's proposed "plain and ordinary" construction fails.

CCE further confuses the issue by introducing concepts of physical and logical paths.  Figures 2, 6, 7, and 8 all illustrate paths that messages take in different embodiments.  Notably, the '8923 Patent does not identify whether these are physical paths or logical paths.  Rather, the focus is on whether the message would have traversed the same path had it not been redirected.  (*See, e.g.*, Ex. 8 at 1:59–63 ("In the present invention, the control mechanisms rest on a ***separate***

controlling entity residing in a terminal. At least some of the outbound messages generated by an application in a terminal are **_diverted_** to the controlling entity **_on their way from the application to the network_**." (emphasis added)).) Otherwise, if the message can traverse the same path whether or not it is redirected, the "diverting" limitation is improperly rendered superfluous. *See Hyperion Solutions Corp., v. Outlooksoft Corp.*, 422 F. Supp. 2d 760, 772 (E.D. Tex. 2006) ("Bedrock principles of claim construction counsel against a construction that renders additional limitations superfluous.").

According to CCE's infringement contentions, CCE's interpretation of the "plain and ordinary meaning" includes operations where the messages always traverse the same path. (Ex. 10, Plaintiff's First Supplemental Disclosure of Asserted Claims and Infringement Contentions, Ex. F at 2.) In other words, CCE's "plain and ordinary meaning" does not require diverting at all. CCE interprets the "plain and ordinary meaning" of "diverting" to include the mere sending of a message from one component to another, regardless of whether the message is diverted. Defendants' construction, on the other hand, defines this term as used in Claim 24 and avoids any further dispute regarding CCE's interpretation of the "plain and ordinary meaning" of diverting. Accordingly, the Court should adopt Defendants' proposed construction.

### 2. "based on the message" (Claim 24)

| Defendants' Construction | Plaintiff's Construction |
|---|---|
| "based on the contents of the message" | Plain and ordinary meaning; no construction necessary. |

Defendants' proposed construction resolves an ambiguity in claim scope that should be decided by the Court, rather than the jury. *See O2 Micro* , 521 F.3d at 1361–62; *Every Penny*, 563 F.3d at 1383. Consistent with the intrinsic evidence, Defendants' construction clarifies that controlling the behavior of an application "based on the message" sent by that application requires an examination of the message's content, rather than the mere existence of such a message or the fact that such a message was sent. As explained below, the specification sets out two distinct embodiments: one where a controlling entity makes decisions based on **an examination of a**

19

**message** sent by an application; the other where the controlling entity makes decisions based on analysis of **the behavior of the application itself**.  It is this first embodiment to which the "based on message" claim language is directed.

The specification explains that, in the first embodiment, the content of the message is *examined* (at step 8) and a decision is made by the controlling entity based on that examination. (*See* Ex. 8 at 4:46–5:4 (describing the first embodiment controlling an application based on its examination of message contents for an "INVITE request" in the description for step 8:  "The trusted agent [*i.e.,* the controlling entity (*see, e.g.*, *id.* at 2:9–10)] then **examines the request** and checks, [*sic*] whether the application behaves as it should be behaving (step 8).") (Ex. 8 at 4:61– 63); *see also* Dkt. No. 277 at 30 (citing to the first embodiment).)  In other words, the controlling entity analyzes the **content** of the message—as opposed to some aspect of the application's operation—to determine if the application is behaving as it should.  The specification then discloses a second embodiment where, the trusted agent (*i.e.,* the controlling entity) examines the behavior of the application itself, rather the content of the message, to determine if the application is behaving as it should.  (*See* Ex. 8 at 6:27–48 (describing the second embodiment controlling an application with *policy rules set by an operator* and noting the exception for step 8: "The operation of the terminal corresponds to that described in connection with FIGS. 2 and 3 [as described in conjunction with the first embodiment], **except that in this embodiment the trusted agent compares the behavior of the application to the policy rules at step 8.**") (emphasis added).)

Asserted Claim 24 (and claims dependent on it) is directed to the first embodiment, as the claim language requires that the controlling entity make a decision "based on the message."  Indeed, CCE concedes that an analysis of the message is required (Dkt. No. 277 at 30), but then improperly conflates the two embodiments, suggesting that the "controlling entity examines the message . . . as well as the behavior of the application."  This argument fails because it ignores the central distinction made in the specification between the two embodiments.

CCE's argument that Defendants' construction limits the controlling entity's analysis of the message to the "payload" is similarly flawed.  Defendants' construction calls for no more than

that disclosed in the specification and clarified during prosecution[6]—that the contents of the message is "*examined*" by the controlling entity, in order to determine whether the application is behaving as it should—without placing any limits on the portion of the message that is examined. (*See* Ex. 8 at 4:46–5:4.)

