**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | |
|---|---|
| CELLULAR COMMUNICATIONS EQUIPMENT LLC, | |
| Plaintiff, | CIVIL ACTION NO. 6:13-cv-507 |
| v. | **CONSOLIDATED LEAD CASE** |
| HTC CORPORATION, ET AL. | |
| Defendants. | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
OF INVALIDITY FOR INDEFINITENESS**

## TABLE OF CONTENTS

I.      RESPONSE TO STATEMENT OF ISSUES ...................................................................1

II.     RESPONSE TO DEFENDANTS' STATEMENT OF
        UNDISPUTED MATERIAL FACTS ............................................................................1

III.    CCE'S STATEMENT OF UNDISPUTED MATERIAL FACTS ...................................2

IV.     APPLICABLE LAW ....................................................................................................3

V.      ARGUMENT ...............................................................................................................5

        A.      The asserted claims of the '019 patent are not indefinite .......................................5

                1.      "processing means for arranging gaps in a time-slot frame
                        according to the measurement pattern definitions" ....................................5

                2.      "the processing means are also arranged to set for the measurement
                        pattern definition a delay according to the measurement pattern
                        definitions"...............................................................................................8

        B.      The asserted claims of the '9923 patent are not indefinite ...................................11

                1.      "means for receiving a neighbor cell information message"....................11

                2.      "means for associating a specific value of said set of specific
                        parameter values indicated by one of said index with the
                        corresponding second parameter of a neighbor cell"................................14

        C.      The asserted claims of the '174 patent are not indefinite .....................................18

        D.      The asserted claims of the '820 patent are not indefinite .....................................22

                1.      Claims 1, 12, and 24 do not recite conflicting requirements ....................22

                2.      "the designating unit" ..............................................................................23

# TABLE OF AUTHORITIES

## CASES

*Adaptix, Inc. v. Apple, Inc.*
    2014 U.S. Dist. LEXIS 152797 (N.D. Cal. Oct. 27, 2014)................................................24

*AllVoice Computing PLC v. Nuance Communications, Inc.*
    504 F.3d 1236 (Fed. Cir. 2007)........................................................................................7

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242 (1986)..........................................................................................................3

*Apple Inc. v. Motorola, Inc.*
    757 F.3d 1286 (Fed. Cir. 2014)........................................................................................4

*Augme Technologies v. Yahoo! Inc.*
    755 F.3d 1326 (Fed. Cir. 2014)........................................................................................7

*C4Cast.com, Inc. v. Dell, Inc.*
    2013 U.S. Dist. Lexis 93199 (E.D. Tex. Jul. 3, 2013) ....................................................14

*Competitive Techs., Inc. v. Fjuitsu Ltd.*
    185 F. App'x 958 (Fed. Cir. 2006) ..................................................................................23

*Datamize, LLC v. Plumtree Software, Inc.*
    417 F.3d 1342 (Fed. Cir. 2005)........................................................................................4

*EnOcean GmbH v. Face Int'l Corp.*
    742 F.3d 955 (Fed. Cir. 2014)........................................................................................12

*Function Media v. Google Inc.*
    708 F.3d 1310 (Fed. Cir. 2013)......................................................................................14

*Ibormeith IP, LLC v. Mercedes-Benz USA*
    732 F.3d 1376 (Fed. Cir. 2013)........................................................................................7

*In re Katz Interactive Call Processing Patent Litigation*
    639 F.3d 1303 (Fed. Cir. 2011)...........................................................................4, 13, 14

*Intel Corp. v. VIA Techs.*
    319 F.3d 1357 (Fed. Cir. 2003).........................................................................7, 8, 10, 13, 18

*Invensys Systems, Inc. v. Emerson Electric Co.*
    No. 6:12-cv-799, Doc. No. 205 (E.D. Tex. Aug. 6, 2014) ...............................................4

*Med Instrumentation & Diagnostics Corp. v. Elekta AB*
    344 F.3d 1205 (Fed. Cir. 2003)........................................................................................4

*Microsoft Corp. v. i4i Ltd. P'ship*

    131 S. Ct. 2238 (2011) ................................................................................3

*Nautilus, Inc. v. Biosig Instruments, Inc.*

    134 S. Ct. 2120 (U.S. 2014) ........................................................................4

*Optimize Tech. Solutions v. Staples, Inc.*

    2013 U.S. Dist. Lexis 164867 (E.D. Tex. Nov. 20, 2013) .................................4, 13, 16, 18

*Smartphone Techs. LLC v. Research in Motion Corp.*

    2012 U.S. Dist. LEXIS 108370 (E.D. Tex. Aug. 2, 2012) .................................................24

*Typhoon Touch Techs., Inc. v. Dell, Inc.*

    659 F.3d 1376 (Fed. Cir. 2011) ...............................................................5, 8, 10, 16, 18

*Variant Holdings v. Z Resorts* LLC

    2013 U.S. Dist. Lexis 67943 (E.D. Tex. May 9, 2013) .............................................12, 13

*Williamson v. Citrix Online LLC.*

    2014 U.S. App. Lexis 21115 (Fed. Cir. Nov. 5, 2014) .............................................24, 25

*WMS Gaming, Inc. v. Int'l Game Tech.*

    184 F.3d 1339 (Fed. Cir. 1999) ................................................................................4


## **STATUTE**

35 U.S.C. § 282 ...........................................................................................................3

35 U.S.C. § 112(6) ................................................................................. 1, 3, 4, 23-25

## TABLE OF EXHIBITS

Exhibit  A        Declaration and Curriculum Vitae of Esmael Dinan, Ph.D.

Exhibit  B        U.S. Patent No. 6,819,923

Exhibit  C        Excerpts from Response dated May 3, 2004 filed during prosecution of U.S. Patent No. 6,819,923

Exhibit  D        U.S. Patent No. 6,810,019

Exhibit  E        U.S. Patent No. 7,941,174

Exhibit  F        U.S. Patent No. 8,055,820

Exhibit  G        Excerpts from Application dated Nov. 5, 2008 filed during prosecution of U.S. Patent No. 8,055,820

Exhibit  H        Excerpts from Office Action dated Sept. 30, 2010 filed during prosecution of U.S. Patent No. 8,055,820

Exhibit  I        Excerpts from Response dated May 10, 2011 filed during prosecution of U.S. Patent No. 8,055,820

Exhibit  J        Excerpts from Petition for *Inter Partes* Review of U.S. Patent No. 8,055,820 filed July 10, 2014 by Defendants NEC, HTC, ZTE, Amazon, Pantech, LG, and Dell

Exhibits  K-M     [Not used]

Exhibit  N        Excerpts from Steven M. Kaplan, Wiley Electrical and Electronics Engineering Dictionary (IEEE Press, John Wiley & Sons 2004)

Exhibit  O        Excerpts from Martin H. Weik, D.Sc., Communications Standard Dictionary (Van Nostrand Reinhold Co. 1983)

Exhibit  P        Excerpts from Julie K. Petersen, Data & Telecommunications Dictionary (CRC Press 1999)

Exhibit  Q        Excerpts from Petition for *Inter Partes* Review of U.S. Patent No. 7,941,174 filed July 10, 2014 by NEC, HTC, Amazon, Pantech, LG, and Dell

Exhibit  R        Excerpts from Declaration under 37 C.F.R. § 1.132 of Tim Williams, Ph.D In Support of Petition for *Inter Partes* Review of U.S. Patent No. 7,941,174.

