# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| CELLULAR COMMUNICATIONS EQUIPMENT LLC, | § § § | |
| Plaintiff, | § § | CASE NO. 6:13-cv-507-LED |
| v. | § § | CONSOLIDATED LEAD CASE |
| HTC CORPORATION, *et al*., | § § | |
| Defendants. | § § § | |

## DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     LEGAL AUTHORITY ....................................................................................... 1

III.    ANALYSIS.......................................................................................................... 2

        A.      U.S. Patent No. 8,055,820........................................................................ 3

                1.      "usage" (Claims 1, 12, 24)............................................................ 3

        B.      U.S. Patent No. 7,218,923........................................................................ 8

                1.      "a message of the messages" (Claim 24)...................................... 8

                2.      "tamper resistant" (Claim 26) ...................................................... 13

IV.     CONCLUSION.................................................................................................... 19

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*2-Way Computing, Inc. v. Nextel Fin. Co.*,
  No. 11-CV-00012, 2012 WL 4846145 (D. Nev. Oct. 9, 2012) ...............................................2

*ACTV, Inc. v. Walt Disney Co.*,
  346 F.3d 1082 (Fed. Cir. 2003)...............................................................................................7

*Advanced Fiber Techs. Trust v. J&L Fiber Servs.*,
  674 F.3d 1365 (Fed. Cir. 2012)...............................................................................................1

*Beneficial Innovations, Inc. v. Blockdot, Inc.*,
  2010 WL 2246291 (E.D. Tex. June 3, 2010)...........................................................................9

*Exxon Chem. Patents, Inc. v. Lubrizol Corp.*,
  64 F.3d 1553 (Fed. Cir. 1995).................................................................................................4

*Free Motion Fitness, Inc. v. Cybex Int'l*,
  423 F.3d 1343 (Fed. Cir. 2005)...............................................................................................2

*Fuji Photo Film Co. v. Int'l Trade Comm'n*,
  386 F.3d 1095 (Fed. Cir. 2004).............................................................................................11

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
  381 F.3d 1111 (Fed. Cir. 2004)...............................................................................................4

*Int'l Airport Ctrs., L.L.C. v. Citrin*,
  440 F.3d 418 (7th Cir. 2006) .................................................................................................18

*LSI Indus., Inc. v. ImagePoint, Inc.*,
  279 F. App'x 964 (Fed. Cir. 2008) ..........................................................................................9

*Novartis Pharm., Corp. v. Wockhardt USA LLC*,
  No. 12-CV-3967, 2014 WL 2861209 (D. N.J. June 24, 2014)................................................2

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
  521 F.3d 1351 (Fed. Cir. 2008)...........................................................................................3, 4

*Omega Eng'g, Inc. v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003)...............................................................................................9

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc)...................................................... *passim*

*Smith v. Snow*,
   294 U.S. 1 (1935)..........................................................................................................2

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
   299 F.3d 1313 (Fed. Cir. 2002)...................................................................................1

*United States v. Drew*,
   259 F.R.D. 449 (C.D. Cal. 2009) ...............................................................................18

*United States v. John*,
   597 F.3d 263 (5th Cir. 2010) .....................................................................................18

*United States v. Nosal*,
   676 F.3d 854 (9th Cir. 2012) (en banc) .....................................................................18

*United States v. Phillips*,
   477 F.3d 215 (5th Cir. 2007) .....................................................................................18

*United States v. Rodriguez*,
   628 F.3d 1258 (11th Cir. 2010) .................................................................................18

*Vantage Point Tech., Inc. v. Amazon.com, Inc.*,
   2015 U.S. Dist. LEXIS 16316 (E.D. Tex. Feb. 11, 2015) ..........................................5

*WEC Carolina Energy Solutions LLC v. Miller*,
   687 F.3d 199 (4th Cir. 2012) .....................................................................................17

**Statutes**

18 U.S.C. 1030...............................................................................................................17

**Other Authorities**

Computer Fraud and Abuse Act (CFAA) ......................................................................17

Orin Kerr, *Cybercrime's Scope: Interpreting "Access" and "Authorization" in
   Computer Misuse Statutes*, 78 N.Y.U. L. Rev. 1596 (2003) ....................................18

Orin Kerr, *Vagueness Challenges to the Computer Fraud and Abuse Act*,
   94 Minn. L. Rev. 1561 (2010) ...................................................................................18

## TABLE OF EXHIBITS

Exhibit 1       U.S. Patent No. 8,055,820

Exhibit 2       Microsoft   Press,   Internet   &   Networking   Dictionary   271   (2003)
                [JOINTDEFS-CCE00005231–34]; New Oxford American Dictionary 1853 (2d ed.
                2005)  [JOINTDEFS-CCE00005235–38];  Webster's  II  New  College  Dictionary
                1244 (3d ed. 2005) [JOINTDEFS-CCE00005243–46]; Webster's New American
                Dictionary 573 (1995) [JOINTDEFS-CCE00005247–50]; Webster's New World
                Dictionary 710 (4th ed. 2003) [JOINTDEFS-CCE00005251–54]; Collins English
                Dictionary 1767 (9th ed. 2007) [JOINTDEFS-CCE00005255–57]; Random House,
                Webster's    Unabridged    Dictionary    2097    (2d    ed.    2001)
                [JOINTDEFS-CCE00005258–60]

Exhibit 3       Table of Dictionary Definitions

Exhibit 4       U.S. Patent No. 7,218,923

Exhibit 5       *NEC Corp. v. Cellular Commc'ns Equip., LLC*, IPR2014-01133, Paper 9 (P.T.A.B.
                Oct. 23, 2014)

## I.  INTRODUCTION

The multiple rounds of local rule disclosures, evidentiary productions, and conferences demonstrate that the parties disagree on the meaning and scope of the three claim terms discussed herein.  In its opening brief, however, Plaintiff contends that all three disputed terms do not require construction because the "plain and ordinary meaning" is sufficient.  Yet Plaintiff goes on to provide confusing definitions of what it contends are the plain and ordinary meanings of the terms.  Thus, even if the Court were to adopt Plaintiff's proposals of "plain and ordinary meaning," that would not resolve the claim construction issues in this case.  Plaintiff's proposed non-constructions would merely punt to the jury legitimate issues of claim scope that are instead the Court's to resolve as a matter of law.  Defendants' constructions, in contrast, should be adopted because they accurately define the disputed terms in the context of the claims and will assist the jury in understanding and applying the claim language.  With the above in mind, Defendants hereby submit their Responsive Claim Construction Brief.[1]

## II.  LEGAL AUTHORITY

Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc).  The specification may resolve ambiguous claim terms "where the ordinary and accustomed meaning[s] of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone."  *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).

