# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# TYLER DIVISION

| | |
|---|---|
| CELLULAR COMMUNICATIONS EQUIPMENT LLC,<br><br>  Plaintiff,<br><br>v.<br><br>HTC CORPORATION, ET AL.<br><br>  Defendants. | CIVIL ACTION NO. 6:13-cv-507<br><br>**CONSOLIDATED LEAD CASE** |

**PLAINTIFF'S REPLY BRIEF
ON CLAIM CONSTRUCTION**

### A. U.S. Patent No. 8,055,820 — "usage"

CCE's position is straightforward: "usage" is an ordinary word used in its ordinary sense, and the specification confirms it should receive its full ordinary meaning. In light of this, and because the intrinsic record includes no disclaimer or lexicography, no construction is necessary. *Hill-Rom Svcs. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014) ("We depart from the plain and ordinary meaning of claim terms based on the specification in only two instances: lexicography and disavowal."). As confirmed by their own dictionaries, Defendants' proposal constricts the ordinary meaning of "usage" and is therefore improper.

Rather than identifying disclaimer or lexicography to justify their construction, Defendants respond by accusing CCE of "throwing a hodge-podge of dictionary definitions at the Court." Def. Br. at 4-5. And they proceed to attack a quintessential straw man, accusing CCE of endorsing "all possible" definitions of "usage" — including those that obviously have no applicability (*e.g.*, "habit," "a particular expression in speech or writing," "something permitted or established by custom or practice."). *Id.* at 3-4, 6-7. Such arguments have no merit. In reality, CCE merely pointed out that Defendants' construction excludes, without justification, conceptions of "usage" that plainly apply to the asserted claims, such as "use," "employment," and "the fact of being used." *See* Def. Br. at 5-6; Ex. B at JOINTDEFS-CCE005227; -5230; -5238; -5246; -5250; -5254; -5257; -5260.

These exclusions are central to the parties' dispute. Although obscured in five pages of briefing, Defendants reject the ordinary meaning of "usage" in favor of an alternative construction that excludes monitoring buffer "usage" by observing the buffers (*e.g.*, by observing whether they contain data or, if so, how much). In other words, they want the claimed "monitoring the usage of a plurality of buffers" to require monitoring something other than the buffers — namely, how "other components" use them. Def. Br. at 5-6 ("Thus, the claimed

1

monitoring must be directed to the 'usage' of the buffers by other components (*e.g.*, applications) as opposed to monitoring directly the buffers themselves.").

That contrived view finds no support in the claim language. The ordinary meaning of "usage" encompasses, among other things, "use," "employment," and "the fact of being used." *See* Ex. B at JOINTDEFS-CCE00005227, -5230, -5238, -5257, -5260. Thus, "monitoring a usage of a plurality of buffers" may be accomplished by looking at the buffers to discern whether (or not) the buffers are used or employed. This aligns with how the word "usage" is ordinarily understood — one may monitor "usage" of a fuel tank by observing the fuel in it, as opposed to monitoring specific sources of the fuel (*e.g.*, a particular pipeline). Likewise, one may monitor usage of buffers by observing if or how much data is stored in the buffers. Contrary to Defendants' strained interpretation, "usage" of a repository (such as a buffer or fuel tank) can be monitored by observing its content, without reference to the source of that content.

Defendants' proposal also improperly excludes embodiments. For instance, the embodiment depicted in Figure 4 begins by "monitor[ing] buffers," which entails monitoring "whether at least one buffer of the multiple buffers has data." Ex. A at 8:6-20. One skilled in the art would recognize that this "monitoring buffers" step corresponds with monitoring "a usage of a plurality of buffers." However, Defendants' proposal divorces "monitoring buffers" from monitoring buffer "usage," and thus excludes this embodiment. Def. Br. at 5-6 ("the claimed monitoring must be directed to the 'usage' of the buffers by other components (*e.g.*, applications) as opposed to monitoring directly the buffers themselves.") (emphasis added). That strained construction is improper and should be rejected. *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013) ("[A]n interpretation which 'excludes a [disclosed] embodiment from the scope of the claim is rarely, if ever correct.'"); *GE Lighting Solutions, LLC. v. Agilight, Inc.*, 750 F.3d 1304, 1311 (Fed. Cir. 2014) ("[W]here claims can reasonably [be] interpreted to

include a specific embodiment, it is incorrect to construe the claims to exclude that embodiment, absent probative evidence on the contrary.") (internal citation omitted).

