# Exhibit "G"

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____


NEC CORPORATION OF AMERICA, NEC CASIO MOBILE
COMMUNICATIONS, LTD., HTC CORPORATION, HTC AMERICA,
ZTE (USA), PANTECH CO., LTD., PANTECH WIRELESS, INC.,
LG ELECTRONICS, INC., and LG ELECTRONICS U.S.A., INC.,

Petitioners,

v.

CELLULAR COMMUNICATIONS EQUIPMENT, LLC,

Patent Owner.
_____

Case IPR2014-01133

Patent 7,218,923
_____


PATENT OWNER'S PRELIMINARY RESPONSE
UNDER 37 CFR § 42.107


Mail Stop PATENT BOARD
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

as disclosed in the '8923 specification, and equivalents thereof. Petition at 17-18. Patent Owner presently takes no position on this proposed claim construction, and reserves the right to propose alternative claim constructions if the Board institutes *inter partes* review.

### B. Patent Owner's Proposed Claim Construction

In addition to the above remarks and proposed claim constructions, Patent Owner proposes claim construction for the following terms.

#### 1. "divert[ing] a message of the messages"

Claim 1, for example, recites "sending messages from an application program towards a communication network … [and] diverting a message of the messages to a controlling entity residing in the communication terminal," (emphasis added). Claim 24, for example, recites "a diverting unit configured to divert a message of the messages sent from the application program and destined for the communication network to a controlling entity residing in the terminal," (emphasis added). Claim 33, for example, recites "diverting means for diverting a message of the messages sent from the application program and destined for the communication network to a controlling entity residing in a terminal," (emphasis added).

The '8923 specification provides that, in one embodiment, a method of the invention includes sending messages from an application towards a communication

network and diverting *at least one message destined for the communication network* to a controlling entity residing in the communication terminal, and that, in another embodiment, a terminal of the invention includes one or more applications configured to send messages towards a communication network and diverting means for diverting *selected messages* sent from an application and *destined for the communication network* to a controlling entity residing in the terminal.[10]

Accordingly, Patent Owner proposes that the term "divert[ing] a message of the messages to a controlling entity residing in a communication terminal" should mean:

> "redirecting a message of the messages to a controlling entity residing in a communication terminal."

### 2. "the controlling being performed *before* the message is transmitted from the communication terminal to the communication network"

Claim 1, for example, recites "diverting a message of the messages to a controlling entity residing in the communication terminal; and based on the message, controlling in the controlling entity whether the application program behaves in a predetermined manner in the communication terminal, the controlling

---

[10] The '8923 patent at 2:11-31.

To the extent that Richardson's security element 105 can correspond to the claimed controlling entity, Richardson at best discloses that the security element 105 is external to the hosted machine 101.[21] Even assuming *arguendo* that Richardson's host machine 101 could include a tamper resistant area, Richardson does not disclose that the security element 105 could be configured to reside in that tamper resistant area of the host machine 101.

For at least these reasons, Richardson cannot teach or suggest a combination, wherein "the controlling entity is configured to reside in a tamper resistant area of the terminal," as recited in claim 26. Richardson thus cannot anticipate claim 26.

Claims 2-5, 8, 9, 25, 31, 33, 39 and 40 either recite or require claim elements similar to those recited in independent claims 1 and 24. Accordingly, Richardson cannot anticipate claims 2-5, 8, 9, 25, 31, 33, 39 and 40 for at least the same reasons as independent claims 1 and 24. Therefore, Ground I should be denied.

### C.   Ground II Should Be Denied.

Patent Owner submits that no *inter partes* review should be instituted based on Ground II, because claims 1-2, 4-5, 8, 24-26, 31, 39 and 40 of the '8923 patent are not anticipated by D'Aviera. In particular, Petitioner has not shown where D'Aviera discloses the claim limitations relating to "diverting a message of the

---

[21] Id. at 3:65-4:25.

27

messages." Furthermore, D'Aviera's isolation engine 225 cannot be the claimed diverting unit, because it intercepts <u>all outbound operations</u> of the application program 210.

Independent claim 1, for example, recites a method for controlling application programs in a communication terminal, the method comprising, *inter alia*, "<u>diverting a message of the messages to a controlling entity residing in the communication terminal</u>; and based on the message, controlling in the controlling entity <u>whether the application program behaves in a predetermined manner</u> in the communication terminal, <u>the controlling being performed before the message is transmitted</u> from the communication terminal to the communication network," (emphasis added). D'Aviera fails to teach or suggest at least "diverting a message of the messages [sent towards a communication network] to a controlling entity."