Finally, CCE's argument that Defendants' construction should be rejected because it is different from the construction advanced in one of the *inter partes* petitions for the '8923 Patent is equally unavailing.  (Dkt. No. 277 at 30.)  As discussed above, even if the construction for this term in an *inter partes* petition is broader than Defendants' construction here, that difference would be entirely proper.  *Inter partes* proceedings employ a "*broadest reasonable construction*" construction standard, unlike in district court.  And in any event, no construction of the term "based on the message" was proposed in the IPR cited by CCE.  Rather, a construction for the longer term "based on the message, control[ling] . . . whether the application behaves in a predetermined manner" was proposed, and that construction included the phrase "based on a message."

The Court should construe "based on the message" as "based on the contents of the message."

### E.       '9923 Patent

The '9923 Patent is directed to reducing network resources for transmission of "neighbor cell information messages" periodically informing mobile devices about nearby base stations. (Ex. 12 at 1:34–67, 2:2–10.)  Specifically, to shorten the time required for the communication of the messages and to save the transmission capacity of signaling channels used for transmitting the

---

[6] During prosecution, the patentee amended Claim 24 to "more particularly point out and distinctly claim the invention" by adding, *inter alia*, that "the controlling entity is configured to control, based on the message … ." (Ex. 11, '8923 Patent File History, June 2, 2006 Amendment at 8, 13 (underlined portion added).) The patentee used this amendment to distinguish prior art, informing the examiner that prior art (Quine) failed to control the application program based on examination of the message. (*id.*, '8923 Patent File History, June 2, 2006 Amendment at 17 ("Claim 24 recites 'wherein the controlling entity is configured to control, based on the message and before the message is transmitted to the communication network, whether the application program behaves in a predetermined manner in the communication terminal.'… Accordingly, Quine cannot disclose the above identified features of claim[] 24.").)

messages, the patent describes removing redundant information in the neighbor cell information messages and repeating the redundant values only once.  (*Id.* at  2:2–22.)

The parties agree that the disputed terms are to be construed in accordance with 35 U.S.C. § 112, ¶ 6.  The parties also agree on the function of the terms.  The parties dispute whether the specification discloses structures corresponding to the claimed functions.  The specification, however, fails to disclose any structure in the form of a specific algorithm that is clearly linked to and necessary for performing either of the claimed "receiving" or "associating" functions.  Although the specification discloses a general purpose microprocessor, the specification does not identify any specific algorithm for performing the claimed functions.  (*See* Ex. 1 at ¶¶ 156–70, 175–90.)  Such a "total omission of structure" is fatal to the claim.  *See Default Proof*, 412 F.3d at 1298.  Claim 11 is therefore indefinite and thus invalid.

### 1. "means for receiving a neighbor cell information message" (Claim 11)

| Defendants' Construction | Plaintiff's Construction |
|---|---|
| Indefinite<br><br>Function:  "receiving  a  neighbor  cell information message"<br><br>Structure:  no  corresponding  structure (algorithm) disclosed | Function:  receiving  a  neighbor  cell information message<br><br>Structure:  an  antenna,  a  receiver,  and  a microprocessor (1:34-47; 2:4-7; 6:19-61; Fig. 7),  and  equivalents  thereof  (no  special algorithm required) |

#### a. The "means for receiving" limitations lacks the corresponding structure that 35 U.S.C. § 112, ¶ 6 requires.

The '9923 Patent discloses nothing more than a vague reference to "software programs" that must be implemented in a black box as the structure corresponding to the "means for receiving" limitation.  "A structure disclosed in the specification qualifies as a 'corresponding structure' if the specification or the prosecution history 'clearly links or associates that structure to the function recited in the claim.'"  *See Noah*, 675 F.3d at 1311.  The specification "clearly links" the claimed function—"receiving a neighbor cell information message"—to "means 410" shown in Figure 7.  (Ex. 12 at 6:41–44 ("According to the invention, a mobile communication means 10

further comprises at least a) means 410 *for receiving a neighbor cell information message* ….” (emphasis added)); *see also* Ex. 1 at ¶¶ 175, 186–87.).)

The specification goes on to explain that “means 410” constitutes “software programs . . . being executed by a microprocessor.”  (Ex. 12 at 6:57–60.)  But disclosing that means 410 constitutes a generic software program “‘without providing some detail about the means to accomplish the function, is not enough.’”  *See Noah*, 675 F.3d at 1312  (citing *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008)).  The specification provides no detail regarding this generic software program or its underlying algorithm.  (Ex. 1 at ¶¶ 174–90.)  Accordingly, Claim 11 is indefinite and thus invalid.  *See Aristocrat*, 521 F.3d at 1338.