Exhibit  S        Excerpts from Response dated December 2, 2010 filed during prosecution of U.S. Patent No. 8,055,820.

Cellular Communications Equipment LLC ("CCE" or "Plaintiff") submits this Response in Opposition to Defendants' Motion for Summary Judgment of Invalidity for Indefiniteness.

## I.     RESPONSE TO STATEMENT OF ISSUES

1-6.     CCE agrees that the Court may decide whether claims 11-13 of the '019 patent, claims 11 and 13 of the '9923 patent, claims 1, 6, 9, 14, 18, and 19 of the '174 patent, and claims 1, 4, 6-12, 15, 17-22, and 24 of the '820 patent are invalid for indefiniteness. However, Defendants carry the burden of demonstrating by clear and convincing evidence that the patent fails to disclose sufficient corresponding structure for the disputed claim elements.

7.     CCE agrees that the Court may decide whether claims 12, 15, and 17-22 of the '820 patent are invalid for indefiniteness. However, the challenged claims do not recite a "designating means," and the Court must first decide whether those the phrase "the designating unit" invokes 35 U.S.C. § 112(6). Defendants carry the burdens of overcoming a strong presumption against application of § 112(6) to the disputed claims and demonstrating by clear and convincing evidence that the patent fails to disclose sufficient corresponding structure for the disputed claim element.

## II.    RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

1-13.     Undisputed.

14.     CCE does not dispute that claim 1 of the '820 patent recites "designating one of a plurality of buffer status reporting formats comprising a long buffer status reporting format and a short buffer status reporting format depending on the pre-selected condition detected" and "wherein the designating designates the long buffer status reporting format when there is sufficient uplink bandwidth to communicate using the long buffer status reporting format." Ex. F at 11:7-20.  Claims 12 and 24 recite similar language.

1

15.     CCE does not dispute that claim 12 of the '820 patent recites "wherein the designating unit is configured to designate the long buffer status reporting format when there is sufficient uplink bandwidth to communicate using the long buffer status reporting format." However, the intrinsic record makes clear that inclusion of the phrase "the designating unit" is an obvious error, and a person skilled in the art would understand that element to refer back to the memory, processor, and computer program code configured to "designate."  Ex. I at 5-6, 10.

16-17.  Undisputed.

## III.   CCE'S STATEMENT OF UNDISPUTED MATERIAL FACTS

1.     The '019 patent discloses that TGL, TGPL, TGD, and TGPRC parameters are used to inform a terminal about the timing of compressed mode transmission by defining the locations of gaps in a time-slot frame.  *E.g.*, Ex. D at 5:52-64; 6:1-3; 6:20-60; Figs. 3-5.

2.     The '019 patent discloses that different values for the parameters CFN and TGSN can be allocated for individual terminals to set a different, terminal-specific delay for the measurement pattern of each terminal.  *E.g.*, Ex. D at 7:13-8:51; Fig. 5.

3.     Mobile stations at the time of the filing date of the '9923 patent required a receiver and an antenna to receive a message sent over a cellular network. Ex. A at ¶¶ 74-75.

4.     The '9923 patent discloses that an index or pointer specifies which value in a common values table is to be used by a mobile station for the parameter of a neighbor cell.  Ex. B at 2:15-2; 3:10-22; 5:6-17.

5.     In their petition for *inter partes* review ("IPR") of the '174 patent, Defendants Amazon, NEC, HTC, Pantech, LG, and Dell provide an overview of the patent which states: "Once the transmit power difference is determined, it is used by the subscriber station to set its transmit power at the start of a multicode transmission so as to 'maintain' the transmit power

2

difference[.]" Ex. Q at 9.

6.      The declaration of Tim Williams, Ph.D., submitted by Defendants Amazon, NEC, HTC, Pantech, LG, and Dell with their petition for IPR of the '174 patent, states the following in describing the "purported invention" of the patent: "After the base station or subscriber station determine the transmit power difference, the subscriber station sets its' transmit power at the beginning of a multicode transmission to 'maintain' that difference (headroom)." Ex. R at ¶ 51.

7.      As originally presented during prosecution, the phrase "wherein the designating unit…" recited in the claim which issued as claim 12 of the '820 patent referred back to "a designating unit configured to designate one of a plurality of buffer status reporting formats…" recited previously in that claim.  Ex. S at 24-25.

8.      In their petition for IPR of the '820 patent, Defendants Amazon, NEC, HTC, Pantech, LG, and Dell did not identify "the designating unit" as a means-plus-function term be construed pursuant to § 112(6), despite the fact that four other terms are alleged to be subject to § 112(6).  Ex. J at 18-20.

## IV.   APPLICABLE LAW

Summary judgment is appropriate only if the movant demonstrates that there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Patents are presumed valid, and Defendants must establish invalidity by clear and convincing evidence. 35 U.S.C. § 282; *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2243 (2011). "The primary purpose of the requirement of definiteness is to provide notice to those skilled in the art of what will constitute infringement." *Invensys Systems, Inc. v. Emerson*

*Electric Co.*, No. 6:12-cv-799, Doc. No. 205 at 7 (E.D. Tex. Aug. 6, 2014) (internal citation omitted).  Absolute precision is "unattainable," and the claims of a patent are not indefinite so long as they inform those skilled in the art about the scope of the invention with "reasonable certainty," viewed in light of the specification and prosecution history and having regard to the relevant subject-matter.  *Nautilus, Inc. v. Biosig Instruments, Inc*., 134 S. Ct. 2120, 2129 (2014).  Close questions of indefiniteness are properly resolved in favor of the patentee.  *Invensys*, 2014 U.S. Dist. LEXIS 107928 at *11 (citing, *inter alia*, *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1348 (Fed. Cir. 2005).

Pursuant to 35 U.S.C. § 112(6), a patentee may choose to express a claim limitation as a means for performing a specified function.  Such elements are construed to cover the corresponding structure clearly linked or associated with the claimed function in the specification or file history, and equivalents of those structures. *Medical Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1219 (Fed. Cir. 2003). In general, the corresponding structure for a computer-implemented means-plus-function limitation is an algorithm that carries out the claimed function.  *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). Algorithms may be disclosed in any understandable form, though a term may be indefinite if the specification fails to disclose any algorithm. *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298-99 (Fed. Cir. 2014).