"Courts may rely on dictionary definitions when construing claim terms, 'so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.'"  *Advanced Fiber Techs. Trust v. J&L Fiber Servs.*, 674 F.3d 1365, 1373 (Fed.

---

[1] This brief is filed on behalf of AT&T Mobility LLC, HTC Corporation, HTC America, Inc., Exedea, Inc., Sprint Solutions, Inc., Sprint Spectrum L.P., Boost Mobile, LLC, Dell Inc., T-Mobile USA, Inc., T-Mobile US, Inc., Pantech Co., Ltd., Pantech Wireless, Inc., LG Electronics, Inc., LG Electronics USA, Inc., Amazon.com, Inc., Cellco Partnership d/b/a Verizon Wireless, ZTE USA, Inc., and Apple Inc., (collectively, "Defendants").  Each Defendant joins the brief only with respect to the claims asserted against that Defendant.

Cir. 2012) (citing *Phillips*, 415 F.3d at 1322–23).  "Dictionaries or comparable sources are often useful to assist in understanding the commonly understood meaning of words and have been used both by our court and the Supreme Court in claim interpretation."  *Phillips*, 415 F.3d at 1322.  "A dictionary definition has the value of being an unbiased source 'accessible to the public in advance of litigation.'"  *Id.* at 1322 (*citing Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1585 (Fed. Cir. 1996)).  However, dictionary definitions "may extend patent protection beyond what should properly be afforded by the inventor's patent."  *Id.* at 1322; *see also Smith v. Snow*, 294 U.S. 1, 14 (1935) ("[I]f the claim were fairly susceptible of two constructions, that should be adopted which will secure to the patentee his actual invention").  "Under *Phillips*, the rule that 'a court will give a claim term the full range of its ordinary meaning,' does not mean that the term will presumptively receive its broadest dictionary definition or the aggregate of multiple dictionary definitions. Rather, in those circumstances where reference to dictionaries is appropriate, the task is to scrutinize the intrinsic evidence in order to determine the most appropriate definition."  *Free Motion Fitness, Inc. v. Cybex Int'l*, 423 F.3d 1343, 1348–49 (Fed. Cir. 2005).

Several courts have also recognized that "a key aspect of claim construction is to assist the jury in understanding complicated language and concepts."  *See Novartis Pharm., Corp. v. Wockhardt USA LLC*, No. 12-CV-3967, 2014 WL 2861209, at *2 (D. N.J. June 24, 2014) (quoting *Encap LLC v. Oldcastle Retail, Inc.*, No. 11-CV-808, 2012 WL 2339095, at *9 (E. D. Wis. June 19, 2012)).  A construction that "will be easier to understand [for] a jury… is a key goal of claim construction."  *2-Way Computing, Inc. v. Nextel Fin. Co.*, No. 11-CV-00012, 2012 WL 4846145, at *9 (D. Nev. Oct. 9, 2012) on reconsideration in part sub nom. *2-Way Computing, Inc. v. Sprint Nextel Corp.*, No. 11-CV-12, 2013 WL 2218010 (D. Nev. May 17, 2013).

## III.    ANALYSIS

For a detailed overview of relevant technology described in the Asserted Patents, Defendants invite the Court to review their Technology Tutorial submitted on February 20, 2015.[2]

---

[2] Defendants' Technology Tutorial is identical to the Technology Tutorial submitted to the Court on October 28, 2014.

### A.    U.S. Patent No. 8,055,820

The '820 Patent relates to techniques for increasing data buffer status reporting efficiency and adapting buffer status reporting according to uplink bandwidth.  To determine its needs for resources from the network, a user device monitors the usage of a plurality of data buffers and detects a plurality of pre-selected conditions corresponding to those buffers.  (Ex. 1 at 7:58–63.)  In turn, to convey its needs for resources to the network, a user device can then report a data buffer status report.  (*Id.* at 8:66–9:5.)  The '820 Patent discloses two distinct types of buffer status reports—a long format and a short format.  (*Id.* at 1:53–55.)

### 1.    "usage" (Claims 1, 12, 24)

| Defendants' Construction | Plaintiff's Construction |
|---|---|
| "an act, way, or manner of using" | "Plain and ordinary meaning [*i.e.*, all dictionary definitions for usage, including, but not limited to, Defendants' proposed construction ('an act, way, or manner of using'), 'use,' 'employment,' 'the fact of being used,' 'treatment,' 'the action or mode of using,' 'the … extent of using,' and 'an act … of employing.' (Pl. Br. at 5–6)]; no construction necessary." |

**a. The Court should construe "usage," because Plaintiff proposes that the jury be told only that the term has its "plain and ordinary meaning," despite the clear dispute regarding the meaning.**

The parties dispute the meaning of "usage."  Where a "term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties dispute," determining that "a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate."  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008).  Even if a term has a "well-understood definition," a court should construe the term if the parties dispute its scope.  *Id.*

As illustrated by the dictionaries attached as Exhibit 2, there are many potential usages of the term "usage."  Many of these definitions clearly do not apply in the context of the claims.  (*See, e.g.*, Ex. 2 at 27 ("monitoring ['a custom'] of a plurality of buffers").)  Yet, Plaintiff contends that

3

the proper interpretation of the term "usage" includes **all** of the dictionary definitions.  *See* Pl. Br. at 5.  Throwing a hodge-podge of dictionary definitions at the Court in arguing that "no construction is necessary" is contrary to governing legal principles and simply places the burden on the jury to resolve the parties' dispute regarding the scope of the term.  Given the numerous potential usages of "usage," Defendants' construction defines the term as it is used in the claims and the specification, fairly capturing the dictionary definitions that make sense in that context, as illustrated in Exhibit 3.

In light of the clear dispute regarding the scope of "usage," the Court should construe the meaning of the term in view of the claims and the specification.

### b.  Plaintiff's interpretation conflates the claimed "monitoring *a usage of* the buffers" with the much broader concept of "monitoring the buffers."

Plaintiff conflates the different concepts of "monitoring the buffers" and "monitoring ***the usage of*** buffers."  *See, e.g.*, Pl. Br. at 5 ("[M]onitoring 'usage' may entail monitoring whether or not data is in one or more of the buffers.").  "While not an absolute rule, all claim terms are presumed to have meaning in a claim."  *See, e.g.*, *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004), *reaffirmed in Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc) (finding that one party's "interpretation largely reads the term 'operatively' out of the phrase 'operatively connected'"); *see also Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1557 (Fed. Cir. 1995) (recognizing that "[w]e must give meaning to all the words in [the] claims"; the patentee "need not have included [the specific] limitation in its claim" but "[h]aving done so, it must live with the language it chose").