Moreover, Defendants' position is without support in the intrinsic record. Despite five pages of discussion, their brief cites the specification only once. And, the sole passage they cite ("monitoring 310 buffers may include monitoring a usage of one or more communication buffers") does not support their argument; rather than distancing "monitoring the buffers" from "monitoring the usage of buffers," it confirms the congruity between them. In fact, there is no evidence the inventors intended to substantively distinguish "monitoring buffers" from monitoring "usage" of buffers. The context makes clear that "monitoring 310 buffers" is a shorthand phrase (for use in a flow chart) that refers to monitoring "usage" of the buffers. *Compare* Ex. A at Fig. 7 (step 310 "monitoring buffers") *with* 7:58-60 ("monitoring 310 buffers may include monitoring a usage of one or more communication buffers").

Further, although Defendants argue that "the claimed monitoring must be directed to the 'usage' of the buffers by other components (*e.g.*, applications) as opposed to monitoring directly the buffers themselves," nothing in the specification describes monitoring in that manner. Indeed, there is no indication that monitoring usage of buffers requires any awareness whatsoever of applications that pass data to, or obtain data from, the buffers. Defendants' attempt to restrict the claim language to phantom components described nowhere in the patent is baseless. The specification supports a broad understanding of "usage" that encompasses the full spectrum of its meaning, including "use," "employment," and "the fact of being used. Accordingly, Defendants' proposal must be rejected.

**B.      U.S. Patent No. 7,218,923 — "a message of the messages"**

Defendants' efforts to constrict the claim language is again unsupported by intrinsic evidence. Open-ended claim 24 recites divert[ing] "a message" of "the messages." It does not

3

require "undiverted messages" or restrict how many messages may be diverted. And, contrary to Defendants' dubious logic, use of the singular ("message") in an open-ended claim to refer to one of a plurality ("messages") does not mean "less than all." The absence of any authority supporting Defendants' rationale is telling.

At best, Defendants' position rests on inferences drawn from disclosed embodiments. Def. Br. at 12 ("The specification summarizes the invention as diverting 'at least some,' 'at least one,' or 'selected' messages."). But even if Defendants identified an embodiment prohibiting diversion of "all" messages (they do not), it would be improper to limit the claim language on that basis. *See Hill-Rom Svcs.*, 755 F.3d at 1371-72 ("Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'") (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)).

Nor did CCE disclaim the scope of "a message of the messages" in its preliminary response to Defendants' *inter partes* review petition. Rather, CCE construed the phrase "divert[ing] a *message of the messages* to a controlling entity residing in a communication terminal" as "redirecting *a message of the messages* to a controlling entity residing in a communication terminal." Ex. G at 15-16 (emphasis added). It then distinguished asserted references, including D'Aviera and Richardson, not because they "diverted ***all*** of the messages" (as Defendants allege), but because they did not divert ***any*** of the messages — that is, they fail to disclose any "diverting" whatsoever. This is clear when CCE's arguments are read as a whole, rather than misleadingly characterized and selectively quoted.

For instance, regarding D'Aviera, CCE argued that the petitioners failed to identify where it discloses "diverting a message of the messages." This shortcoming was explained in detail:

4

> To the extent that the isolator engine 225 could correspond to the claimed controlling entity, which Patent Owner disagrees, <u>Petitioner has not shown where D'Aviera discloses the claimed step of "diverting a message of the messages [sent towards a communication network] to a controlling entity,"</u> as recited in claim 1.
>
> . . . . D'Aviera merely discloses that, when the isolation engine 225 is executing, outbound operations or messages from application program 210 are intended to be received by the isolation engine 225. <u>D'Aviera does not disclose anything between the application program 210 and the isolation engine 225 that could "divert" the outbound operations or messages</u>.
>
> As discussed above, to meet the claimed diverting step, there must be something that "diverts" a message of messages destined to the network to a controlling entity in a communication terminal. <u>Because, in D'Aviera, outbound operations or messages from application program 210 merely pass through the isolation engine 225 before being transmitted to the network module 220, no outbound operation or message is actually "diverted" to any entity that could possibly constitute the claimed controlling entity.</u> For at least these reasons, D'Aviera cannot teach or suggest the claimed "diverting" step. By pointing to the isolator engine 225 for both the diverting and control functions, the Petitioner vitiates the diverting element.