D'Aviera is directed to a system and method for controlling transmission of information using an isolation engine 225 that intercepts outbound operations of an application program 210 that is attempting to send messages to the Internet via a network module 220.[22] As shown in FIG. 2 of D'Aviera, reproduced below, the application program 210 receives information from the INTERNET through the

---

[22] D'Aviera at Abstract; see FIG. 2 of D'Aviera.

network module 220, which processes a set of protocol layers working together for defining communication over the INTERNET.[23]



FIG. 2

Information to be sent to the INTERNET is intercepted by an isolator engine 225, which in turn retransmits the information to the network module 220.[24] This technique allows the isolator engine 225 to intercept all the outgoing messages that the application program attempts to send to the INTERNET, in a manner that is completely transparent to the application program 210.[25] The user can start execution of the isolator engine 225 at block 303, for example, with a double click of the mouse on a corresponding icon.[26]

---

[23] Id. at p.3, ll. 18-21.
[24] Id. at p.3, ll. 21-24.
[25] Id. at p.5, ll. 11-15.
[26] Id. at p.4, ll. 3-5.

Petitioners asserted that "the isolator engine 225, which functions as a controlling unit, verifies whether at least one privacy item stored in a privacy list matches the retrieved information and prevents the sending of the retrieved information if the result of the verification is positive." Petition at 34-35. Accordingly, Petitioners have characterized D'Aviera's isolator engine 225 as corresponding to the claimed controlling entity.

Patent Owner notes that D'Aviera's isolator engine 225 is a standalone application, the execution of which can be initiated by double clicking on an icon.[27] To the extent that the isolator engine 225 could correspond to the claimed controlling entity, which Patent Owner disagrees, Petitioner has not shown where D'Aviera discloses the claimed step of "diverting a message of the messages [sent towards a communication network] to a controlling entity," as recited in claim 1.

For example, D'Aviera at Abstract states that "[p]referably the invention comprises an 'isolation engine' 225 which intercepts all outbound operations of an application program 210 which is attempting to send messages to the internet via network module 220," (emphasis added). Accordingly, D'Aviera merely discloses that, when the isolation engine 225 is executing, outbound operations or messages from application program 210 are intended to be received by the isolation engine

---

[27] Id.

225. D'Aviera does not disclose anything between the application program 210 and the isolation engine 225 that could "divert" the outbound operations or messages.

As discussed above, to meet the claimed diverting step, there must be something that "diverts" a message of messages destined to the network to a controlling entity in a communication terminal. Because, in D'Aviera, outbound operations or messages from application program 210 merely pass through the isolation engine 225 before being transmitted to the network module 220, no outbound operation or message is actually "diverted" to any entity that could possibly constitute the claimed controlling entity. For at least these reasons, D'Aviera cannot teach or suggest the claimed "diverting" step. By pointing to the isolator engine 225 for both the diverting and control functions, the Petitioner vitiates the diverting element.

Independent claim 24, for example, recites a terminal for a communication system, the terminal comprising, *inter alia*, "a diverting unit configured to divert a message of the messages sent from the application program and destined for the communication network to a controlling entity residing in the terminal," (emphasis added). D'Aviera fails teach or suggest at least these limitations.

As discussed above, D'Aviera does not disclose anything that could "divert" outbound messages sent towards the network 104 to the isolator engine 225. For at

31

IPR2014-01133                                                                                     Patent 7,218,923

least these reasons, D'Aviera fails to teach or suggest, "a diverting unit configured to divert a message of the messages sent from the application program and destined for the communication network to a controlling entity residing in the terminal," as recited in claim 24.

Claim 26 depends from claim 24 and recites "the controlling entity is configured to reside in a tamper resistant area of the terminal." D'Aviera fails to teach or suggest these limitations.

For example, D'Aviera discloses that computer programs shown in FIG. 2 are installed onto a hard disk from CD-ROM or directly loaded into the working memory from CD-ROM, and that a user can start execution of the isolator engine 225 with a double click of the mouse on a corresponding icon.[28] Accordingly, D'Aviera at best discloses the isolator engine 225 is computer software program installed onto a regular hard disk or a regular CD-ROM.

To the extent that D'Aviera's isolator engine 225 could correspond to the claimed controlling entity, D'Aviera does not disclose that the isolator engine 225 could be configured to reside in anything of the client computer 110 that could include a tamper resistant mechanism. Accordingly, D'Aviera cannot teach or suggest a combination, wherein "the controlling entity is configured to reside in a

---

[28] Id. at p. 3, ll. 6-11 and p.4, ll. 3-5.

32

tamper resistant area of the terminal," as recited in claim 26. For at least these reasons, D'Aviera cannot anticipate claim 26.

Claims 2, 4-5, 8, 25, 31, 39 and 40 either recite or require claim elements similar to those recited in independent claims 1 and 24. Accordingly, D'Aviera cannot anticipate claims 2, 4-5, 8, 25, 31, 39 and 40 for at least the same reasons as independent claims 1 and 24. Therefore, Ground II should be denied.

### D. Ground III Should Be Denied.

Patent Owner submits that no *inter partes* review should be instituted based on Ground III, because claims 24, 26 and 40 of the '8923 patent are not anticipated by Williamson.