### b.   CCE's proposed structure is improper and should be rejected.

CCE's proposed structure improperly attempts to read an antenna and receiver into the structure as well as a microprocessor.  (Dkt. No. 277 at 5.)  “To meet the definiteness requirement, structure disclosed in the specification must be clearly linked to and capable of performing the function claimed by the means-plus-function limitation.”  *Default Proof*, 412 F.3d at 1299.  The patent unambiguously and expressly defines the “means 410 for receiving a neighbor cell information message” as corresponding to “software programs stored in a memory element of a control block 490.”  (Ex. 12 at 6:43–44, 6:57–61.)

The specification does not link the antenna, receiver, and microprocessor as the structure corresponding to the claimed function.  According to the specification, the receiver of CCE's alleged corresponding structure filters, amplifies, converts, demodulates, and decodes the received *signal*—it has no disclosed involvement with the *neighbor cell information message*.  (*See id.* at 6:19–27; Ex. 1 at ¶¶ 181.)  The antenna of CCE's alleged corresponding structure is not associated with any function at all.  (*See* Ex. 12 at 6:33–34 (“The mobile communication means further comprises an antenna 498 ….” with no disclosed functionality.); Ex. 183 at ¶ 183.)  And the specification merely states that the microprocessor of CCE's alleged corresponding structure executes software programs—not that it receives a *neighbor cell information message*.  *See* Ex. 12 at 6:5–8 (“the programs being executed by a microprocessor of the control unit”), 6:57–61 (“the

programs being executed by a microprocessor of the control block 490"). Although these components (an antenna, a receiver, and a microprocessor) may generally receive signals, the claimed function is not merely "receiving," but "receiving *a neighbor cell information message*." (*See* Ex. 1 at ¶¶ 186–87.) Further, the antenna and receiver are described as being separate and distinct from the "means 410 *for receiving a neighbor cell information message*." (*Compare* Ex. 12 at 6:19–27 (describing the receiver), *and* 6:33-34 (describing the antenna), *with* 6:40–61 (describing "means 410 for receiving a neighbor cell information message" and "realized using software programs . . . being executed by a microprocessor").)

To support its proposed structure, CCE relies on mere suppositions and conclusions that the antenna and receiver also help "receive" messages and are linked to the "means for receiving" 410. (Dkt. No. 277 at 5–6.) It is improper to include "as structures the types of connections over which the transmission could occur" where the structure that corresponds to the function is "software, not hardware," such as the means 410 that are clearly linked to the claimed function and "realized [by] using [non-disclosed] software programs." (Ex. 12 at 6:57–61.); *Function Media*, 708 F.3d at 1318–19. Moreover, it is improper to import structures into the claim language that do not clearly correspond to the claimed function. *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1113, 1116 (Fed. Cir. 2002). Thus, the Court should reject CCE's proposed function that improperly incorporates "an antenna, a receiver, and a microprocessor."

CCE's alternative argument that no algorithm is necessary because "'receiving' a message is so basic that it may be performed by any general-purpose computer, and no special algorithm is necessary" fails for the same reasons. (Dkt. No. 277 at 7.) As discussed above, the specification expressly links "means 410 for receiving *a neighbor cell information message*" to "software programs" executed by a general purpose microprocessor. (Ex. 12 at 6:56-61.) Thus, the structure is not the generic microprocessor, but the software programs executed by it. The specification, however, fails to describe any details about these software programs and discloses no algorithm to perform the claimed function. (*See* Ex. 1 at ¶¶ 174–90.)

Moreover, CCE's reliance on *In re Katz* and its progeny is misplaced. CCE "interpretation" of *In re Katz* is incorrect. Indeed, multiple claims were invalidated in *In re Katz* because their specifications failed to disclose an algorithm. *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1315 (Fed. Cir. 2011). *In re Katz* and its progeny are a "narrow exception" to traditional Federal Circuit case law cited "only in situations involving functions that can be accomplished by any general purpose computer without special programming." *Noah*, 675 F.3d at 1312 n.8. *In re Katz* does not apply if the claim requires, as it does here, "specific functions that would need to be implemented by programming a general purpose computer to convert it into a special purpose computer capable of performing those specified functions." *In re Katz*, 639 F.3d at 1316. The claims in this case are more akin to those addressed in *Function Media*, where the Federal Circuit held that the limitation "means for transmitting said presentations to a selected media venue of the media venues" required the disclosure of an algorithm for performing the claimed function. 708 F.3d at 1317-18. Similar to the claims in *Function Media*, Claim 11 of the '9923 Patent requires the specific function of receiving a particular type of message, and the failure to disclose an algorithm for performing this function is fatal to that claim.