However, an algorithm is not required if the recited function can be achieved by a general-purpose computer without special programming.  *In re Katz*, 639 F.3d 1303, 1316 (Fed. Cir. 2011).  This "reinforces the self-evident proposition that the required degree of disclosure of corresponding structure is commensurate with the complexity of the claimed function." *Optimize Tech. Solutions v. Staples, Inc.*, No. 2:11-cv-419, 2013 U.S. Dist. Lexis 164867, *122

(E.D. Tex. Nov. 20, 2013); *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1385 (Fed. Cir. 2011).

## V.   ARGUMENT

### A.   The asserted claims of the '019 patent are not indefinite.

#### 1.   "processing means for arranging gaps in a time-slot frame according to the measurement pattern definitions" (cl. 11)

As explained in CCE's Opening Claim Construction Brief,[1] the '019 patent teaches that TGL, TGPL, TGD, and/or TGPRC parameters define gaps in a measurement pattern definition,[2] and a processor, controller, or application specific integrated circuit (described at 10:34-52 and Fig. 6) of the claimed terminal arranges gaps in a time-slot frame by applying these parameters.

The patent describes six parameters related to transmission gaps.  Ex. D at 5:53-6:3; 6:20-60; 7:4-8:63.  And, the patent teaches that devices arrange such gaps in a time-slot frame by ***applying*** TGL, TGD, TGPL, and TGPRC parameters, as illustrated in the embodiment of



Fig. 3

Figure 3.  Indeed, the '019 patent makes unmistakably clear that these parameters are sent to and used by mobile devices for that purpose.  *See, e.g., id.* at 5:53-6:3; 6:1-3 ("the performance of measurements [made during transmission gaps] is typically defined by means of the parameters TGL1/2, TGPL1/2, TGD, and TGPRC"); 6:8-11 ("The fixed network UTRAN then signals to the user equipment UE monitoring settings for the handover and compressed mode parameters to be used for the required measurements"); 6:31-32 ("The user equipment UE performs

---

[1] *See* Doc. No. 277 at 13-16.
[2] For instance, the embodiment depicted in Figure 5 employs TGL, TGPL, and TGPRC parameters (but not TGD) to arrange gaps in a time-slot, while the embodiments discussed with reference to Figures 3 and 4 employ TGL, TGPL, TGD, and TGPRC.  Accordingly, the disclosure indicates that the TGD parameter is optional.

measurements during gaps whose length (TGL1) is either 7 or 14 time slots"); 6:45-47 ("The user equipment UE uses the gap period parameters TGPL1 and TGPL2 one after the other"); 7:39-43 ("The gap length TGL1 is seven time-slots in each mobile station. The gap pattern length is one time-slot frame in the user equipment UE1 and UE2, and two time-slot frames in the user equipment UE3 and UE4"); 7:62-8:2 (as shown in Figure 5, "the gap length TGL1 is seven time-slots in all user equipment, and the gap pattern length is one time-slot frame for the user equipment UE1 and UE2 and two time-slot frames for the user equipment UE3 and UE4 as in the table on the left"); *see also* Figure 5 *and* 7:31-8:40 (describing and illustrating how TGL, TGPL, and TGPRC parameters contained in measurement pattern definitions are used to arrange transmission gaps for each UE).

Thus, the disclosed structure for "arranging gaps in a time-slot frame according to the measurement pattern definitions" is a processor, controller, or ASIC configured to apply the TGL, TGPL, TGD, and/or TGPRC  parameters described at 5:53-67; 6:1-19; 6:20-7:3; 7:31-9:5 and depicted in Figures 3-5.  Ex. A at ¶¶ 48-51.

Defendants mistakenly argue that application of these parameters cannot suffice as an algorithm because the patent does not detail "how" they are used.  Doc. No. 287 at 6-7.  But, the TGL, TGD, TGPL, and TGPRC parameters described in the patent are not mere "inputs." Rather, the '019 patent explains how these parameters instruct the mobile device about the arrangement of transmission gaps in a time-slot — TGL defines the length of the gap, TGD defines the distance between consecutive gaps, TGPL defines the number of consecutive frames with one or two gaps, and TGPRC defines the total time of measurement. Ex. D at 5:53-6:3. Indeed, Defendants' own expert acknowledges that these parameters provide the location of gaps in a time slot. Doc. No. 287-1 at ¶ 34 ("The network informs the mobile device about the timing

of compressed mode transmission by defining and transmitting a measurement pattern definition to the mobile device which provides the locations of gaps in a time-slot frame during which the mobile device can measure the signals from other cells."). Thus, they are not generic "inputs,"[3] but constitute specific structure to one skilled in the art, who would have knowledge of how parameters are used in UMTS devices. *AllVoice Computing PLC v. Nuance Communications, Inc.*, 504 F.3d 1236, 1241-42 (Fed. Cir. 2007) (holding that reference to a known protocol sufficiently disclosed algorithm for corresponding structure).

Moreover, Defendants' overtures about innumerable ways to "use" these parameters are contrived and unfounded. Breadth of disclosure is not to be confused with indefiniteness. *See Intel Corp. v. VIA Techs.*, 319 F.3d 1357, 1367 (Fed. Cir. 2003) ("By analogy, if a chair is disclosed in the specification that corresponds to the 'means for seating' limitation in a claim, asserting that there are infinite numbers of structures that could make a chair or there are unlimited types of chairs in the world would not necessarily make the claim indefinite."). One skilled in the art would be familiar with use of parameters and would unquestionably understand how gaps are arranged according to a measurement pattern definition by applying the claimed parameters. Ex. A at ¶¶ 48-52.

Defendants also wrongly allege that CCE uses "the wrong legal standard." CCE has not relied on an expert to "derive" the requisite structure; the '019 patent teaches that the identified

---

[3] Defendants' reliance on *Augme Technologies v. Yahoo! Inc* and *Ibormeith IP, LLC v. Mercedes-Benz USA* is misplaced. The claim at issue in *Augme.* recited "means for assembling, at said server system, said second computer readable code module," and the alleged structure was simply a step labeled "assemble second code module" with "code assembler instructions." 755 F.3d 1326, 1337-38 (Fed. Cir. 2014). Accordingly, the court held that "simply disclosing a black box that performs the recited function is not a sufficient explanation of the algorithm required to render the means-plus-function term definite." *Id.* at 1338. In *Ibormeith IP*, the plaintiff asserted that the alleged algorithm — a table of "factors" or "variables" — "equally covers all ways of taking into account the listed variables, or some subset of the variables, that a skilled artisan would find appropriate." 732 F.3d 1376, 1381-82 (Fed. Cir. 2013). Thus, the court ruled that "a description of an algorithm that places no limitations on how values are calculated, combined, or weighted is insufficient to make the bounds of the claim understandable." *Id.* at 1382. In each instance, the alleged algorithm was devoid of specificity and substance, unlike the disclosure here.

parameters are applied to arrange transmission gaps. Whether this adequately sets forth structure corresponding to the claimed functions *must* be considered from the perspective of one skilled in the art. *Intel Corp.*, 319 F.3d at 1365-66. Nor does CCE's construction "read out" or render "superfluous" any claim language. Doc. No. 287 at 7-8. Claim 11 simply recites a device that *receives* measurement pattern definitions comprising particular parameters, then *applies* certain parameters in the definition to arrange transmission gaps in a time slot.