Plaintiff's interpretation is improper because the '820 Patent expressly distinguishes the two concepts:  "In certain embodiments, monitoring 310 buffers ***may include*** monitoring a usage of one or more communication buffers."  (*See* Ex. 1 at 7:58–60 (emphasis added).)  This passage from the specification makes clear that "monitoring the buffers" is both broader and different than the claimed "monitoring ***the usage of*** the buffers."

4

Plaintiff's interpretation—that "monitoring *the usage of* buffers" includes "monitoring buffers"—flips this important distinction on its head and would improperly expand the scope of the claims beyond their express language. *See* Pl. Br. at 4–5. "[I]t is the function of the claims, not the specification, to set forth the limits of the patentee's invention. Otherwise, there would be no need for claims." *Vantage Point Tech., Inc. v. Amazon.com, Inc.*, 2015 U.S. Dist. LEXIS 16316, at *11 (E.D. Tex. Feb. 11, 2015) (*citing SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc)). Here, the patentee disclosed in the specification an important distinction between the broader concept of monitoring buffers and the different, narrower concept of monitoring the usage of buffers. Fully aware of this distinction, the patentee elected to direct its claims to monitoring the usage of buffers, not the broader concept of monitoring buffers. Plaintiff is not permitted to recapture the subject matter the patentee elected not to claim.

Thus, Defendants are not trying to narrow a claim limitation in light of the specification, as Plaintiff contends. Rather, Defendants' construction ascribes meaning to the disputed term as the patentee used that term in the patent. In contrast, Plaintiff is trying to broaden a claim limitation beyond its meaning as used in the claims and the specification. That is improper and should be rejected.

### c. Defendants' construction follows the claim language and will assist the jury in understanding and applying it.

As explained above, Plaintiff seeks to interpret the term "usage" in a manner that improperly broadens the scope of the claim. In contrast, Defendants' construction defines the meaning of "usage" within the context of the claims, as would be understood by a person of skill in the art. To that end, Defendants' construction broadly encompasses multiple dictionary definitions that align with the claim language and specification disclosures, in a manner that will assist the jury in understanding and applying the claim language, and that will not improperly leave to the jury the task of resolving the parties' dispute regarding the scope of the claims.

The specification distinguishes between monitoring buffers and monitoring the usage of buffers. Thus, the claimed monitoring must be directed to the "usage" of the buffers by other

5

components (*e.g.*, applications) as opposed to monitoring directly the buffers themselves.  As "usage" is not a technical term of art, Defendants turned to dictionaries that were available as of the alleged priority date for the '820 Patent.

Defendants' construction—"an act, way, or manner of using"—fairly captures the meaning of the term as it is used in the claims.  (*See* Ex. 3 (depicting the numerous dictionary definitions that are consistent with Defendants' construction); *see, e.g.*, Ex. 2 at 24 ("the act or a manner of using"); *id.* at 21 ("the act, way, or extent of using"); *id.* at 13 ("the act or manner of using or treating").)  Moreover, Defendants' construction reconciles the distinction between monitoring buffers and monitoring the usage of buffers—the former monitors the buffers themselves while the latter, for example, monitors how the buffers are being used.  (*Compare with id.* at 5 ("usage analysis: Data collected to evaluate how a Web site is being used, such as visitor user names, how often each page was visited, and the types of Web browsers used").)  Thus, Defendants' construction provides the proper meaning of the term "usage," and will permit the jury to understand the metes and bounds of the monitoring limitation.

### d. Plaintiff's interpretation of the "plain and ordinary meaning" is unwieldy and would confuse the jury.

Plaintiff's interpretation, on the other hand, is unwieldy and would confuse the jury.  As discussed above, Plaintiff's interpretation conflates the claimed monitoring the usage of buffers with the different, broader concept of monitoring buffers.  This interpretation will confuse the jury because it improperly discards "usage" from the claim limitation.

Plaintiff's contention that is entitled "the broader meaning of 'usage' conveyed in . . . dictionaries" will also confuse the jury because many of the definitions are inapplicable.  *See* Pl. Br. at 5-6 (arguing the broader meaning of usage "encompass[es] not only 'an act, way, or manner of using' but also 'use,' 'employment,' 'the fact of being used,' 'treatment,' 'the action or mode of using,' 'the . . . extent of using,' and 'an act . . . of employing.'").

Substituting certain of the dictionary definitions for the term "usage" in the claim further illustrates problems with Plaintiff's contention that the claimed "usage" encompasses all of the

possible dictionary definitions.  (*See, e.g.*, Ex. 2 at 21 ("monitoring a ['habit'] of a plurality of buffers"); *id.* at 13 ("monitoring ['a particular expression in speech or writing'] of a plurality of buffers"); *id.* at 24 ("monitoring ['something permitted or established by custom or practice'] of a plurality of buffers").)  As these examples of the claim language that would result from Plaintiff's inapplicable definitions make no sense, Plaintiff's interpretation cannot be correct.

Despite certain usages of "usage" being inapplicable in the context of the claims, Plaintiff maintains that it is entitled to capture all of those usages.  However, a claim term is only afforded its meaning within the scope of the claims and specification.  *See Phillips*, 415 F.3d at 1315; *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003).  Here, the claims and specification do not extend the meaning of the term "usage" to include even Plaintiff's similar expressions (*e.g.*, "monitoring the [use] of buffers"), much less Plaintiff's more extreme expressions (*e.g.*, "monitoring ['the way in which a word, phrase, etc. is used to express a particular idea'] of a plurality of buffers").

With respect to the '820 Patent, the patentee made a conscious decision to forgo claiming "monitoring buffers," "monitoring the use of buffers," and other possibilities, electing instead to claim "monitoring a usage of . . . buffers."  Plaintiff now elects to forgo proposing a construction that properly reflects the plain and ordinary meaning of the term "usage," and focuses instead on trying to identify alleged flaws in Defendants' construction.  Those efforts fall short.[3]

There is a dispute between the parties regarding the scope of the term "usage."  For the reasons discussed above, the Court should reject Plaintiff's non-construction because it would impermissibly broaden the scope of the express claim language and improperly shift to the jury the task of resolving the dispute as to claim scope.  Instead, the Court should adopt Defendants' construction because it defines the meaning of the term in the context of the claims and specification, and will assist the jury in understanding and applying the claim language.

---

[3] Plaintiff's allegations are also conclusory.  As one example, Plaintiff fails to explain how Defendants' construction—"an act, way, or manner of using"—would not adequately cover certain definitions identified in Plaintiff's brief, such as "the action or mode of using."