Ex. G at 28-31 (emphasis added). Thus, rather than distinguishing that reference based on a construction of "a message of the messages" that excludes all messages, CCE argued that it fails to disclose anything that performs the claimed "diverting." That is, the fact that all alleged "messages" of D'Aviera simply "pass through" the "isolation engine 225," without exception, fails to evidence that *any* message is "diverted" by that element. In fact, the Board's institution decision acknowledged CCE's position that "the isolation engine intercepts *all* outbound operations of an application, and therefore, D'Aviera does not disclose *diverting* the outbound operations." Ex. H at 10 (emphasis in original).

> Addressing the Williamson reference, CCE made similar arguments, explaining:
>
> Patent Owner respectfully notes that, to the extent that the VAPS could correspond to the claimed "controlling entity," which Patent Owner disagrees, <u>Petitioner has not demonstrated where Williamson discloses the claimed "diverting unit."</u> For example, Williamson at ¶ [0082] states that "[a]s with the VPMS, the VAPS handles all requests to send outbound data from the

5

> workstation 910, and operates to restrict the propagation of viruses within the network by limiting the extent to which the workstation can engage in what may be thought of as 'unusual' behaviour in contacting other hosts," (emphasis added). Accordingly, Williamson merely discloses that VAPS handles all requests to send outbound data. <u>Williamson does not disclose "diverting" some of the requests (sent to the network) to the VAPS for processing.</u>
>
> As discussed above, to meet the claimed diverting unit, there must be something that "diverts" an outbound request from being sent to the network to being sent a controlling entity in a communication terminal. Because, <u>all outbound requests from the application merely pass through the VAPS before being transmitted to the network, no request is actually "diverted" to the VAPS</u>. For at least these reasons, Williamson cannot teach or suggest the claimed diverting unit. By pointing to VAPS for both the diverting unit and the controlling entity, the Petitioner vitiates the diverting element.

Ex. G at 34-36 (emphasis added). Again, rather than distinguishing Williamson based on an understanding of "a message of the messages" that excludes all messages, CCE explained that it failed to disclose diverting *any* message. In this instance, the PTAB agreed, and denied Defendants' request for review because the reference fails to disclose "changing the course of [i.e., diverting] a message." *See* Ex. H at 12.

Defendants deliberately obfuscate these arguments, but their attempt to twist CCE's words cannot establish disclaimer, which must be clear and unmistakable. *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366-7 (Fed. Cir. 2012); *see also Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1276 (Fed. Cir. 2012) ("[I]t is particularly important not to limit clam scope based on statements made during prosecution absent a clear disavowal or contrary definition.") (internal quotations omitted). Defendants' proposal is thus without merit, and should be rejected.

### C. U.S. Patent No. 7,218,923 — "tamper resistant"

"Tamper resistant" is not a term of art; the plain meaning of that phrase is "resistant to harmful or unauthorized interference."[1] Ex. F at 771. This characterization is consistent with a

---

[1] Although Defendants' disparage dictionary definitions generally (*see* Def. Br. at 17), the

6

layperson's understanding of the term and aligns with the claims and specification. Defendants do not dispute the accuracy of that ordinary meaning, nor can they deny that that broadly accounts for the intrinsic evidence.

Nonetheless, in an effort to avoid infringement, Defendants seize on a single passage explaining that a controlling entity may reside in a tamper resistant area "<u>so that</u> its operation cannot be affected by the user or other parties that are beyond the control of the network operator." Ex. C at 2:3-6 (emphasis added). Despite their feigned ignorance, Defendants understand the words "so that" introduce "a clause of purpose," not a redefinition. *See* Ex. I. Hence, they do not even allege that this passage constitutes lexicography — they call it an "explanation" instead. Def. Br. at 14-15 ("the specification's *explanation* of 'tamper resistant'") (emphasis added). But, an "explanation" that aligns with a well-known, broader meaning of a claim term is not a redefinition of it. For a patent to redefine a known term, its special meaning must be "clearly set forth," and the patentee's intent to redefine it must be expressed "clearly." *Hill-Rom Svcs.*, 755 F.3d at 1371. Defendants' cannot identify any clear redefinition of the disputed term or any intent to redefine it, and their position thus fails the test for lexicography.[2]