Independent claim 24 recites a terminal for a communication system, the terminal comprising, *inter alia*, "<u>a diverting unit configured to divert a message of the messages sent from the application program and destined for the communication network to a controlling entity residing in the terminal</u>, wherein the controlling entity is configured to control, based on the message and <u>before the message is transmitted to the communication network</u>, whether the application program behaves in a predetermined manner in the communication terminal," (emphasis added). Williamson fails teach or suggest at least these elements.

Williamson is directed to preventing computer viruses from spreading by analyzing outbound data.[29] As shown in Williamson's FIG. 9, reproduced below, Williamson uses a Virus Anti-Propagation Software (VAPS) that runs within the *network stack*, to handle *all requests* to send outbound data from the workstation 910, and operates to restrict the propagation of viruses within the network.[30] As demonstrated below, Petitioner's arguments with respect to Williamson cannot be sustained, at least because Williamson fails to teach or suggest the diverting unit recited in Claim 24.



Petitioner asserted that "the VAPS [(Viral Anti-propagation Software)], which functions as a <u>controlling unit</u> that 'handles all requests to send outbound data from the workstation 910,'" and that "Williamson inherently discloses that the

---

[29] Williamson at Abstract and ¶ [0062].
[30] Williamson at ¶¶ [0081]-[0082].

VAPS is located in a 'tamper resistant area of the terminal' as in claim 26 of the '923 Patent." Petition at 41, emphasis added. Accordingly, it appears that Petitioner has characterized Williamson's VAPS as corresponding to the claimed controlling entity residing in the terminal.

Patent Owner respectfully notes that, to the extent that the VAPS could correspond to the claimed "controlling entity," which Patent Owner disagrees, Petitioner has not demonstrated where Williamson discloses the claimed "diverting unit." For example, Williamson at ¶ [0082] states that "[a]s with the VPMS, the VAPS handles <u>all requests to send outbound data</u> from the workstation 910, and operates to restrict the propagation of viruses within the network by limiting the extent to which the workstation can engage in what may be thought of as 'unusual' behaviour in contacting other hosts," (emphasis added). Accordingly, Williamson merely discloses that VAPS handles *all* requests to send outbound data. Williamson does <u>not</u> disclose "diverting" some of the requests (sent to the network) to the VAPS for processing.

As discussed above, to meet the claimed diverting unit, there must be something that "diverts" an outbound request from being sent to the network to being sent a controlling entity in a communication terminal. Because, all outbound requests from the application merely pass through the VAPS before being transmitted to the network, no request is actually "diverted" to the VAPS. For at

least these reasons, Williamson cannot teach or suggest the claimed diverting unit. By pointing to VAPS for both the diverting unit and the controlling entity, the Petitioner vitiates the diverting element.

Moreover, Petitioners' own expert declaration further illustrates Petitioner's failure to demonstrate where Williamson discloses the claimed diverting unit. For example, in the claim chart, Dr. Williams provided a copy of Williamson's FIG. 9 and manually added an annotation, pointing to the juncture of the operating system and the VAPS as if it teaches the claimed "diverting unit."[31] See below reproduction of the partial claim chart in Dr. Williams' Declaration. In the body of his Declaration, Dr. Williams also could not identify which part of Williamson is relied upon as constituting the claimed "diverting unit."[32] Accordingly, Dr. Williams acquiesced to Williamson's non-disclosure of the claimed diverting unit.

---

[31] Declaration of Tim A. Williams, Ph.D. (Ex. 1011, "Williams Declaration"), at Appendix A-3, p.2.
[32] Id. at ¶ 84.

36



For at least these reasons, Williamson fails to teach or suggest, "a diverting unit configured to divert a message of the messages sent from the application program and destined for the communication network to a controlling entity residing in the terminal, wherein the controlling entity is configured to control, based on the message and before the message is transmitted to the communication network, whether the application program behaves in a predetermined manner in the communication terminal," as recited in claim 24.

Claim 26 depends from claim 24 and recites "the controlling entity is configured to reside in a tamper resistant area of the terminal." Williamson fails to teach or suggest this element.

37

Williamson merely discloses that the VAPS is a regular application software that is installed in and run on workstation 910 within the network stack.[33] To the extent that Williamson's VAPS could correspond to the claimed controlling entity, Williamson does not disclose that the VAPS could be configured to reside in a tamper resistant area. Accordingly, Williamson cannot teach or suggest a combination, wherein "the controlling entity is configured to reside in a tamper resistant area of the terminal," as recited in claim 26. For at least these reasons, Williamson cannot anticipate claim 26.

Claim 40, while of different scope from claim 24, recites subject matter similar to that recited in claim 24. Accordingly, Williamson cannot anticipate claim 40 for at least the same reasons as independent claim 24. Therefore, Ground III should be denied.

### E. Ground IV Should Be Denied.

Patent Owner submits that no *inter partes* review should be instituted based on Ground IV, because claims 1-5, 8, 9, 24-26, 31, 33, 39 and 40 of the '8923 patent are not obvious over Calder in view of Richardson.

Independent claim 1, for example, recites a method for controlling application programs in a communication terminal, the method comprising, *inter*

---

[33] Williamson at ¶[0081].