If CCE's argument were true, one should be able to purchase any computer from Best Buy and have it perform the entire "receiving a neighbor cell information message" function without any further programming. No general purpose computer could accomplish this without special programming. Furthermore, the patent itself states that the claimed function is not performed by a general purpose computer. Instead, the "means 410 for receiving a neighbor cell information message . . . are realized using software programs." Accordingly, the Court should reject CCE's proposed function for the "means for receiving" term of Claim 11.

> **2.** **"means for associating a specific value of said set of specific parameter values indicated by one of said index with the corresponding second parameter of a neighbor cell" (Claim 11)**

| Defendants' Construction | Plaintiff's Construction |
|---|---|
| Indefinite | Function: associating a specific value of said set of specific parameter values indicated by one of said index with the corresponding second parameter of a |
| Function: "associating a specific value of | index with the corresponding second parameter of a |

| said set of specific parameter values indicated by one of said index with the corresponding second parameter of a neighbor cell" <br><br> Structure:  no corresponding structure (algorithm) disclosed | neighbor cell <br><br> Structure:  a microprocessor (6:57-61; Fig.  7) configured to use a parameter (or set of parameters) specified by an index (or pointer) for a parameter of a neighbor cell (2:15-28; 2:35-43; 3:4-26; 4:11-5:17; 5:35-46; 7:39-49; Figs. 2-5), and equivalents thereof |
|---|---|

      a.      **The "means for associating" limitation lacks the corresponding structure that 35 U.S.C. § 112, ¶ 6 requires.**

The '9923 Patent fails to disclose sufficient structure for performing the "means for associating" function for reasons similar to those discussed above with respect to the "means for receiving" limitation.   As discussed above, the specification "clearly links" the claimed function—"associating a specific value of said set of specific parameter values indicated by one of said index with the corresponding second parameter of a neighbor cell"—to "means 420" shown in Figure 7.  (Ex. 12 at 6:41–42, 6:51–54 ("According to the invention, a mobile communication means 10 further comprises at least . . . b) means 420 *for associating a value of said set of parameter values indicated by one of said second values with the corresponding parameter of a neighbor cell*." (emphasis added)); *see also* Ex. 1 at ¶ 156.)  The specification then describes "means 420" as "realized using software programs stored in a memory element of a control block 490 . . ., the programs being executed by a microprocessor of the control block 490."  (Ex. 12 at 6:57–61.)  Despite linking the claimed function to "software programs . . . being executed by a microprocessor," the specification fails to disclose any algorithm that describes *how* the software performs that function.  (*Id.* at 6:41–61; *see also* Ex. 1 at ¶¶ 156–70.)

CCE's illustration linking Figures 2–5 in its opening *Markman* brief does not provide the requisite algorithm.  (*See* Ex. 13, '689 Application, Response to Office Action 10 (May 3, 2004); Dkt. No. 277 at 9; Ex. 1 at ¶¶ 155–69.)  Rather, those figures are merely the content of the "neighbor cell information message" that is received by the "means for receiving" and used by the "means for associating."  (*Id.*)  Neither these figures, nor the specification, disclose how a general purpose computer is to go about using, accessing, or associating the data *within* the message.  (*Id.*)  The mere disclosure of an input, *i.e.*, the "neighbor cell information message," is insufficient to

26

transform the general purpose microprocessor into a special purpose computer capable of performing the claimed function.  *See, e.g., id.; Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*, 732 F.3d 1376, 1382 (Fed. Cir. 2013) (finding that table of inputs "without specifying any single formula or function or algorithm defining the contribution of any of the inputs" failed to sufficiently disclose an algorithm).

CCE concedes that the disclosed general purpose microprocessor could not accomplish the claimed function without being programmed with a specific algorithm to perform that function. (Dkt. No. 277 at 8 (proposing that the corresponding structure is a "microprocessor … configured to use a parameter (or set of parameters) specified by an index (or pointer) for a parameter of a neighbor cell …, and equivalents thereof."), 10 ("The patent explains that the structure corresponding to this function includes means 420 'for associating . . .,' which may be realized using 'software programs . . . executed by a microprocessor of control block 490. '").)  CCE's expert similarly concludes that a person of ordinary skill in the art "would understand these passages [referring to the '9923 Patent at 6:41–61] to disclose a microprocessor for performing the 'associating function' recited in claim 11."  (Dkt. No. 277-1 at ¶ 86.)  However, a proposed structure that "simply references a computer that is programmed so that it performs the function in question" is insufficient.  *Aristocrat*, 521 F.3d at 1334.  Moreover, CCE's conclusion contradicts the specification, which states, "means . . . 420 [is] realized using software programs stored in the memory element of a control block 490."  (Ex. 12 at 6:57–61.)