Finally, Defendants baselessly argue that the patent must provide additional detail. To the contrary, application of TGL, TGD, TGPL, and/or TGPRC parameters is tied to the claimed function, and one skilled in the art would be equipped to implement the claimed function based on that algorithm. Ex. A at ¶ 52. The inventors are not required to supply source code-level detail in the patent disclosure. *Typhoon Touch*, 659 F.3d at 1385 ("[T]he patent need only disclose sufficient structure for a person of skill in the field to provide an operative software program for the specified function."). Accordingly, Defendants' motion should be denied.

   2.   **"the processing means are also arranged to set for the measurement pattern definition a delay according to the measurement pattern definitions" (cl. 11)**

As explained in CCE's Opening Claim Construction Brief,[4] the '019 patent explains how two of the parameters in a measurement pattern definition — namely, CFN and TGSN — can be used to set a measurement delay for the measurement pattern. Ex. D at 5:46-53; 6:3-6; 7:6-9. More specifically, it explains that rather than setting the same delay for all mobile devices, compressed mode measurements in a W-CDMA network can be optimized by defining different values of CFN and TGSN for each device, thereby defining device-specific delays. *E.g., id.* at 3:19-26 ("The invention is based on the idea that to make measurements…non simultaneous, at least partly different delays are set for the measurement patterns defining the measurement gaps

---

[4] *See* Doc. No. 277 at 14-15; 17-19.

of each mobile station[.]"); 7:12-17 ("Instead of setting the same delay for all mobile stations UE, the fixed network UTRAN can preferably allocate different values for the parameters CFN and TGSN for each mobile station…."); 7:59-8:51.

Figure 5 illustrates this by comparing measurement patterns for multiple devices (UE1-UE4) that include the *same* CFN and TGSN values (and thus same delay) with optimized measurement patterns that include *device-specific* CFN-TGSN value pairs to set different delays for the measurement patterns. *See id.* at Fig. 5; 7:4-8:51. As shown in Fig. 5, each UE in the table on the left has the same gaps in a timeslot, while the overlap among transmission gaps is minimized in the table on the right as a result of device-specific CFN and TGSN values.

| | parametres not optimised | | | | parametres optimised | | | |
|---|---|---|---|---|---|---|---|---|
| UE number | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 |
| CFN (frame no.) | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 |
| TGSN (slot no.) | 4 | 4 | 4 | 4 | 0 | 8 | 4 | 4 |
| TGL1 (slots) | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 |
| TGPL1/2 (frames) | 1 | 1 | 2 | 2 | 1 | 1 | 2 | 2 |
| frame 1 (gap: slot - slot) | 4 -10 | 4 -10 | 4 -10 | 4 -10 | 0 - 6 | 8 - 14 | 4 - 10 | - |
| frame 2 (gap: slot - slot) | 4 -10 | 4 -10 | - | 4 -10 | - | - | - | 4 - 10 |
| frame 3 (gap: slot - slot) | 4 -10 | 4 -10 | 4 -10 | 4 -10 | 0 - 6 | 8 - 14 | 4 - 10 | - |

Fig. 5

The patent thus teaches that devices "set for the measurement pattern a delay according to the measurement pattern definition" by applying a device-specific CFN-TGSN parameter combination. As with the disputed claim element addressed above, the patent makes clear that these parameters are sent to and used by mobile devices for that purpose. *See, e.g.*, *id.* at 7:59-62 ("In the table on the right, different delays are preferably defined according to the invention to the user equipment UE1, UE2, UE3, and UE4 by defining differing values for the parameters CFN and TGSN of each user equipment"); 8:2-11 ("The user equipment UE1, UE2 and UE3 are set to start measuring from the first frame (CFN=1), here, however, different values for the parameter TGSN, which defines the time-slot in the frame, from which the gap starts, are preferably set for each user equipment. The parameter TGSN of user equipment UE1 obtains the value 0, UE2 obtains the value 8 and UE3 obtains the value 4. Further, the user equipment UE4

9

is set to start measuring from the second frame (CFN=2), in time-slot four (TGSN=4).… The table shows that during the first frame, the gap falls in time-slots 0 to 6 in the user equipment UE1, in time-slots 8 to 14 in UE2 and in time-slots 4 to 10 in UE3. The user equipment UE4 does not have a gap in the first frame, because the measuring only starts in the second frame (CFN=2)").

Thus, the disclosed structure for "set[ting] for the measurement pattern a delay according to the measurement pattern definition" is a processor, controller, or application specific integrated circuit (as disclosed at 10:34-52 and Fig. 6) configured to apply a connection frame number (CFN) and transmission gap starting slot number (TGSN) parameter combination specific to the terminal as described at 5:46-53; 6:1-19; 7:4-30; 7:31-9:5 and depicted in Figure 5. Ex. A at ¶¶ 64-67.

Defendants regurgitate the same arguments they set forth against prior claim limitation, and they fail for the same reasons. The applicable parameters — a device-specific CFN defining the frame into whose times-slots a gap is left and accompanying TGSN defining the time slot from which the gap starts — are specifically defined and directly tied to implementation of the claimed function. One skilled in the art would be familiar with the use of parameters in a UMTS system[5] and would be capable of applying a device-specific CFN-TGSN value pair to provide an operative software program for the claimed function. Ex. A at ¶ 67; *Typhoon Touch*, 659 F.3d at 1385.

Moreover, Defendants' claim that the patent must more specifically explain the way parameter combinations are applied is baseless. The patent describes in detail how application of device-specific CFN-TGSN parameters are used to perform the claimed function. *See, e.g.*, Ex. D at 7:31-8:51. CCE has not sought to claim "any possible algorithm a skilled artisan could

---

[5] Indeed, the patent specifically references applicable 3GPP specifications.  Ex. D at 6:62-7:3.

come up to achieve the [claimed] result." Doc. No. 287 at 9. To the contrary, the asserted claims

covers application of specifically-defined parameters for performing the claimed function. *See*

*Intel Corp.*, 319 F.3d at 1367. Defendants' position is without merit and should be rejected.

**B.      The asserted claims of the '9923 patent are not indefinite.**

**1.      "means for receiving a neighbor cell information message" (cl. 11)**

CCE's   Opening   Claim   Construction   Brief

explains[6] that   the disclosed   structure for   "receiving a

neighbor   cell   information   message"   is   an   antenna,

receiver, and microprocessor. Each of these elements is

necessary and clearly linked to the claimed function.