### B.      U.S. Patent No. 7,218,923

The '8923 Patent relates to a technique for controlling the behavior of messages sent by applications within a terminal.  The '8923 Patent praised the emergence of open development platforms as ushering in a new era of services and applications for the multimedia environment. However, the '8923 Patent was concerned that these open development platforms enabled fraudulent applications to misuse the communication environment.  The '8923 Patent sought to eliminate this issue by "ascertaining [whether] the applications developed for the open platform behave in an appropriate and rightful manner."  (Ex. 4 at 1:39–43.)

The claimed invention includes a diverting unit, which routes some of an application's outgoing messages to a separate controlling entity before they are sent out to the network.  (*See id.* at 10:62–65.)  This separate controlling entity houses the control mechanisms.  For instance, the controlling entity is configured with a set of predetermined parameters which determine whether the application that sent the outgoing message should behave in a certain manner.  (*See id.* at 10:66–11:5.)  The controlling entity can also be configured with parameters to accomplish a number of effects, including but not limited to checking the rights of the application program to send messages to the network, adding an additional identifier to the message, or adding a digital signature for authentication to the message.  (*See id.* at 1:67–2:3, 2:58–62.)

#### 1.   "a message of the messages" (Claim 24)

| Defendants' Construction | Plaintiff's Construction |
|---|---|
| "one or more, but less than all, of the messages" | "Plain and ordinary meaning [*i.e.*, 'one or more of the messages' (Pl. Br. at 7)]; no construction necessary." |

The '8923 Patent is directed to platforms where applications send messages to the network. To accomplish these operations, the applications utilize a network stack to simplify the process. When an application routes a message to the network by way of the network stack, the "diverting unit," described above, may divert the message, routing that message to the controlling entity. Thus, the purpose of the diverting unit is to redirect selected messages to a secure area for further operations and/or analysis.

The parties dispute the meaning of "a message of the messages." Defendants' construction defines the scope of "a message of the messages" in light of the claims, the specification, and Plaintiff's prior statements to the Patent Office. Plaintiff, on the other hand, has espoused two polar opposite interpretations for "a message of the messages." First, in its brief, Plaintiff argues that this term broadly covers "one or more of the messages," including *all* of the messages. *See* Pl. Br. at 7; *see also id.* ("Defendants wrongly allege that 'a message of the messages' means 'less than all' of them."). Second, in response to an IPR petition directed to the '8923 Patent, Plaintiff distinguished certain prior art references on the basis that they diverted *all* of the messages. (*See, e.g.*, Ex. 5 at 27–28.) In other words, Plaintiff's position in the IPR proceeding is that the prior art does not anticipate the claims because diverting "one or more of the messages" does not cover diverting *all* of the messages, in direct conflict with Plaintiff's position here.

As the parties dispute the scope of "a message of the messages" when interpreted in context of the claims, the specification, and Plaintiff's prior statements, construction of this term is necessary and appropriate.

> **a. Plaintiff's prior statements to the Patent Office—that "a message of the messages" does not include *all* messages—precludes Plaintiff's arguments to the Court here.**

A patentee's statements to the Patent Office regarding the scope of a patent may limit the construction of that patent's terms. *See Beneficial Innovations, Inc. v. Blockdot, Inc.,* 2010 WL 2246291, at *2 (E.D. Tex. June 3, 2010) ("Statements made during prosecution or reexamination may commit the patentee to a particular meaning for a patent term."). When a patentee surrenders specific subject matter through its arguments, it may not recapture that subject matter through claim construction. *See LSI Indus., Inc. v. ImagePoint, Inc.*, 279 F. App'x 964, 969 (Fed. Cir. 2008) (limiting claim scope "because the statements at issue clearly and unmistakably disavowed claim scope by distinguishing prior art references to overcome the examiner's rejections"). And for good reason—a patentee's statements regarding what a patent does and does not cover provide an important public notice function. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) ("As a basic principle of claim interpretation, prosecution disclaimer promotes the

9

public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution.").

In this case, Plaintiff filed a response to a petition to institute an IPR for the '8923 Patent. As discussed above, Plaintiff distinguished Claim 24 from multiple prior art references.  Plaintiff's arguments are highly relevant to the instant claim construction because the IPR standard for claim construction—the "broadest reasonable construction"—is necessarily broader than the standard this Court must apply in light of *Phillips*.  Thus, Plaintiff cannot reasonably interpret the Claim 24 more broadly here than it did in opposing the IPR petition.

In opposing the IPR petition, Plaintiff made multiple, specific arguments regarding the scope of "a message of the messages" as part of the larger "diverting unit configured to divert a message of the messages" limitation.  For one prior art reference, Plaintiff stated: "Petitioner has not shown where D'Aviera discloses the claim limitations relating to 'diverting *a message of the messages*.'  Furthermore, D'Aviera's isolation engine 225 cannot be the claimed diverting unit, because it intercepts *all outbound operations* of the application program 210."  (Ex. 5 at 27–28 (emphasis in original).)  Thus, Plaintiff interpreted the scope of "a message of the messages" to exclude diverting *all* messages, and then used that interpretation to expressly distinguish the D'Aviera prior art reference.

Plaintiff also used its interpretation of "a message of the messages"—excluding diverting *all* messages—to distinguish another prior art reference in a similar manner:

> For example, Williamson at ¶ [0082] states that "[a]s with the VPMS, the VAPS handles *all requests to send outbound data* from the workstation 910, and operates to restrict the propagation of viruses within the network by limiting the extent to which the workstation can engage in what may be thought of as 'unusual' behaviour in contacting other hosts," (emphasis added). Accordingly, Williamson merely discloses that VAPS handles *all* requests to send outbound data. Williamson does *not* disclose "diverting" some of the requests (sent to the network) to the VAPS for processing.

(Ex. 5 at 35 (emphasis in original).)

10

Plaintiff thus unequivocally took the position that diverting "a message of the messages" excludes diverting **all** messages.  Plaintiff cannot represent to the Patent Office (and the public) that "a message of the messages" does not cover **all** messages, in an effort to save its patent from invalidity, only to take a polar opposite position before this Court a few months later.

Finally, Plaintiff's arguments regarding the meaning applied by certain Defendants in their IPR petition are misplaced.[4]  As noted above, this Court's standard for claim construction in light of *Phillips* differs from the Patent Trial and Appeal Board's "broadest reasonable construction" standard.  As a result, the fact that certain defendants may be applying a narrower construction in this district court litigation under the narrower *Phillips* standard than they did in their IPR petition under the broader PTAB standard is to be expected.  In contrast, Plaintiff's interpretation requires it to argue here that the scope of the term is **broader** than the "broadest reasonable construction" (*i.e.*, excluding diverting **all** messages) it advanced to the PTAB.