In addition to being unfounded, Defendants' proposal is impractical and improper. It introduces a negative limitation ("cannot") and, in light of the fact that a user arguably "affects" every aspect of a device (including "tamper resistant" areas) by powering it off or updating

---

Federal Circuit has recognized that dictionaries are unbiased, publicly-available sources that may be useful to determine the commonly understood meaning of words in claims. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005). In this instance, Defendants fail to identify any fault with the dictionary CCE identified, nor do they identify any competing dictionary definition. Indeed, there is no dictionary that supports their construction.

[2] The "other teachings of the specification" identified by Defendants plainly describe particular embodiments, and thus cannot constitute lexicography or disclaimer. *Inverness Med. Switzerland GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1379 (Fed. Cir. 2002) ("It is improper to limit the claim based on a preferred embodiment of the invention.").

software, Defendants' quest to forbid "being affected" by anyone but a network operator is plainly a non-infringement argument masquerading as claim construction. Moreover, while arguing that "authorization" is too imprecise for a claim construction (*see* Def. Br. at 17-18), Defendants ignore the manifest ambiguities of their own proposal, which invites inquiries concerning not only the meaning of "being affected," but also "control," what lies "beyond" it, and who or what qualifies as a "network operator" or "other parties."

Nonetheless, Defendants' brief helpfully points out that the Computer Fraud and Abuse Act expressly targets computer access realized "without authorization." Def. Br. at 17. This supports CCE's position in at least two ways. First, it confirms the applicability of "authorization" in the context of the '8923 patent, which addresses problems of computer fraud. *See* Ex. C at 1:43-47 (discussing "deceptive application developers"). Additionally, it evidences that Congress and the President were satisfied with the clarity and precision of "authorization" as a test for liability. Indeed, it bears noting that Defendants' concern with "authorization" is, at this juncture, hypothetical. Should the scope of that language give rise to an actual controversy, it can be addressed by experts, the Court, and, if appropriate, a jury, in due course.

Finally, while conceding the specification teaches that "manufacturers" <u>do</u> have access to "tamper resistant" areas at certain times, Defendants nonetheless exclude them from their proposal by arguing that their access is "confined to the manufacturing phase." Def. Br. at 15. That bright-line exclusion is not only absent from the specification, but conflicts with industry practices. Indeed, one skilled in the art would know that manufacturers often maintain access to devices after their sale in order to distribute software updates for programs and data stored on them (including programs and data in tamper resistant areas).

Defendants' narrow construction is thus unjustified and improper. Their proposal should be rejected, and the claim language should receive the full scope of its ordinary meaning.

| | |
|---|---|
| Dated: **March 23, 2015**. | By: |

*/s/ Edward R. Nelson, III*
Edward R. Nelson, III
enelson@nbclaw.net
Texas State Bar No. 00797142
S. Brannon Latimer
blatimer@nbclaw.net
Texas State Bar No. 24060137
Thomas C. Cecil
tcecil@nbclaw.net
Texas State Bar No. 24069489
NELSON BUMGARDNER CASTO, P.C.
3131 West 7th Street, Suite 300
Fort Worth, Texas 76107
Phone:  (817) 377-9111
Fax:  (817) 377-3485

T. John Ward, Jr.
Texas State Bar No. 00794818
J. Wesley Hill
Texas State Bar No. 24032294
Claire Abernathy Henry
Texas State Bar No. 24053063
WARD & SMITH LAW FIRM
P.O. Box 1231
1127 Judson Rd. Ste. 220
Longview, Texas  75606-1231
(903) 757-6400
(903) 757-2323 (fax)
jw@jwfirm.com
wh@wsfirm.com
claire@wsfirm.com

**ATTORNEYS FOR PLAINTIFF CELLULAR COMMUNICATIONS EQUIPMENT LLC**

## **CERTIFICATE OF SERVICE**

      I hereby certify that on the 23rd day of March, 2015, I electronically filed the foregoing document with the clerk of the Court for the U.S. District Court, Eastern District of Texas, Tyler Division, using the Court's electronic case filing system. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

                                                       */s/ Edward R. Nelson, III*