CCE insists, however, that "the algorithm disclosed for performing this function is simple: *using* the parameter value specified by the index for the second parameter."  (Dkt. No. 277 at 10 (emphasis added).)  Despite CCE's claim that the alleged algorithm is "simple," CCE goes to great lengths on pages 9–11 of its opening brief to try to explain the function of the software. Ultimately, CCE insists that the algorithm is just the claimed function itself—associating a specific parameter value indicated by the index with the second parameter is exactly the same as merely using in some undisclosed way the parameter value specified by the index for the second parameter.  (Dkt. No. 277-1 at ¶ 88.)  But, as discussed above, the law is clear that the specification

"must disclose *some* algorithm; it cannot merely restate the function recited in the claim *Augme Techs.,*755 F.3d at1337 (emphasis in original).

To try to explain the absence of the required algorithm, CCE relies on its expert, who asserts that "[t]his algorithm is apparent from the claim language, which recites 'an index for a second parameter, said index indicating which value of said set of specific parameter values is used for said second parameter.'" (Dkt. No. 277-1 at ¶ 88.) First, an index is not an algorithm, and "using" a value does not specify the algorithm of *how* the value is used. (*Id.* at ¶ 88; Ex. 1 at ¶¶ 166–69.) Second, as with its similar argument with respect to the '019 Patent, by citing to index values corresponding to parameters as providing the alleged structure, CCE attempts to claim the index values themselves rather than any means for associating the index values to parameters, thus impermissibly reading out the claimed means elements and expanding the scope of the claimed invention. *Merck & Co. v. Teva Pharms. USA, Inc., 395 F.3d 1364, 1372 (Fed. Cir. 2005)..* Moreover, CCE cannot manufacture an algorithm through expert testimony, especially when the expert relies solely on the claim language itself. *See Noah*, 675 F.3d at 1312. The proper inquiry focuses on whether the specification actually discloses an algorithm, not whether a person of ordinary skill in the art might have been able to devise one. *See Function Media* 708 F.3d at 1319; *Mobile Telecomms. Techs., LLC*, No. 2:13-cv-00883-JRG-RSP, Dkt. No. 79 at 40 (means-plus-function limitation invalid as indefinite where patent did not include any algorithm, let alone an algorithm clearly linked to the function, and finding that "expert testimony cannot remedy the absence of the requisite linkage.").

The specification passages that CCE identifies do not change the result. (*See* Ex. 1 at ¶¶ 155–67.) At best, the passages illustrate the neighbor cell information message's content, which is merely an input for the undisclosed algorithm, not the algorithm. (*See id.* at ¶¶ 163, 167–69; Dkt. No. 277 at 10 (citing Ex. 12 at 2:15–23, 3:8–22, 5:6–17, each of which discloses contents of a neighbor cell information message, namely index or pointer parameters).)

With a general purpose microprocessor, the claimed associating function could potentially be performed in any number of ways—generically claiming a means in purely functional terms

does not give CCE a monopoly to them all.  *See Noah*, 675 F.3d at 1318.  For the reasons discussed above, Claim 11 is indefinite and thus invalid.  *See Ibormeith*, 732 F.3d at 1381 (disclosure of inputs failed to adequately disclose an algorithm corresponding to a "computational means").

**b.      CCE's proposed structure is improper and should be rejected.**

Even if the Court does not find the claim indefinite, the Court should still reject CCE's proposed structure of "a microprocessor (6:57-61; Fig. 7) configured to relate a parameter (or set of parameters) specified by an index (or pointer) to a parameter of a neighbor cell (2:15-28; 2:35-43; 3:4-26; 4:11-5:17; 5:35-46; 7:39-49; Figs. 2-5), and equivalents thereof."

CCE initially said that the structure was "a microprocessor configured to ***relate*** a parameter (or set of parameters) specified by an index (or pointer) ***to*** a parameter of a neighbor cell . . . ." (Dkt. No. 248-1, Corrected Joint Claim Construction Statement at 1.)  CCE now says structure is "a microprocessor configured to ***use*** a parameter (or set of parameters) specified by an index (or pointer) ***for*** a parameter of a neighbor cell . . . ."  (Dkt. No. 277 at 8.)  Apparently, CCE recognized that the specification does not support a structure configured to "associate" or "relate" a parameter, and thus is trying to manufacture a structure with the more generic term "use."  CCE's second modification also attempts to expand the purpose of the "index" to cover a much broader set of uses related to the "parameter of a neighbor cell."  However, CCE's new proposed structure also fails to find support in the specification.