Ex. A at ¶¶ 73-77. Claim 11 recites a "mobile

communication means;" Figure 7 is "a block diagram



**Fig. 7**

of…a mobile communication means[.]" Ex. B at 6:16-19. Because the Figure 7 depicts an

apparatus as recited in claim 11, one skilled in the art would look to the components of Figure 7

to discern structure for the claimed "receiving" function.

Wireless communications are impossible without an antenna, and one of ordinary skill in

the art would thus recognize that antenna 498 is essential for the claimed mobile communication

means to "receive" a neighbor cell information message. Ex. A at ¶ 75. The receiver (comprising

components 452-462) is likewise critical to "receiving" a message.  As its name indicates, it is a

component specifically designed to receive signals. *Id.* at ¶ 74; Ex. N at CCE2448; Ex. O at

CCE2452; Ex. P at CCE2456. In fact, the patent expressly notes that a benefit of the invention is

that neighbor cell information messages are smaller and thus "reserv[e] the receiver of a mobile

station for a shorter time than in the prior art." Ex. B at 2:4-7; *see also id.* at 7:2-8 (explaining

_____

[6] Doc. No. 277 at 5-8.

that the inventive method "allows the receivers of the mobile stations to use more time to [sic] other duties."). The patent also explains that "means 410 for receiving a neighbor cell information message" is "preferably" realized using software programs "executed by a microprocessor of the control block 490." *Id.* at 6:41-61.

Thus, an antenna, receiver, and microprocessor work together to "receiv[e] a neighbor cell information message." Ex. A at ¶¶ 73-78. And, because the structure for performing the claimed function is a combination of hardware (an antenna, receiver, and microprocessor), a special algorithm is not required. *See Variant Holdings v. Z Resorts* LLC, No. 2:11-cv-290, 2013 U.S. Dist. Lexis 67943, *116-119 (E.D. Tex. May 9, 2013).

To evade this straightforward conclusion, Defendants must deny that one skilled in the art would recognize that the antenna, receiver, and processor are involved in "receiving" the claimed message. To this end, they argue that the disclosed antenna is not associated "with any function at all" (ignoring its well-known inherent function), that the receiver "has no disclosed involvement with the neighbor cell information message" (despite statements to the contrary at 2:4-7 and 7:2-9), and the microprocessor does not receive a "neighbor cell information message" (though it executes "programs" that do). And, to discount dictionary definitions of "receiver" that fly in the face of their position, they fabricate a distinction between receiving "signals" and receiving "messages" — despite the fact such messages are indisputably received *as* signals, and that it is well known that "receivers" perform "receiving" functions. *See, e.g., EnOcean GmbH v. Face Int'l Corp.*, 742 F.3d 955, 960-62 (Fed. Cir. 2014).

Defendants' strategy is clear: discard wholly the broader disclosure and understanding of one skilled in the art in favor of myopic focus on a single passage. Such is improper; whether the specification discloses structure corresponding to the claimed functions must be considered from

12

the perspective of one skilled in the art. *Intel Corp.*, 319 F.3d at 1365-66.

This is not an instance where the specification is devoid of structure. To the contrary, the specification explicitly describes the antenna, receiver, and processor.  The fact that a particular structure (such as software running on the processor) may be "preferably" used for to the claimed function in a certain embodiment does not justify ignoring other structures that are also clearly linked to the claimed function.

Further, even if the supporting structure was simply a microprocessor of control block 490 executing means 410[7] (without an antenna and receiver), the claimed function — "receiving" a neighbor cell information message — is so basic that it may be performed without a special algorithm.  *See* Ex. A at ¶ 77; *In re Katz*, 639 F.3d at 1316 (ruling that a general-purpose computer without special-purpose programming was sufficient structure for "processing," "receiving," and "storing").

Defendants attempt to avoid *Katz* by baldly asserting that receiving "a neighbor cell information message" is a specialized implementation of "receiving" requiring an algorithm. But, basic functions such as "receiving," "processing," and "storing" are not transformed into something else merely because something particular is "received," "processed" or "stored." Indeed, among the terms in *Katz* specifically exempted from the algorithm requirement was "means for processing *at least certain of said answer data signals relating to select ones of said individual callers*." *See In re Katz*, 639 F.3d at 1316 (discussing claim 96 of U.S. Patent No. 5,684,863); *see also Optimize Tech. Solutions*, 2013 U.S. Dist. Lexis 164867 at *132-133 (holding that "means for storing *the data file for at least one visitor*" required no algorithm);

---

[7] Defendants wrongly attempt to divorce means 410 from the microprocessor of control block 490.  The patent plainly says that means 410 and 420 are "preferably" realized "using software programs stored in a memory element of a control block 490…[and] *executed by a microprocessor of the control block 490*." Ex. B at 6:57-61 (emphasis added).  This is not a description of software in the abstract, but software executed by a microprocessor.

13

*Variant*, 2013 U.S. Dist. Lexis 67943 at *116-119 (holding that *Katz* applied to "means for downloading software ***from the central communications facility to the computerized remote facility***," thus "obviating any algorithm requirement for the disputed term."); *C4Cast.com, Inc. v. Dell, Inc.*, No. 2:12-cv-271, 2013 U.S. Dist. Lexis 93199, *60-61 (E.D. Tex. Jul. 3, 2013) (holding that that "means for maintaining ***a collection of resources***" falls within *Katz* exception).

These cases confirm that the *Katz* rule applies to basic functions, even when they are performed with or on a specific item or structure. By contrast, the *Function Media v. Google Inc.* case on which Defendants rely did not address any function discussed in *Katz* (i.e., "processing," "receiving," or "storing"), and it was ***undisputed*** in that case that the structure for performing the claimed "transmitting" function is in that case was software ***alone*** — without hardware. 708 F.3d 1310, 1318 (Fed. Cir. 2013). Its holding is inapplicable, and Defendants' motion must fail.

> **2.    "means for associating a specific value of said set of specific parameter values indicated by one of said index with the corresponding second parameter of a neighbor cell" (cl. 11)**

CCE's Opening Brief on Claim Construction explains[8] that the disclosed structure for this claim element is a microprocessor (as described at 6:57-61 and shown in Fig. 7) configured to use a parameter (or set of parameters) specified by an index (or pointer) for a parameter of a neighbor cell, as described at 2:15-28; 2:35-43; 3:4-26; 4:11-5:17; 5:35-46; 7:39-49 and shown in Figures 2-5. This construction is well-grounded in the claims, specification, and file history, and it comports with the understanding of one skilled in the art.

As a threshold matter, the patent explains that the structure corresponding to this function includes means 420 "for associating a value of said set of parameter values indicated by one of said second values with the corresponding parameter of a neighbor cell," which may be realized using "software programs … executed by a microprocessor of control block 490." Ex. B at 6:51-

---

[8] *See* Doc. No. 277 at 8-13.

61. Thus, one skilled in the art would read the patent to disclose a microprocessor for performing the claimed function. Ex. A at ¶ 86.