### b.  Plaintiff's interpretation of the "plain and ordinary meaning" vitiates the context of the claim term.

Plaintiff's argument that Defendants ignore the open-ended nature of "a message" is incorrect.  Defendants' construction is entirely consistent with the interpretation that "a message" can mean "one or more" messages.  In fact, this open-ended principle is explicitly incorporated into Defendants' construction.

Plaintiff's interpretation that "a message of the messages" merely means "one or more messages," on the other hand, vitiates the distinction between "message" and "messages."  *See* Pl. Br. at 7 ("And, because 'a message of the messages' appears in an open-ended claim containing the transitional phrase 'comprising,' as a rule it is to be interpreted as 'one or more of the messages.'").  The patentee could easily have drafted the claim to cover "an application program

---

[4] AT&T, Sprint, T-Mobile, and Verizon have not participated in any way in the IPR proceedings. *Cf. Fuji Photo Film Co. v. Int'l Trade Comm'n*, 386 F.3d 1095, 1101 (Fed. Cir. 2004) ("The infringement analysis in the initial determination was made pursuant to a stipulation with respect to the meaning of the claim terms by one of the respondents in that proceeding. Since the respondents who are affected by the claim construction in the present proceedings were not parties to that stipulation, they are not bound by it, nor does the administrative law judge's acceptance of the stipulation constitute a formal claim construction.").

configured to send *a message* . . .; and a diverting unit configured to divert *said message*."  Had the patentee chosen such language, it would have covered diverting a single message, multiple messages, or all of the messages.  Instead, the patentee chose to claim "an application program configured to send *messages* . . .; and a diverting unit configured to divert *a message of the messages*."  That claim language cannot properly be interpreted to cover diverting *all* of the sent messages, as the set of messages diverted must be a subset of the set of messages sent.

For at least these reasons, Plaintiff's interpretation is an improper attempt to rewrite the scope of the claim.

>    **c.  Defendants' construction defines "a message of the messages" in light of the claim language, the specification, and Plaintiff's prior statements regarding the scope of the claim.**

Defendants' construction is proper because it defines the scope of "a message of the messages" as that phrase is used within the claims and the specification.  The claim language distinguishes between "message" and "messages."  Rather than improperly conflate "message" with "messages" as in Plaintiff's interpretation, Defendants' construction preserves the distinction between the two terms, while clarifying that any diverted "message" must belong to the antecedent set of sent "messages"—*i.e.*, "*one or more*, but less than all, *of the messages*."

Furthermore, the specification only discloses diverting a subset of the sent messages, for further operations and/or analysis.  The specification summarizes the invention as diverting "at least some," "at least one," or "selected" messages.  (*See, e.g.*, Ex. 4 at Abstract (diverting "at least some of the messages"); 1:60–63 (diverting "at least some of the outbound messages"); 2:16 ("diverting at least one message"); 2:21–22 ("at least one message diverted"); 2:26–27 ("diverting selected messages"); 2:39 ("diverting at least some of the messages").)  Notably, although the patentee repeatedly made clear that more than one message may be diverted, in summarizing the invention the patentee never disclosed the possibility of diverting all of the messages.

The specification's detailed description makes a similar distinction between messages that are diverted and messages that are not diverted.  (*See generally id.* at 4:20–5:8.)  This passage illustrates how an INVITE request from one application is diverted to the controlling entity, *see id.*

4:57–62 ("If the application identifier is found in the repository, the repository returns a positive response (step 6) indicating that the application needs to be controlled. When the protocol stack receives the positive response, it sends the INVITE request to the trusted agent (step 7)."), while an INVITE request from a different application is **not** diverted, *see id.* 5:5–8 ("If the response at step 6 from the application repository is negative, the protocol stack transmits the INVITE request directly to the network, i.e. the INVITE request is not sent to the trusted agent.").  As such, the disclosed invention has two classes of messages—messages that are diverted and messages that are not diverted.

Plaintiff's interpretation that "a message of the messages" includes all of the messages effectively erodes this distinction—a distinction Plaintiff has already conceded before both the Court and the Patent Office.  *See* Pl. Reply Br. on Claim Construction at 8 (Dkt. No. 305) ("CCE does not allege that **'diverted' messages** are treated exactly the same as **other messages that are not 'diverted.'**  Rather, CCE maintains that the claimed 'diversion' may be implemented at a logical or physical level …." (emphasis added)); Ex. 5 at 10 ("If the application does not need to be controlled, the protocol stack transmits the INVITE request directly to the network, **without diverting the INVITE request** to the trusted agent 212." (emphasis added)).  The Court should hold Plaintiff to its prior statements and adopt Defendants' construction.

### 2. "tamper resistant" (Claim 26)

| Defendants' Construction | Plaintiff's Construction |
| --- | --- |
| "resistant to being affected by a user or other parties that are beyond the control of the network operator" | "Plain and ordinary meaning [*i.e.*, 'resistant to harmful or unauthorized interference' (Pl. Br. at 9)]; no construction necessary." |

Claim 24 is directed to a "terminal in a communications network" having a "controlling entity."  Claim 26, which depends from Claim 24, further requires that the "controlling entity be "configured to reside in a **tamper resistant** area of the terminal."  The specification unambiguously describes what tamper resistance means in the context of Claim 26:  Resistant to being affected by a user or other parties beyond the control of the network operations.  "[T]he specification 'is

always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  Despite that fact, Plaintiff would have the Court ignore the specification's clear teachings and adopt a dictionary definition cherry-picked to support Plaintiff's litigation position.  For the reasons set forth below, the Court should adopt Defendants' proposed construction.

> **a.  The meaning of tamper resistant is clearly and consistently set forth in the specification.**

Claim 26 requires the "controlling entity" to reside in a "tamper resistant area."  The specification explicitly addresses "tamper resistant area" in the context of the controlling entity: "The controlling entity resides in a ***tamper resistant area*** of the terminal, so that its operation cannot be affected by the user or other parties that are ***beyond the control of the network operator***." (Ex. 4 at 2:3–6 (emphasis added).)  Plaintiff argues without support or explanation that this passage from the specification sets forth "a reason [for], not a definition [of]" tamper resistant. Pl. Br. at 10.  Regardless, this passage from the specification provides the clearest explanation of the meaning of "tamper resistant" in the context of the claimed invention.