As discussed above, a proposed structure cannot incorporate a function that differs in scope from the claimed function.  *Northrop Gruman Corp. v. Intel Corp.*, 325 F.3d 1346, 1352 (Fed. Cir. 2003).  CCE's new proposed structure incorporates a function that merely "us[es] a parameter . . .," which is a drastic expansion from the claimed function that is limited to "associating a specific value . . . ."  CCE's new proposed structure that incorporates a function that merely "us[es] a parameter . . . specified by an index . . . for a parameter of a neighbor cell" is also a drastic expansion from the claimed function that is limited to "associating a specific value . . . indicated by one of said index with the corresponding second parameter . . . ."  Thus, CCE's incorporation of a function that expands the claimed function is improper and should be rejected.

Second, CCE improperly claims that the microprocessor is "configured to use a parameter *(or set of parameters)* . . . ." (Dkt. No. 277 at 8.)  Here, CCE also impermissibly broadens "a specific value" to mean "a set of parameters."  CCE relies on portions of the specification contemplating embodiments where a field can comprise a set of parameter combinations.  (*Id.* at 11–12.)  However, CCE ignores the plain language of the claim, which requires "associating a specific value of said set of specific parameter values" (Ex. 12 at 9:18–21), not "using a set of parameters," as CCE now proposes.  Thus, CCE's proposed structure improperly reads "a specific value of said set of specific parameter values" out of the claim.

Finally, CCE's proposed structure is incorrect because it renders two distinct limitations in Claim 11 redundant: the "means for associating …" limitation and the limitation "an index for a second parameter, said index indicating which value of said set of specific parameter values is used for said second parameter." *See Merck*, 395 F.3d at 1372.  In arguing that "the index … is a data structure that, by definition, underlines associates a specific value with a second parameter" (Dkt. No. 277 at 10), CCE essentially argues that these two limitations require using the same structure to accomplish the same result—using an index to associate a specific value with a parameter. Because each of the last two limitations of Claim 11 must be given its own, distinct meaning, the structure for the "means for associating …" limitation cannot be an index as CCE suggests.

Accordingly, the Court should reject CCE's proposed function for the "means for associating" term of Claim 11.

## IV.    CONCLUSION

For the applicable § 112, ¶ 6 terms, the claim language and specifications point to the same conclusion—the patentee claimed software functions without disclosing algorithms clearly linked to performing those functions and thus fail to inform one skilled in the art of the scope of the inventions.  For the remaining terms, Defendants' constructions, which are faithful to the claim language and consistent with the specification and prosecution history, should be adopted.

Dated: November 14, 2014

Respectfully submitted,

/s/ Christopher W. Kennerly

Christopher W. Kennerly
TX Bar No. 00795077
Jeffrey G. Randall
CA Bar No. 130811
PAUL HASTINGS LLP
1117 S. California Ave.
Palo Alto, CA  94304-1106
Telephone: (650) 320-1800
Facsimile: (650) 320-1900
chriskennerly@paulhastings.com
jeffrandall@paulhastings.com

**ATTORNEYS FOR DEFENDANT AT&T MOBILITY LLC**

/s/ Jamie B. Beaber

Jamie B. Beaber (D.C. Bar No. 484186)
Kfir B. Levy (D.C. Bar No. 989212)
Michael W. Maas (D.C. Bar No. 493685)
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 263-3300
jbeaber@mayerbrown.com
klevy@mayerbrown.com
mmaas@mayerbrown.com

Robert G. Pluta (IL Bar No. 6278255)
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
Telephone: (312) 782-0600
Facsimile: (312) 701-7711
rpluta@mayerbrown.com

Michael E. Jones
State Bar No. 10929400
Allen F. Gardner
State Bar No. 24043679

/s/ Melissa R. Smith

Melissa R. Smith
State Bar No. 24001351
GILLAM & SMITH, LLP
303 S. Washington Ave.
Marshall, TX 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257
melissa@gillamsmithlaw.com

John C. Hueston (*Pro Hac Vice*)
Douglas J. Dixon (*Pro Hac Vice*)
IRELL & MANELLA LLP
840 Newport Center Dr., Ste. 840
Newport Beach, CA 92660
Telephone: (949) 760-0991
Facsimile: (949) 760-5200
JHueston@irell.com
DDixon@irell.com

Ellisen S. Turner (*Pro Hac Vice*)
Benjamin Haber (*Pro Hac Vice*)
IRELL & MANELLA LLP
1800 Avenue of the Stars, Ste. 900
Los Angeles, CA 90067