The algorithm disclosed for performing this function is simple:  using the parameter value specified by the index for the second parameter. This finds support in, and is clearly linked to, the claimed function by the claim language, specification, and file history, and would be well-understood by one skilled in the art, who would be familiar with neighbor cell information messages used in GSM. *Id.* at ¶¶ 86-94.

In particular, claim 11 recites "an index for a second parameter, said index indicating which value of said set of specific parameter values **is used** for said second parameter." The fact that the index is "for a second parameter," and "indicat[es]" which specific value is used for the second parameter, conveys to one skilled in the art that it is a data structure that associates a specific value with a second parameter. *Id.* at ¶ 88. Further, the specific value "indicat[ed]" by the index is "used" for the second parameter, and a skilled artisan would understand that this "use" is use *by the claimed mobile device*. *Id.* at ¶ 89. Such is apparent from the claim, which recites a device for receiving the index and associating values it specifies. *Id.* Thus, the microprocessor of the device performs the claimed function by using the parameter value specified by the index for the second parameter. *Id.* at ¶¶ 87-89.

This is confirmed in the specification, which repeatedly illustrates and explains that an index (or "pointer") is used to associate a value with a parameter. *See* Ex. B at 2:15-28; 2:35-43; 3:4-26; 4:11-5:17; 5:35-46; Figs. 2-5. Moreover, the embodiment described in Figures 2-5 shows how an index or pointer is used to specify a specific value for a parameter for a specific cell:

> FIG. 5 illustrates the structure of a CELLxINFO field 255. This field specifies the information concerning a single neighbor cell. The CELLxINFO field 255 comprises a BSIC field 256, which specifies the BSIC (base station identity code) of the cell. In addition to the BSIC field 256, the CELLxINFO field 255 may

> comprise also other fields which <u>always contain cell specific information. The CELLxINFO field 255 also comprises PARAMETERxPOINTER fields 257, each of which contains a pointer specifying which of the values of the corresponding PARAMETERxVALUE LIST field 222 is to be used for the particular cell being described by the CELLxINFO field 255.</u>

*Id*. at 5:6-17. And multiple passages confirm that the pointer or index may specify a ***set*** of specific parameter values. *Id.* at 5:35-46; 3:23-26.

Thus, reading the claim in light of this intrinsic evidence, one skilled in the art would understand that the microprocessor performs the claimed "association" by using the parameter value specified by the index for the second parameter. Ex. A at ¶¶ 87-94. This algorithm is clearly linked to that function by the claim language describing the index, and its simplicity aligns with that of the claimed function. *Optimize Tech. Solutions*, 2013 U.S. Dist. Lexis 164867 at *122 ("[T]he required degree of disclosure of corresponding structure is commensurate with the complexity of the claimed function."); *Typhoon Touch,* 659 F.3d 1376 at 1385 (Fed. Cir. 2011) ("The amount of detail that must be included in the specification depends on the subject matter that is described and its role in the invention as a whole, in view of the existing knowledge in the field of the invention.").

Moreover, it constitutes sufficient structure for one skilled in the art to provide an operative software program for the claimed function. Ex. A at ¶¶ 92-93; *Typhoon Touch*, 659 F.3d at 1385. Defendants again bury their heads in the sand to ignore the broader disclosure and myopically focus on a single, isolated statement in the patent discussing a preferred embodiment. But Defendants' superficial methodology is improper because one skilled in the art would not end his inquiry with that statement.



Additionally, Defendants wrongly allege that the patent does not show "how" data within the message depicted in Figures 2-5 is "associated." Doc. No. 287 at 13. As noted above, the claim language and specification both speak to the association of data in that message. Further, the inventors illustrated during prosecution how the index is used to associate message data with in a figure submitted during prosecution (shown on the following page). Ex. C at 10. The box in the bottom right states that "PARAMETER POINTER 257 points to a specific value for that parameter in the PARAMETER VALUE LIST 222." Accordingly, the intrinsic evidence conveys to one skilled in the art (who would have knowledge of GSM messages and indexes) how a common parameter specified by a pointer is used for a particular cell parameter.

Defendants also attempt to liken the algorithm to a mere "input," but CCE's proposed algorithm is not merely a "black box." Rather, it specifies how the processor performs the function: by using a parameter specified by an index for a parameter of a neighbor cell.

Echoing their arguments against the '019 patent, Defendants object that the algorithm "reads any required structure out of the claim and renders the 'means for associating' and 'index for a second parameter' limitations redundant." Doc. No. 287 at 13. But, this reflects a misapprehension of the claim. The claimed apparatus receives a message that *includes* an index, and then *uses* the parameter value specified by the index for the second parameter, thereby

17

"associating a specific value of said set of specific parameter values indicated by one of said index with the corresponding second parameter of a neighbor cell." What the index is and how it is used are distinct.  CCE's construction maintains the integrity of the claim elements.

Defendants' complaint that there are "a number of different ways" to implement an index is conclusory and seemingly confuses breadth with indefiniteness. *See Intel Corp. v. VIA Techs.*, 319 F.3d 1357, 1367 (Fed. Cir. 2003). CCE's proposed algorithm specifies how the index is used; it does not "generically" encompass a means "in purely functional terms" to obtain a "monopoly" to them all.   And Defendants' demand for additional detail is arbitrary and unwarranted. *See Optimize Tech. Solutions*, 2013 U.S. Dist. Lexis 164867 at *122; *Typhoon Touch,* 659 F.3d 1376 at 1385 (Fed. Cir. 2011). The disclosure conveys an appropriate algorithm to one skilled in the art, and the claim is not indefinite.

### C.     The asserted claims of the '174 patent are not indefinite.

Defendants' competing claim interpretations are a recently-concocted litigation tactic. They are set forth without any reference to the intrinsic record, fail to reflect the understanding of one skilled in the art, and contradict their representations to the Patent Trial and Appeal Board.  Indeed, unlike the petitions for *inter partes* review Defendants filed against the '019, '9923,'820, and '804 patents, their '174 petition does ***not*** allege the claims are indefinite. To the contrary, Defendants' petition affirmatively explains the meaning of the claims based on citations to the intrinsic evidence and the sworn declaration of their expert. Ex. Q at 6-9. Because the scope of the claims is clear to one skilled in the art, Defendants' motion must fail.

The '174 patent describes a technique for determining and maintaining a "transmit power difference." *See, e.g.*, Ex. E at 6:40-42. Defendants' petition for *inter partes* review aptly summarizes the teachings of the patent:

The '174 patent proposes to solve the foregoing problem [aborting transmission] by requiring the transmit power difference (or headroom) be <u>determined and then maintained at the start of a transmission</u>. (6:40-42.) Power headroom, or "transmit power difference" as it is called in the '174 patent (6:40-44), "is required to exist between the total transmit power for the two codes DCH and EDCH at the start of the transmission of an EDCH message and the maximum transmit power for the two codes DCH and EDCH. The transmit power difference thus corresponds to an unused transmit power at the start of the transmission of an EDCH message." (6:42-49.) If the base station requests the subscriber station to increase its power during ongoing data transmission, for example due to deteriorated network conditions, and if the mobile station does not reserve power headroom for such increases, it may reach its maximum allowable transmit level during the ongoing transmission and be forced to abort its transmission. (See, e.g., 4:47-52.)