Plaintiff also ignores the other teachings of the specification that are fully consistent with the specification's explanation of "tamper resistant" set forth above.  The purpose of the claimed invention is to prevent "deceptive application developers [from] misus[ing] the new communication environment and . . . develop[ing] applications that behave contrary to the ***agreements made with the operator of the network***." (Ex. 4 at 1:43–47 (emphasis added).)  Thus, the mechanisms described in the '8923 Patent are specifically implemented to control unauthorized applications, *i.e.*, "applications that are not ***approved by the [network] operator***," by preventing them from being used.  (*Id*. at 7:1–3 (emphasis added).)  Indeed, the specification explains that "the mechanism is utilized for ensuring that authorized applications obey the SIP ***policies of the operator***." (*Id*. at 5:11–12 (emphasis added).)  Moreover, sensitive information such as digests or digital signatures that are used for authenticating an application have to be

"verified by the ***network*** prior to setting up a session." (*Id*. at 2:58–62 (emphasis added).)  Such authentication of the applications "allows the ***network operators*** to use application-specific billing without a risk of misuse of the terms of an invoicing agreement, for example." (*Id*. at 2:65–67 (emphasis added).)

Thus, the "tamper resistant" area of the claimed communication terminal must be resistant to being affected by a user or other parties who are beyond the control of the network operator, as stated in Defendants' construction.

### b. Plaintiff's argument that manufacturers have access to the "tamper resistant" area is groundless.

To attempt to avoid the specification's explanation of "tamper resistant" as preventing the user or other parties beyond the control of the network operator from affecting the operation of the controlling entity, Plaintiff selectively plucks disclosures regarding manufacturer access to the tamper resistant area, taking them completely out of context.  Plaintiff relies exclusively on two statements in the specification.  However, both of these passages clearly state that manufacturers' access to the tamper resistant area is confined to the "manufacturing phase":

> A default set of the policy rules may be stored in the tamper resistant area in the ***manufacturing phase*** of the terminal, and/or the operator may be able to download policy rules into the tamper resistant area.

(*Id.* at 6:45–48 (emphasis added)); and

> The private key and a certificate (including the corresponding public key) may be stored in the terminal already in the ***manufacturing phase***, for example. If the authentication process utilizes a permanent private key stored in the tamper-resistant area, all the applications are authenticated by means of the same key. In case of a key that is not application-specific, the trusted entity is actually the entity authenticated.

(*Id.* at 7:67–8:7 (emphasis added).)  Of course manufacturers have access to the tamper resistant area during the "manufacturing phase," as they would to all other areas of the terminal during manufacturing.  Claim 24, however, is directed to a "terminal of a communications system," *i.e.*, a terminal that has already been manufactured.  (*Id.* at 10:58–11:5.)

There is no suggestion in the patent that manufacturers have access to the tamper resistant area of a terminal *after* the terminal is manufactured, *i.e.*, during the period in which Defendants are alleged to infringe the patent.  Plaintiff reliance on column 6, lines 45–48 for the proposition that "tamper-resistant areas are accessible to manufacturers as well as operators" is misplaced, because it ignores the surrounding context which explains that only network operators have access to the tamper resistant area after the terminal is manufactured.  For instance, the first sentence of the paragraph Plaintiff relies on states unambiguously:  "As mentioned above, in one embodiment of the invention the applications are controlled to *ensure that they obey the policies set by the operator*."  (*Id*. at 6:27–31 (emphasis added).)  Although a default set of policy rules may be stored in the tamper resistant area in the manufacturing phase, it is only the network operator—not the manufacturer—who has the ability to replace the default policy rules in the completed device:

> A default set of the policy rules may be stored in the tamper resistant area in the manufacturing phase of the terminal, *and/or the operator may be able to download policy rules into the tamper resistant area*.

(*Id*. at 6:45–48 (emphasis added).)  There is no disclosure teaching that the manufacturer of the device can supplant or alter policy rules downloaded into the tamper resistant area by the network operator, after the manufacturing phase.

Plaintiff's reliance on column 7, line 67 through column 8, line 5 for the proposition that "tamper-resistant areas are accessible to manufacturers as well as operators" is also misplaced.  Pl. Br. at 11.  This portion of the specification teaches that during the "manufacturing phase….a *permanent* private key [can be] stored in the tamper-resistant area."  (Ex. 4 at 7:67–8:5 (emphasis added).)  In other words, after the terminal has been manufactured, no one—network operator, manufacturer, user, *etc*.—can change the "permanent private key stored in the tamper-resistant area."  Even this usage of "tamper resistant," albeit narrower, is consistent with Defendants' construction.

### c.  Plaintiff ignores the teachings of *Phillips* and seeks to improperly define "tamper resistant" in a vacuum.

Plaintiff's sole support for its proposed construction of "tamper resistant"—"resistant to harmful or unauthorized interference"—is a definition from a single dictionary.   While dictionaries can be valuable tools in construing claims, they cannot supplant the teachings of the specification.   In *Phillips*, the Federal Circuit identified several reasons why rote adherence to a technical dictionary can be problematic.   For instance, "[t]here is no guarantee that a term is used in the same way in a treatise as it would be by the patentee. In fact, discrepancies between the patent and treatises are apt to be common because the patent by its nature describes something novel."   *Phillips*, 415 F.3d at 1322.   "Moreover, different dictionaries may contain somewhat different sets of definitions for the same words.  A claim should not rise or fall based upon the preferences of a particular dictionary editor, or the court's independent decision, uninformed by the specification, to rely on one dictionary rather than another."   *Id.*   "Finally, the authors of dictionaries or treatises may simplify ideas to communicate them most effectively to the public and may thus choose a meaning that is not pertinent to the understanding of particular claim language."   *Id.*   Accordingly, given the primacy of the specification and the limitations of dictionaries, the Federal Circuit has cautioned against using dictionary definition to "contradict any definition found in or ascertained by a reading of the patent documents."   *Id*. at 1322–23.