31

POTTER MINTON P.C.
110 N. College Avenue, Suite 500
Tyler, Texas 75702
Telephone: (903) 597-8311
Facsimile: (903) 593-0846
mikejones@potterminton.com
allengardner@potterminton.com

**ATTORNEYS FOR DEFENDANTS LG
ELECTRONICS, INC. AND LG
ELECTRONICS U.S.A., INC.**

/s/ Alan A. Wright
Alan A. Wright
Oluwaseun O. Ajayi
Brendan P. O'Shea
H.C. PARK & ASSOCIATES, PLC
1894 Preston White Drive
Reston, VA  20191
Telephone:  (703) 288-5105
Facsimile:   (703) 288-5139
awright@park-law.com
oajayi@park-law.com
boshea@park-law.com

Melissa R. Smith
State Bar No. 24001351
GILLAM & SMITH, LLP
303 S. Washington Ave.
Marshall, TX 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257
melissa@gillamsmithlaw.com

**ATTORNEYS FOR DEFENDANTS
PANTECH CO. LTD. AND PANTECH
WIRELESS, INC.**

Telephone: (310) 277-1010
Facsimile: (310) 203-7199
ETurner@irell.com
BHaber@irell.com

**ATTORNEYS FOR DEFENDANTS
T-MOBILE USA, INC. AND T-MOBILE US,
INC.**

/s/ Jennifer H. Doan
Jennifer H. Doan
Texas Bar No. 08809050
Joshua R. Thane
Texas Bar No. 24060713
HALTOM & DOAN
Crown Executive Center, Suite 100
6500 Summerhill Road
Texarkana, TX 75503
Telephone: (903) 255-1000
Facsimile: (903) 255-0800
jdoan@haltomdoan.com
jthane@haltomdoan.com

J. David Hadden
CA Bar No. 176148 (Admitted E.D. Tex)
dhadden@fenwick.com
Saina Shamilov
CA Bar No. 215636 (Admitted E.D. Tex)
sshamilov@fenwick.com
Ravi R. Ranganath
CA Bar No. 272981 (Admitted E.D. Tex)
rranganath@fenwick.com
FENWICK & WEST LLP
Silicon Valley Center
801 California Street
Mountain View, California 94041
Telephone: (650) 988-8500
Facsimile: (650) 938-5200

**ATTORNEYS FOR DEFENDANT
AMAZON.COM, INC.**

/s/ Robert W. Weber
Robert W. Weber
Texas State Bar No. 21044800
SMITH WEBER, L.L.P.
5505 Plaza Drive -- P.O. Box 6167
Texarkana, TX 75505-6167
Telephone: 903-223-5656
Facsimile: 903-223-5652
bweber@smithweber.com

Mark McGrory (*Pro Hac Vice*)
ROUSE HENDRICKS GERMAN MAY PC
1201 Walnut, 20th Floor
Kansas City, MO 64106
Telephone: 816-471-7700
Facsimile: 816-471-2221
MarkM@rhgm.com

**ATTORNEYS FOR DEFENDANTS SPRINT
SOLUTIONS, INC.; SPRINT SPECTRUM
L.P.; and BOOST MOBILE, LLC**

/s/ Roger Joseph Fulghum
Roger Joseph Fulghum
(TX Bar No. 00790724)
Tammy M Pennington Rhodes
(TX Bar No. 24051182)
BAKER BOTTS LLP
910 Louisiana Street
One Shell Plaza
Houston, TX 77002-4995
Telephone: 713/229-1707
Facsimile: 713/229-2707
roger.fulghum@bakerbotts.com
tammy.pennington@bakerbotts.com

Deron R Dacus
(TX Bar No. 00790553)
T Shannon Marie Dacus
(TX Bar No. 00791004)
THE DACUS FIRM, PC
821 ESE Loop 323
Suite 430
Tyler, TX 75701
Telephone: 903/705-1117
Facsimile: 9037051117

/s/ Inge Larish
Inge Larish
TX State Bar No. 00796924
Steven A. Moore
California State Bar No. 232114
Nicole S. Cunningham
California State Bar No. 234390
PILLSBURY WINTHROP SHAW
PITTMAN LLP
501 West Broadway, Suite 1100
San Diego, CA 92101
Telephone: 619-544-3119
Facsimile: 619-236-1995
inge.larish@pillsburylaw.com
steve.moore@pillsburylaw.com
nicole.cunningham@pillsburylaw.com