The '174 patent teaches that the transmit power difference can be determined by the base station or by the subscriber station based on the likelihood and magnitude of power increases that may be required during the course of a transmission.....

<u>Once the transmit power difference is determined, it is used by the subscriber station to set its transmit power at the start of a multicode transmission so as to 'maintain' the transmit power difference</u>, i.e., so "that the sum formed from the transmit powers for the two codes DCH and EDCH <u>at the start of the transmission of the EDCH message</u> differs from the maximum transmit power available for the two codes DCH and EDCH precisely by the transmit power difference, or that the transmit power difference [] represents a minimum value which must be present at least between the sum of the transmit powers for the two codes DCH and EDCH <u>at the start of the transmission of the EDCH message</u> and the maximum transmit power available for the two codes DCH and EDCH." (8:50-63.)

<u>Claim 1 is representative</u>[.]

Ex. Q at 7-9 (emphasis added) (citations in original).

Defendants' summary correctly recognizes that, according to the '174 patent, ***the "transmit power difference" is "determined and then maintained" at the start of a message transmission using a first one of the codes.*** *Id.* at 7. This understanding is based on Defendants' citations to the intrinsic record (shown above) and the sworn declaration of their expert, Dr. Williams (not CCE's alleged interpretation, as they insinuate in their brief). *See* Ex. R at ¶¶ 42-51. Moreover, is it not "standard practice" to disguise or distort the scope of a claim in an *inter partes* review petition, and Defendants cannot disavow their statements to the PTAB. Doc. No.

287 at 18.

In contrast to the well-founded explanation of the patent found in their petition, Defendants' motion fabricates alternative interpretations of the claim language without any reference to the intrinsic record.  For instance, Defendants' "determining interpretation" purports to require that the "determining" occur "at the start of a message transmission, as opposed to, *e.g.*, a determination made prior to the message transmission." Doc. No. 287 at 17 (internal quotations omitted). In other words, it would foreclose "determining" ***prior to*** a message transmission.

This directly contradicts Defendants' and Dr. Williams' statements, which agree that the subscriber station determine the transmit power difference ***before*** a message transmission. Ex. Q at 7 ("The '174 patent proposes to solve the foregoing problem by requiring the transmit power difference (or headroom) be determined ***and then maintained at the start of a transmission***. (6:40-42.)") (emphasis added); Ex. R at ¶ 51 ("***After the base station or subscriber station determine the transmit power difference***, the subscriber station sets its' transmit power at the beginning of a multicode transmission to "maintain" that difference (headroom).") (emphasis added). It also contradicts the specification, which states that the transmit power difference "is required ***to exist*** between the total transmit power for the two codes DCH and EDCH ***at the start of the transmission of an EDCH message*** and the maximum transmit power for the two codes." Ex. E at 6:40-47 (emphasis added); *see also* 8:50-63 ("It is possible that the subscriber station UE has to maintain the transmit power difference exactly…or that the transmit power difference defined by the base station NODE B represents a minimum value which must ***be present*** at least between the sum of the transmit powers for the two codes DCH and EDCH ***at the start of the transmission of the EDCH message***…") (emphasis added). The transmit power difference must

be "determined" beforehand in order for it to "exist" or "be present" at the start of a message transmission.  Defendants' "determining interpretation" is not credible and should be rejected.

Their "total transmit power interpretation" also fails to comport with the intrinsic record and understanding of one skilled in the art. Doc. No. 287 at 16. According to Dr. Akl (Defendants' second expert, employed for purposes of summary judgment), this interpretation means that "the 'determining' and 'maintaining' could both occur *after* the start of a message transmission using a first one of the codes."  Doc. No. 287-1 at ¶ 95 (emphasis in original). But this cannot be correct for reasons similar to their "determining interpretation." Indeed, it directly conflicts with Defendants' and Dr. Williams' explanations that the subscriber station "determines" the transmit power difference *prior to* a message transmission. Ex. Q at 7; Ex. R at ¶ 51. And it is likewise inconsistent with the specification, which states that the transmit power difference "exists" or is "present" at the start of the message transmission. *See* Ex. E at 6:40-47; 8:50-63. Again, the difference must be "determined" *before* it can "exist" or "be present" at the start of a message transmission.  Defendants' "total transmit power interpretation" thus also fails.

The correct view of the claims aligns with Defendants' "maintaining interpretation," which comports with the intrinsic record and both Defendants and Dr. Williams' prior statements. The asserted claims reflect that the transmit power difference is determined (by a base station or subscriber station) and then used by the subscriber station to "maintain" the power difference, beginning "at the start of a message transmission using a first one of the codes." Ex. E at 6:40-49; 8:50-64.  This is consistent with a common-sense understanding of the invention, because the transmit power difference must be "determined" before it is "maintained," and the specification makes clear that it is "maintained" when a message transmission begins. *See id.* It is also plainly reflected in claim 9, which clarifies that the transmit power difference is

determined "previously," and then "maintained" at the start of a message transmission using a first one of the codes. And, it is further confirmed by Defendants' statements and Dr. Williams' sworn declaration. Ex. Q at 7 ("The '174 patent proposes to solve the foregoing problem by requiring the transmit power difference (or headroom) be determined *and then maintained at the start of a transmission*.") (emphasis added); Ex. R at ¶ 51 (*After* the base station or subscriber station determine the transmit power difference, *the subscriber station sets its' transmit power at the beginning of a multicode transmission to "maintain" that difference* (headroom).") (emphasis added).

The patent makes clear to a skilled artisan that the transmit power difference is maintained upon transmission of a message, and Defendants' baseless interpretations must be rejected.

### D.    The asserted claims of the '820 patent are not indefinite.

#### 1.    Claims 1, 12, and 24 do not recite conflicting requirements

Contrary to Defendants' unfounded interpretation, the claims recite (and the specification describes) a *single* designation. Representative claim 1 recites "designating" a buffer status reporting format and "communicating" a buffer status report in accordance with the format designated. It requires only one designation, not serial designations. This understanding is made plain by the "wherein" clause, which expressly refers back to "*the* designating" already recited. Ex. F at 11:11-20.  And, it is confirmed in the specification. *See, e.g., id.* at 10:7-44.

Nor does the claim require designating a format depending "only" on the detected pre-selected condition. *See, e.g.*, *id.* at 10:7-44; 11:11-20.  Rather, the claims are open-ended and permit the designation to depend on additional factors, such as uplink bandwidth.