Furthermore, Plaintiff's "plain and ordinary" construction of "resistant to harmful or unauthorized interference" injects ambiguity into the claim and will prove unworkable.   Among other things, it introduces the concepts of authorized vs. unauthorized access to the "tamper resistant" area of the terminal.   The statutory scheme directed to criminalizing computer hacking, the Computer Fraud and Abuse Act (CFAA), uses the same construct to criminalize computer access "without authorization" or "exceed[ing] authorized access."   *See* 18 U.S.C. 1030.   However, it is still widely disputed as to what it means to have authorized vs. unauthorized access to a computer or information residing on a computer.   The interpretation of authorization changes from state to state, as illustrated by the wide circuit splits.   *See, e.g.*, *WEC Carolina Energy Solutions LLC v. Miller*, 687 F.3d 199 (4th Cir. 2012) (focusing on access rather than use to

determine authorization); *United States v. John*, 597 F.3d 263 (5th Cir. 2010) (relying on social norms and terms of use to determine authorization);  *United States v. Phillips*, 477 F.3d 215 (5th Cir. 2007) (relying on social norms to determine authorization); *Int'l Airport Ctrs., L.L.C. v. Citrin*, 440 F.3d 418 (7th Cir. 2006) (relying on agency principles to determine authorization); *United States v. Nosal*, 676 F.3d 854 (9th Cir. 2012) (en banc) (focusing on access rather than use to determine authorization); *United States v. Rodriguez*, 628 F.3d 1258 (11th Cir. 2010) (relying on social norms and agency principles to determine authorization); *see also United States v. Drew*, 259 F.R.D. 449, 458 (C.D. Cal. 2009) (noting "there is a considerable amount of controversy" as to the meaning of "without authorization").

Orin Kerr, a leading scholar on the topics of computer crime and the CFAA, highlighted many of the issues stemming from the breadth of the term and the lack of clarity from the courts:

> The core difficulty is that access and authorization have a wide range of possible meanings.  In particular, the definition of authorization is notoriously uncertain.  What makes access to a computer unauthorized—either "without authorization" or "in excess of authorization?"  Is it unauthorized if the computer owner tells the person not to access the computer?  Is it unauthorized if the access is against the interests of the computer owner?  Is it unauthorized if the access violates a contract on access?  Presently the answer is remarkably unclear. . . .  [T]he courts have not yet settled on the broader question of what exactly makes access without authorization or in excess of authorization. . . .  As a result, there are a surprising number of instances in which citizens cannot know whether their conduct amounts to an unauthorized access.  The statutes simply do not say what the terms mean, and no precedents have provided clear answers.

Orin Kerr, *Vagueness Challenges to the Computer Fraud and Abuse Act*, 94 Minn. L. Rev. 1561, 1576 (2010) (case citations removed); *see generally* Orin Kerr, *Cybercrime's Scope: Interpreting "Access" and "Authorization" in Computer Misuse Statutes*, 78 N.Y.U. L. Rev. 1596, 1622–24, 1628–42 (2003) (discussing the difficulties of interpreting authorization as it corresponds to computers).

Plaintiff's construction, which incorporates the amorphous concept of whether a party is authorized versus not authorized to access or to "interfere" with the tamper resistant area of the terminal, would render the claim even more difficult to interpret and would subject the Defendants

to additional uncertainty about what they can and cannot do depending on the particular state in which an accused device is sold.  Accordingly, the Court should reject Plaintiff's construction and adopt Defendants' construction, which is grounded in the specification and provides much needed clarity to the parties and the jury.

## IV.    CONCLUSION

Defendants' constructions properly define each disputed term as it is used in the claims and specification and should be adopted.

Dated: March 9, 2015                         Respectfully submitted,


                                              /s/ Christopher W. Kennerly

                                             Christopher W. Kennerly
                                             TX Bar No. 00795077
                                             Jeffrey G. Randall
                                             CA Bar No. 130811
                                             Jonas P. Herrell
                                             CA Bar No. 279075
                                             PAUL HASTINGS LLP
                                             1117 S. California Ave.
                                             Palo Alto, CA  94304-1106
                                             Telephone: (650) 320-1800
                                             Facsimile: (650) 320-1900
                                             chriskennerly@paulhastings.com
                                             jeffrandall@paulhastings.com
                                             jonasherrell@paulhastings.com

                                             Jeffrey D. Comeau
                                             CA Bar No. 259679
                                             jeffreycomeau@paulhastings.com
                                             PAUL HASTINGS LLP
                                             4747 Executive Drive
                                             Twelfth Floor
                                             San Diego, CA 92121-3114
                                             Telephone: (858) 458-3000
                                             Facsimile: (858) 458-3005

                                             Trey Yarbrough
                                             TX Bar No. 22133500
                                             trey@yw-lawfirm.com
                                             YARBROUGH WILCOX, PLLC
                                             100 E. Ferguson St., Suite 1015
                                             Tyler, Texas 75702
                                             Telephone (903) 595-3111
                                             Facsimile (903) 595-019

                                             **ATTORNEYS FOR DEFENDANT AT&T
                                             MOBILITY LLC**

/s/ Jamie B. Beaber
Jamie B. Beaber (D.C. Bar No. 484186)
Kfir B. Levy (D.C. Bar No. 989212)
Michael W. Maas (D.C. Bar No. 493685)
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 263-3300
jbeaber@mayerbrown.com
klevy@mayerbrown.com
mmaas@mayerbrown.com

Robert G. Pluta (IL Bar No. 6278255)
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
Telephone: (312) 782-0600
Facsimile: (312) 701-7711
rpluta@mayerbrown.com

Michael E. Jones
State Bar No. 10929400
Allen F. Gardner
State Bar No. 24043679
POTTER MINTON P.C.
110 N. College Avenue, Suite 500
Tyler, Texas 75702
Telephone: (903) 597-8311
Facsimile: (903) 593-0846
mikejones@potterminton.com
allengardner@potterminton.com

**ATTORNEYS FOR DEFENDANTS LG
ELECTRONICS, INC. AND LG
ELECTRONICS U.S.A., INC.**

/s/ Alan A. Wright
Alan A. Wright
Oluwaseun O. Ajayi
Brendan P. O'Shea
H.C. PARK & ASSOCIATES, PLC
1894 Preston White Drive
Reston, VA 20191
Telephone: (703) 288-5105
Facsimile: (703) 288-5139
awright@park-law.com

/s/ Melissa R. Smith
Melissa R. Smith
State Bar No. 24001351
GILLAM & SMITH, LLP
303 S. Washington Ave.
Marshall, TX 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257
melissa@gillamsmithlaw.com

John C. Hueston (*Pro Hac Vice*)
Douglas J. Dixon (*Pro Hac Vice*)
HUESTON HENNIGAN LLP
620 Newport Center Dr., Suite 1300
Newport Beach, CA 92660
Telephone: (949) 226-6741
DDixon@hueston.com
JHueston@hueston.com

Alexander C.D. Giza
CA Bar No. 212327 (Admitted E.D. Tex.)
HUESTON HENNIGAN LLP
523 West 6th Street, Suite 400
Los Angeles, CA 90014
Telephone: (213) 788-4340
agiza@hueston.com