**ATTORNEYS FOR DEFENDANTS
HTC CORPORATION, HTC AMERICA,
INC., AND ZTE (USA) INC.**

/s/ Michael E. Jones
Michael E. Jones
State Bar No. 10929400
Patrick C. Clutter, IV
State Bar No. 24036374
POTTER MINTON, P.C.
110 N. College Ave., Suite 500
Tyler, Texas 75702
Telephone: (903) 597-8311
Facsimile: (903) 593-0846
mikejones@potterminton.com
patrickclutter@potterminton.com

Charles B. Molster, III
Virginia State Bar No. 23613
Thomas M. Dunham
D.C. Bar No. 448407
Corrine M. Saylor
D.C. Bar No. 997638 (*Pro Hac Vice*)
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20006-3817
Telephone: (202) 282-5000
Facsimile: (202) 282-5100
cmolster@winston.com

ddacus@dacusfirm.com
sdacus@dacusfirm.com

**ATTORNEYS FOR DEFENDANT DELL INC.**

/s/  Robert J. Benson
Robert J. Benson
CA Bar No. 155971
Christina M. Von der Ahe
CA Bar No. 255467
ORRICK HERRINGTON & SUTCLIFFE - Irvine
2050 Main St
Suite 1100
Irvine, CA 92614-8255
Telephone: 949/852-7705
Facsimile: 949/567-6710
rbenson@orrick.com
cvonderahe@orrick.com

I. Neel Chatterjee
CA Bar No. 173985
ORRICK HERRINGTON & SUTCLIFFE –
Menlo Park
1000 Marsh Road
Menlo Park, CA 94025
Telephone: 650/614-7400
Facsimile: 650/614-7401
nchatterjee@orrick.com

Richard A. Cederoth
Ellen S. Robbins
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Telephone: 312-853-7000
Facsimile: 312-853-7036
rcederoth@sidley.com
erobbins@sidley.com

Jennifer Parker Ainsworth
Texas State Bar No. 00784720
WILSON, ROBERTSON & CORNELIUS, P.C.
909 ESE Loop 323, Suite 400
P.O. Box 7339 [75711]
Tyler, Texas 75701
Telephone: (903) 509-5000

tdunham@winston.com csaylor@winston.com

**ATTORNEYS FOR DEFENDANT
CELLCO PARTNERSHIP D/B/A/
VERIZON WIRELESS**

/s/  Mark C. Scarsi
Mark C. Scarsi (admitted *Pro Hac Vice*)
Miguel Ruiz (admitted *Pro Hac Vice*)
Ashlee N. Lin (admitted *Pro Hac Vice*)
Michael Sheen (admitted *Pro Hac Vice*)
MILBANK, TWEED, HADLEY & MCCLOY
LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017-5735
Telephone: (213) 892-4000
Facsimile: (213) 629-5063
mscarsi@mibank.com
mruiz@milbank.com
ashlee.lin@milbank.com
msheen@milbank.com

Thomas C. Mavrakakis (Bar No. 00791209)
Brian C. Kwok (admitted *Pro Hac Vice*)
Christopher R. Lubeck (admitted *Pro Hac Vice*)
MAVRAKAKIS LAW GROUP LLP
735 Emerson Street
Palo Alto, CA 94301
Telephone: (650) 804-7800
Facsimile: (650) 852-9224
mav@mavllp.com
bkwok@mavllp.com
clubeck@mavllp.com

Howard E. Levin (admitted *Pro Hac Vice*)
MAVRAKAKIS LAW GROUP LLP
180 N. LaSalle Street, Suite 2215
Chicago, IL 60601
Telephone: (312) 216-1620
Facsimile: (312) 216-1621
hlevin@mavllp.com

Eric H. Findlay (Bar No. 00789886)
FINDLAY CRAFT PC
102 N. College Avenue, Suite 900
Tyler, TX 75702

34

Facsimile: (903) 509-5092
jainsworth@wilsonlawfirm.com

**ATTORNEYS FOR DEFENDANT
MICROSOFT**

Telephone:  (903) 534-1100
Facsimile: (903) 534-1137
efindlay@findlaycraft.com

**ATTORNEYS FOR APPLE INC**.

/s/  Rick L. Rambo
Rick L. Rambo
Texas State Bar No. 00791479
Adam A. Allgood
Texas State Bar No. 24059403
1000 Louisiana Street, Suite 4000
Houston, Texas 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
rrambo@morganlewis.com
aallgood@morganlewis.com

**COUNSEL FOR DEFENDANTS NEC
CORPORATION OF AMERICA, NEC
CASIO MOBILE COMMUNICATIONS,
LTD. AND AT&T MOBILITY LLC**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 14, 2014, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

<u>/s/ Christopher W. Kennerly</u>
Christopher W. Kennerly