Defendants' argument hinges on the false premise that the claims require designating a particular format depending *only* on the pre-selected condition detected. That is, their allegation

that "in certain circumstances, the 'pre-selected condition' may ***require*** designating the short reporting format" assumes, without basis, that this "only" limitation is recited in the claim.  Doc. No. 287 at 19 (emphasis added). When that illusory limitation is discarded (as it must be), it becomes clear that the "pre-selected condition detected" and "sufficient uplink bandwidth" do not impose "conflicting designations." Thus, Defendants' alleged "conflict" does not exist and cannot serve as a basis for invalidating the claims.

Additionally, Defendants cite no authority for invaliding a claim based on alleged possibilities or imagined scenarios. The sole case referenced in their motion is an non-precedential  decision addressing a claim that recited both an "address means" that *required* ISA structures and a "sustain means" which *excluded* ISA structures. *Competitive Techs., Inc. v. Fjuitsu Ltd.*, 185 F. App'x 958, 966 (Fed. Cir. 2006). In other words, the indefinite claims required both "A" and "not A" — a logical impossibility. In contrast, the language of claims 1, 12, and 24 does not expressly recite contradictory elements, and Defendants' motion must fail.

### 2.      "the designating unit" (cl. 12)

As explained in CCE's Opening Brief,[9] "the designating unit" is not subject to § 112(6). Rather, the correct meaning of the disputed phrase is apparent from the claims and file history: "the designating unit" refers to and further describes the element that "designates," i.e., "the memory and the computer program code configured to, with the processor, cause the apparatus at least to … designate one of a plurality of buffer status reporting formats[.]"

Claim 12 recites a processor, memory, and program code configured to "designate" a "long" buffer status reporting format, and specifies that "the designating unit" also "designates" a "long" buffer status reporting format. Ex. F at 11:56-12:6. Thus, these elements perform the same "designating" function. Moreover, "the designating unit" attempts to refer back to a prior

---

[9] Doc. No. 277 at 22-27.

23

element (by reciting the word "the") and is referenced in a "wherein" clause, denoting its relationship to a prior limitation. One skilled in the art would thus understand that "the designating unit" is a reference to the claimed processor, memory, and computer program code configured to "designate." Ex. A at ¶¶ 96-102.

This is confirmed by Claims 1, 23 and 24, which each include a "wherein" clause that refers back to the "designating" element, just like claim 12. Any remaining doubt is dispelled by the file history. Claim 12 (as originally presented) recited multiple "units," including a "monitoring unit," "and "designating unit." Ex. G at 24. The



examiner rejected this claim, alleging that the claimed "units" were directed to "software per se." *See* Ex. H at 3-4. The applicants traversed this rejection, but ultimately mooted it by rewriting the claim to recite a processor, memory, and computer program code configured to perform specific steps, rather than various "units" (as shown above). Ex. I at 5-6 (emphasis added).

Thus, "the designating unit" is an artifact of prosecution, as it originally referenced the "designating" element recited previously in the claim. The applicants never intended it to introduce a new element or invoke § 112(6). That "the designating unit" was not revised in the amendment above is an obvious, minor error that the Court should correct. *Smartphone Techs. LLC v. Research in Motion Corp.*, 2012 U.S. Dist. LEXIS 108370, *16 (E.D. Tex. Aug. 2, 2012).

Astonishingly, Defendants' motion ignores all of this evidence and urges the Court to apply § 112(6), despite the "strong presumption" against it. *Williamson v. Citrix Online LLC.*,

No. 2013-1130, 2014 U.S. App. Lexis 21115, *13-14 (Fed. Cir. Nov. 5, 2014). But even if the evidence supporting CCE's construction is set aside, Defendants' argument falls short because the '820 patent expressly states that the claimed "units" correspond to structure, namely, hardware and software components. Ex. F at 7:15-24. This understanding was confirmed by the applicant during prosecution. Ex. S at 6-7, 11. Moreover, "the designating unit" is claimed as part of the definite structure of claim 12, which includes an "apparatus" comprising a processor, memory, and computer program code. Thus, the term "designating unit" in the '820 patent has structure connoting meaning to persons of ordinary skill in the art. *Williamson*, 2014 U.S. App. LEXIS 21115 at *17-19. This is further confirmed by claim 23, showing that the inventor used the word "means" when he intended to invoke § 112(6), as well as Defendants' *inter partes* review petition, which omits this phrase from their list of § 112(6) terms. Ex. J at 18-19.

Nonetheless, should "the designating unit" invoke § 112(6), the claimed function is "designating the long buffer status reporting format when there is sufficient uplink bandwidth to communicate using the long buffer status reporting format." Ex. A at ¶ 103. The structure clearly linked to this function is a VLSI circuit, semiconductor, or processor (7:15-24 and FIG. 2) configured to assign a buffer status reporting format depending on the preselected condition detected and uplink bandwidth, and/or buffer priority. *Id.* at ¶¶ 104-111. This algorithm is depicted in Figs. 2-4 and described at 6:1-42 ("[D]esignating unit 260 is configured to designate one of a plurality of buffer status reporting formats depending on the pre-selected condition detected….the buffer prioritizing unit 250 may collaborate with the uplink capacity detecting unit 240 and the designating unit 260 to enable the designating unit 260 to assign/designate the most beneficial buffer status reporting format to the buffer of the highest priority, all in accordance with the uplink capacity of the user equipment 200."); 7:58-8:1; 8:17-39; 10:29-44.

25

Dated:  **December 2, 2014**.                    By:

                                               */s/ Edward R. Nelson, III*
Edward R. Nelson, III
enelson@nbclaw.net
Texas State Bar No. 00797142
Brent N. Bumgardner
bbumgarnder@nbclaw.net
Texas State Bar No. 00795272
Barry J. Bumgardner
barry@nbclaw.net
Texas State Bar No. 00793424
S. Brannon Latimer
blatimer@nbclaw.net
Texas State Bar No. 24060137
Thomas C. Cecil
tcecil@nbclaw.net
Texas State Bar No. 24069489
NELSON BUMGARDNER CASTO, P.C.
3131 West 7th Street, Suite 300
Fort Worth, Texas 76107
Phone:  (817) 377-9111
Fax:  (817) 377-3485

T. John Ward, Jr.
Texas State Bar No. 00794818
J. Wesley Hill
Texas State Bar No. 24032294
Claire Abernathy Henry
Texas State Bar No. 24053063
WARD & SMITH LAW FIRM
P.O. Box 1231
1127 Judson Rd. Ste. 220
Longview, Texas  75606-1231
(903) 757-6400
(903) 757-2323 (fax)
jw@jwfirm.com
wh@wsfirm.com
claire@wsfirm.com

**ATTORNEYS FOR PLAINTIFF
CELLULAR COMMUNICATIONS
EQUIPMENT LLC**

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 2nd day of December, 2014, I electronically filed the foregoing document with the clerk of the Court for the U.S. District Court, Eastern District of Texas, Tyler Division, using the Court's electronic case filing system.  The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

*/s/ Edward R. Nelson, III*

27