**ATTORNEYS FOR DEFENDANTS
T-MOBILE USA, INC. AND T-MOBILE US,
INC.**

/s/ Jennifer H. Doan
Jennifer H. Doan
Texas Bar No. 08809050
Joshua R. Thane
Texas Bar No. 24060713
HALTOM & DOAN
Crown Executive Center, Suite 100
6500 Summerhill Road
Texarkana, TX 75503
Telephone: (903) 255-1000

oajayi@park-law.com
boshea@park-law.com

Melissa R. Smith
State Bar No. 24001351
GILLAM & SMITH, LLP
303 S. Washington Ave.
Marshall, TX 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257
melissa@gillamsmithlaw.com

**ATTORNEYS FOR DEFENDANTS
PANTECH CO. LTD. AND PANTECH
WIRELESS, INC.**

/s/ Robert W. Weber
Robert W. Weber
Texas State Bar No. 21044800
SMITH WEBER, L.L.P.
5505 Plaza Drive -- P.O. Box 6167
Texarkana, TX 75505-6167
Telephone: 903-223-5656
Facsimile: 903-223-5652
bweber@smithweber.com

Mark McGrory (*Pro Hac Vice*)
ROUSE HENDRICKS GERMAN MAY PC
1201 Walnut, 20th Floor
Kansas City, MO 64106
Telephone: 816-471-7700
Facsimile: 816-471-2221
MarkM@rhgm.com

**ATTORNEYS FOR DEFENDANTS SPRINT
SOLUTIONS, INC.; SPRINT SPECTRUM
L.P.; and BOOST MOBILE, LLC**

/s/ Roger Joseph Fulghum
Roger Joseph Fulghum

Facsimile: (903) 255-0800
jdoan@haltomdoan.com
jthane@haltomdoan.com

J. David Hadden
CA Bar No. 176148 (Admitted E.D. Tex)
dhadden@fenwick.com
Saina Shamilov
CA Bar No. 215636 (Admitted E.D. Tex)
sshamilov@fenwick.com
Ravi R. Ranganath
CA Bar No. 272981 (Admitted E.D. Tex)
rranganath@fenwick.com
FENWICK & WEST LLP
Silicon Valley Center
801 California Street
Mountain View, California 94041
Telephone: (650) 988-8500
Facsimile: (650) 938-5200

**ATTORNEYS FOR DEFENDANT
AMAZON.COM, INC.**

/s/ Inge Larish
Inge Larish
TX State Bar No. 00796924
Steven A. Moore
California State Bar No. 232114
Nicole S. Cunningham
California State Bar No. 234390
PILLSBURY WINTHROP SHAW
PITTMAN LLP
501 West Broadway, Suite 1100
San Diego, CA 92101
Telephone: 619-544-3119
Facsimile: 619-236-1995
inge.larish@pillsburylaw.com
steve.moore@pillsburylaw.com
nicole.cunningham@pillsburylaw.com

**ATTORNEYS FOR DEFENDANTS
HTC CORPORATION, HTC AMERICA,
INC., AND ZTE (USA) INC.**

/s/ Michael E. Jones
Michael E. Jones

(TX Bar No. 00790724)
Tammy M Pennington Rhodes
(TX Bar No. 24051182)
BAKER BOTTS LLP
910 Louisiana Street
One Shell Plaza
Houston, TX 77002-4995
Telephone: 713/229-1707
Facsimile: 713/229-2707
roger.fulghum@bakerbotts.com
tammy.pennington@bakerbotts.com


Deron R Dacus
(TX Bar No. 00790553)
T Shannon Marie Dacus
(TX Bar No. 00791004)
THE DACUS FIRM, PC
821 ESE Loop 323
Suite 430
Tyler, TX 75701
Telephone: 903/705-1117
Facsimile: 9037051117
ddacus@dacusfirm.com
sdacus@dacusfirm.com

**ATTORNEYS FOR DEFENDANT DELL INC.**

State Bar No. 10929400
Patrick C. Clutter, IV
State Bar No. 24036374
POTTER MINTON, P.C.
110 N. College Ave., Suite 500
Tyler, Texas 75702
Telephone: (903) 597-8311
Facsimile: (903) 593-0846
mikejones@potterminton.com
patrickclutter@potterminton.com

Charles B. Molster, III
Virginia State Bar No. 23613
Thomas M. Dunham
D.C. Bar No. 448407
Corrine M. Saylor
D.C. Bar No. 997638 (*Pro Hac Vice*)
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20006-3817
Telephone: (202) 282-5000
Facsimile: (202) 282-5100
cmolster@winston.com
tdunham@winston.com csaylor@winston.com

Sarah J. Kalemeris
IL Bar No. 6303644
Winston & Strawn LLP
35 W Wacker Drive
Chicago, IL 60601
Telephone: 312-558-5600
Fax: 312-558-5700
skalemeris@winston.com

**ATTORNEYS FOR DEFENDANT
CELLCO PARTNERSHIP D/B/A/
VERIZON WIRELESS**


/s/  Mark C. Scarsi
Mark C. Scarsi (admitted *Pro Hac Vice*)
Miguel Ruiz (admitted *Pro Hac Vice*)
Ashlee N. Lin (admitted *Pro Hac Vice*)
Michael Sheen (admitted *Pro Hac Vice*)
MILBANK, TWEED, HADLEY & MCCLOY
LLP
601 South Figueroa Street, 30th Floor

Los Angeles, California 90017-5735
Telephone: (213) 892-4000
Facsimile: (213) 629-5063
mscarsi@mibank.com
mruiz@milbank.com
ashlee.lin@milbank.com
msheen@milbank.com

Thomas C. Mavrakakis (Bar No. 00791209)
Brian C. Kwok (admitted *Pro Hac Vice*)
Christopher R. Lubeck (admitted *Pro Hac Vice*)
MAVRAKAKIS LAW GROUP LLP
735 Emerson Street
Palo Alto, CA 94301
Telephone: (650) 804-7800
Facsimile: (650) 852-9224
mav@mavllp.com
bkwok@mavllp.com
clubeck@mavllp.com

Howard E. Levin (admitted *Pro Hac Vice*)
MAVRAKAKIS LAW GROUP LLP
180 N. LaSalle Street, Suite 2215
Chicago, IL 60601
Telephone: (312) 216-1620
Facsimile: (312) 216-1621
hlevin@mavllp.com


Eric H. Findlay (Bar No. 00789886)
FINDLAY CRAFT PC
102 N. College Avenue, Suite 900
Tyler, TX 75702
Telephone:  (903) 534-1100
Facsimile: (903) 534-1137
efindlay@findlaycraft.com

**ATTORNEYS FOR APPLE INC**.

## CERTIFICATE OF SERVICE

I hereby certify that on March 9, 2015, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Christopher W. Kennerly
Christopher W. Kennerly