# Exhibit "C"

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
 2                       TYLER DIVISION

 3   SMARTPHONE TECHNOLOGIES, LLC )(
          Plaintiff,             )(
 4                               )(   Case No. 6:12-cv-245
          v.                     )(
 5                               )(
     HUAWEI DEVICES USA, INC.,   )(   TYLER, TEXAS
 6   et al.                      )(   April 24, 2014
          Defendants.           )(   9:30 a.m.
 7

 8   SMARTPHONE TECHNOLOGIES, LLC )(
          Plaintiff,             )(
 9                               )(   Case No. 6:12-cv-350
          v.                     )(
10                               )(
     ZTE CORPORATION, et al.,    )(   TYLER, TEXAS
11        Defendants.           )(   April 24, 2014
              Defendants.       )(   9:30 a.m.
12
                     MOTIONS HEARING
13         BEFORE THE HONORABLE JOHN D. LOVE
            UNITED STATES MAGISTRATE JUDGE
14

15   APPEARANCES:

16   FOR THE PLAINTIFF:  (See sign-in sheet.)

17   FOR THE DEFENDANTS:  (See sign-in sheet.)

18   COURT REPORTER:  MS. JILL E. McFADDEN, CSR
                      Deputy Official Reporter
19                    Sunbelt Reporting Services
                      100 E. Ferguson, Suite 900
20                    Tyler, Texas  75702
                      (903) 593-3213
21

22

23

24   (Proceedings recorded by mechanical stenography,

25   transcript produced on a CAT system.)
```

```
 1                    THE COURT:  Please be seated.

 2                    All right, Ms. Morris, you may call the

 3      case.

 4                    COURTROOM DEPUTY:  The Court calls Case

 5      No. 6:12-cv-245, SmartPhone Technologies versus Huawei

 6      Devices USA, Inc., et al. as well as 6:12-cv-350,

 7      SmartPhone Technologies versus ZTE corporation, et al.

 8                    THE COURT:  Announcements.

 9                    MR. NELSON:  Good morning, Your Honor.

10      Ed Nelson --

11                    THE COURT:  Good morning.

12                    MR. NELSON:  -- for plaintiff

13      SmartPhone Technologies, with me is Tony Simon --

14                    MR. SIMON:  Good morning, Your Honor.

15                    MR. NELSON:  -- Brannon Latimer, Ben

16      Askew, Tom Cecil, all counsel for SmartPhone

17      Technologies, and we're ready to proceed.

18                    THE COURT:  All right.  Thank you.

19                    For the defendants.

20                    MR. KANTER:  Good morning, Your

21      Honor --

22                    THE COURT:  Good morning.

23                    MR. KANTER:  -- Bob Kanter for the

24      defendants, Huawei and Futurewei, with me today is

25      Melissa Smith -- sorry if I cut you off, Melissa --
```

```
 1    Keith Davis and Lon Outland.

 2                THE COURT:  Good morning.

 3                MR. FINDLAY:  Good morning, Your

 4    Honor --

 5                THE COURT:  Good morning.

 6                MR. FINDLAY:  -- Eric Findlay and Eric

 7    Lutz -- Eric Hutz -- excuse me -- here on behalf of

 8    ZTE, ready to proceed.

 9                MR. HUTZ:  Good morning, Your Honor.

10                THE COURT:  Morning.  Thank you.

11                All right.  Well, ready to proceed here

12    with a motion hearing.  Before we begin with the

13    motions, which I'll have some comments on the -- the

14    way we'll handle the motions this morning, but is

15    the -- I want to cover the issue of just simply how

16    this case -- these cases are going to be tried.

17                What we have here are two case -- two

18    cases, one against Huawei and Futurewei, another

19    against ZTE.  You're both, of course, as you know on

20    the same track headed toward trial, but let me hear

21    from SmartPhone, I guess, first how they intend to try

22    the cases with a couple of defendants -- I don't -- I

23    believe different products.

24                MR. NELSON:  Different -- different

25    products at this point, same patents, Your Honor.  So,
```

```
 1    I guess, if both were to be tried, meaning neither one

 2    settled prior to trial, then -- then we've got the

 3    final pretrial conference I believe on May 20 -- 23rd?

 4    24th? -- 22nd, May 22nd, and jury selection's set for

 5    the 29th.

 6                    I mean, I anticipate back-to-back

 7    one-week trials.  I understand that Judge Davis may

 8    not want to go back to back with the -- with the

 9    trials, and -- and we'd planned for some flexibility

10    there.  I would imagine if we picked the -- picked the

11    jury on -- for both cases on the 29th, then we

12    would -- I think they're set for trial on -- on

13    June 9th, but we'd be amenable to -- to proceeding on

14    the -- on the 2nd, I believe.

15                    MR. SIMON:  I'm sorry, Your Honor.

16    Just -- it's June 2nd.

17                    MR. NELSON:  Oh, June 2nd picking the

18    jury.  Sorry, my -- my fault.  June 2nd is the jury

19    selection.  If we selected both juries on June 2nd,

20    we'd be amenable to proceeding with the first trial on

21    the -- on the 3rd, with the -- with the other trial

22    the -- the following week or the week after.

23                    THE COURT:  Well -- okay.  My specific

24    concern is with -- and this may go more to the

25    defendants, but is the defendants' position on the
```

 1   validity issues in the case -- obviously meaning if

 2   we're having back-to-back trials as was just stated,

 3   what does that mean in relation to the validity

 4   issues, the prior art?  So, let me hear from Huawei

 5   and ZTE on that.

 6                 MR. DAVIS:  Your Honor, Keith Davis for

 7   Huawei.  The parties, ZTE and Huawei, have different

 8   experts, have acted independently with respect to

 9   their invalidity defenses, and as a result at present,

10   we haven't coordinated in so far as having necessarily

11   overlapping issues that would necessarily be

12   efficiently tried in a -- a single invalidity trial

13   first.  That doesn't mean that there isn't some

14   overlap or efficiency just due to explaining the

15   patents once and certain things like that.  But as far

16   as invalidity itself, we do have two different

17   experts, different sets of prior arts, different sets

18   of theories and so on.

19                 THE COURT:  Okay.  Well -- well --

20   okay.  Let me hear from ZTE on that.

21                 MR. HUTZ:  Yes, Your Honor.  This is

22   Eric Hutz.  Just wanted to indicate that that's

23   consistent with -- with our understanding.

24                 THE COURT:  Okay.  Well, I have dealt,

25   to some extent, with the extent of a -- of the prior

 1   art to be presented to a jury in the Huawei case.  I

 2   guess my question is, does ZTE -- I -- are there

 3   issues related to that?  In other words, I've got in

 4   front of me a number of prior art references for --

 5   that I'm allowing Huawei to present as to particular

 6   patent, and there's some dispute as to that.  I know

 7   there's a motion pending on that.

 8                   But what of ZTE?  I have not seen

 9   anything on that.  Is that --

10                   MR. HUTZ:  So, what -- Your Honor, what

11   happened was is that the -- SmartPhone and ZTE were

12   able to stipulate to the number of prior art

13   references for each of the patents-in-suit, and we had

14   asked Huawei to do the same.  And as Your Honor's

15   aware, there was no agreements, though that was fully

16   briefed and then Your Honor entered his order limiting

17   the prior art.

18                   THE COURT:  Okay.  All right.  Well,

19   here's, of course, the thing on this idea of -- of

20   back-to-back trials.  What I may want to understand

21   is -- from both defendants is to the extent possible

22   of advising me or informing me of what Judge Davis

23   would potentially sit through for a second time.  I

24   know you said there's two experts, and I guess you've

25   compiled your own validity cases and -- and expert

1    reports, but I think he's going to be interested in

2    knowing if he's going to sit through a half dozen

3    references that he just heard the week before.  You

4    know, I guess what I'm saying is the extent of the

5    overlap.  I think before he sits through two trials on

6    validity, I think he's going to want to know -- want

7    to know what he's hearing -- going to hear twice.

8                    MR. DAVIS:  I'd be happy to address

9    that, Your Honor.  Keith Davis for Huawei.

10                    The Huawei defendants have relied

11    principally, although not exclusively, on actual prior

12    art devices in the general plan that I think plaintiff

13    is aware of, as we have witnesses listed on our

14    exhibit list such as Mr. Kanoba, Mr. Hood, so on, who

15    were involved with developing these prior art devices,

16    who may come to trial and testify or whose deposition

17    testimony may be played to explain these actual

18    devices.  We may have a few additional written

19    references, so it's a bit of a mix.

20                    But, my understanding, and I'm sure

21    Mr. Hutz can address for ZTE, is that our approach in

22    that fashion is not necessarily the approach that ZTE

23    has taken, and as a result, that it would not be that

24    Judge Davis is having deja vu on two back-to-back

25    trials.

```
 1                    THE COURT:  Okay.  Mr. Hutz.

 2                    MR. HUTZ:  Yes, Your Honor.  That's my

 3       understanding as well, that we're predominantly

 4       relying on printed references and the like and not

 5       products and things like that, so I do not believe

 6       there's a whole lot of overlap between the parties'

 7       positions.

 8                    THE COURT:  Okay.  All right.  Well, I

 9       appreciate that.  And, you know, as we get closer to

10       trial, Judge Davis may want to visit with you about a

11       number of things and that may be one of them, so he'll

12       be made aware of -- of what you've told me today.  But

13       he, again, may want to follow-up with you on exactly

14       what would amount -- or these two trials would consist

15       of, so...

16                    Okay.  That covers I think what I have

17       as far as trial plan.  Anything else the parties want

18       to add on that?

19                    MR. NELSON:  Not from the plaintiff,

20       Your Honor.

21                    THE COURT:  Defendants on -- what was

22       put forward here a moment ago was the idea that two

23       juries to be picked on June 2nd, followed up by either

24       a trial straightaway that week or -- right now it's

25       set for June 9th, a trial June 9th, followed up by a
```

```
 1    trial sometime in the future.
 2                 Defendants have anything to be -- have
 3    anything to say on that?
 4                 MR. DAVIS:  The only thing I'd address,
 5    just to put on the record, is one of our fact
 6    witnesses is coming off of maternity leave, so she has
 7    some scheduling issues about exactly which day.  And
 8    then our expert, Dr. Wicker, his wife is actually
 9    expecting twins at some point in time on or around
10    that date; and if they come early, he would appreciate
11    some certainty as far as exactly when he would need to
12    be here given his personal schedule.
13                 THE COURT:  Okay.  So that's on behalf
14    of Huawei, Dr. Wicker?
15                 MR. NELSON:  Coincidentally, Your
16    Honor, Mr. Latimer's wife is expecting and is due in
17    June -- June the 8th, and so certainty and an earlier
18    date for purposes of -- of inducing or whatever needs
19    to be done, it would be much appreciated.  So I think
20    we've got --
21                 THE COURT:  Judge Davis is going to
22    have to put out his clairvoyant, When is this going to
23    happen?  And he's got a bunch of things to juggle
24    there.  I don't know.
25                 MR. NELSON:  I guess what I'm saying
```

1    is -- is -- is under the circumstances, it seems on

2    both sides, you know, the greater clarity earlier on

3    about when we're picking juries and when trials are

4    going to start would -- would be much appreciated.

5                    THE COURT:  All right.  So, Mr. Davis,

6    you mentioned Dr. Wicker and there's -- you also have

7    a witness coming off maternity leave?

8                    MR. DAVIS:  Yes, sir.

9                    THE COURT:  So you're --

10                   MR. DAVIS:  And those two witnesses,

11   just for Your Honor's sake, the fact witness' name is

12   Sabrina Bohan, and she's located in San Diego so she

13   will have to travel, and she's trying to make

14   arrangements with her baby and family.

15                   Dr. Wicker is actually located in

16   Ithaca, New, York, so it's -- for him, too, it's not

17   exactly an -- an easy trip -- or an easy last-minute

18   logistical arrangements to come down here.

19                   THE COURT:  Okay.  All right.  Well,

20   we'll look at that and see about getting you a

21   schedule as soon as possible.  Somewhat dependent --

22   you know, Judge Davis I know has at least one other

23   trial set during that time frame.  He may have others,

24   but we'll keep that in mind and try to get you

25   something, if possible, as soon as we can.

```
 1                    All right.  Let's move on to the
 2   motions.  First of all, let me ask, I believe from my
 3   review of the materials, Docket No. 276, one of the
 4   motions I believe set for today, I did not find a
 5   response to it.  I don't know if I missed it.
 6                    MR. DAVIS:  Your Honor, that was the
 7   motion on the alter ego defense, and we noted in the
 8   pretrial order we dropped that defense --
 9                    THE COURT:  All right.
10                    MR. DAVIS:  -- so it is moot, I
11   believe.
12                    THE COURT:  All right.  Well, as agreed
13   here, the Court will deny the motion as moot.
14                    Okay.  So, I'm just going to take the
15   motions, I think, with one exception, just in the
16   order -- their docket entry order.  The first motion
17   I'm going to hear is the one on prior art, reducing
18   prior art.  My intention would be to allot 20 minutes
19   to that motion, not saying you need to use it all, may
20   not use it all, but I'll allot that.
21                    I notice, of course, that there's
22   two -- each defendant has a challenge to Ms. Riley's
23   report, damages report.  It's Docket 272 in the Huawei
24   case and 148 in the ZTE case.  I think what I'll do is
25   I'll hear both defendants' positions on those -- those
```

1    reports and then hear from the plaintiff.  So

2    allotting 30 minutes for that, and then 15 each for

3    the copying motion, and the -- I guess the ELA

4    agreement motion involving the ACCESS license defense.

5    So 20, 30, 15, and 15.

6                    All right.  Let's begin with the Docket

7    No. 222 on the motion to enforce the Court's order

8    regarding prior art.

9                    MR. NELSON:  Your Honor, just a point

10   of clarification, are those total times for the

11   motions and --

12                    THE COURT:  Total times, yes.

13                    MR. NELSON:  Yeah.  That shouldn't

14   be -- be an issue.

15                    Okay.  So we're -- we're talking about

16   the motion to enforce the Court's order limiting prior

17   art, and there's a couple of things that are going on

18   here.  Essentially, Huawei believes that every

19   anticipation reference comes with a bonus, Your Honor,

20   and that is, additional obviousness allegations.

21                    So, if we look at the Model Order

22   focusing patent claims and prior art, it makes very

23   clear that for purposes of the final election of

24   asserted prior art, which we have with respect to

25   Huawei's expert report on invalidity, each obviousness

 1    combination counts as a separate prior art reference.

 2              And as the Court's well aware, the

 3    Local Rules Advisory Committee commentary relative to

 4    the Model Order, makes clear that a small number of

 5    prior art references can be combined to form an

 6    exponentially greater number of bases for invalidity.

 7    For the limit on prior art references to be

 8    meaningful, each obviousness combination should count

 9    as a separate prior art reference.  It also says,

10    However by the time of final election, each basis for

11    invalidity should be specifically identified.  And I

12    would emphasize specifically.

13              As we discussed at the outset this

14    morning, plaintiff and ZTE achieved a stipulation

15    relative to limits on prior art references.  This

16    matter had to be briefed before the Court relative to

17    Huawei.  This is a -- an excerpt from the Court's

18    order relative to the limits imposed on Huawei's prior

19    art references for their expert report, and the Court

20    allowed them nine prior art references for the '459

21    patent and six each for the '275 and the '316.  The

22    '485 is no longer in the case.

23              So, these are limits on prior art

24    references for their final election of prior art and

25    what goes in their expert report.  But this is the --

1   the dime dynamic, I guess, in -- in Huawei's expert

2   report is they used their limits, all with 102

3   references, anticipation references.  So there are

4   nine 102 bases -- or nine 102 prior art references

5   relative to the '459 that are enumerated in Huawei's

6   expert report and are discussed in Huawei's export

7   report.  Six for the '275 and six for the '316.

8   They're all anticipation.  That's the only thing

9   that's discussed.

10           But, taking an excerpt from

11  Dr. Wicker's report relative to the '459, after he has

12  enumerated the 102 bases and discussed them, he has

13  the following passage, which are sort of generalized

14  amorphous obviousness allegations that keep the door

15  open.  And I'll point the Court to the -- to the

16  language highlighted in yellow.

17           Moreover, it would have been obvious to

18  one of ordinary skill in the art to combine such

19  functionality disclosed with respect to one or more

20  references or system analyzed in this report with the

21  functionality disclosed with respect to one or more

22  references or systems analyzed in this report to

23  achieve the alleged benefits of the '459.

24           And it goes on to say, A person of

25  ordinary skill in the art would have been motivated to

 1   combine any analyzed reference or system with one or

 2   more of the other references or systems disclosed in

 3   this report.

 4                 And that's all there is.  There is no

 5   specificity with respect to any obviousness

 6   combination.  You could take reference 2, 4, and 6,

 7   and say that's -- also renders the '459 obvious, or 1

 8   and 9, or 2 and 8, or 3, 4, 5 and 6.  There's no

 9   specificity here, and it gives us no idea whatsoever

10   what they're going to claim in terms of obviousness.

11                 Relative to the '275, for instance,

12   this is sort of a different issue.  They -- they come

13   in and they say, In addition to the anticipation of

14   the asserted claims by the -- by the prior art, the

15   asserted claims would also have been obvious based on

16   the scope of the prior art, the differences between

17   the prior art and the claims, and the level of

18   ordinary skill in the art.

19                 What does that even mean?  I can tell

20   you that what Huawei believes it means is that it has

21   general license to ignore court orders to combine any

22   instrumentality that is a 102 reference in this report

23   with the knowledge of one of skill in the art and say

24   that that's an obviousness position.  And, Your Honor,

25   that's not the law.  The law requires specific

 1    combinations of prior art.

 2                Here's the Active Video Networks case

 3    that's particularly on point, Federal Circuit 2012.

 4    In that case, the expert failed to explain how

 5    specific references could be combined, which

 6    combinations of elements in specific references would

 7    yield a predictable result, or how any specific

 8    combination would operate or read on the asserted

 9    claims.  And the court said that is not sufficient.

10                And then the court went on to say, The

11    opinion by Verizon's expert regarding the motivation

12    to combine references was likewise insufficient.  The

13    testimony is generic -- just like Dr. Wicker's

14    report -- and bears no relation to any specific

15    combination in prior art elements -- just like Dr.

16    Wicker's report -- and it fails to explain why a

17    person of ordinary skill in the art would have

18    combined the elements from specific references in the

19    way the claimed invention does.  Just like

20    Dr. Wicker's report, there is absolutely no

21    obviousness analysis in the report.

22                So, it's clear what Huawei's done here

23    with these generalized obviousness allegations.  They

24    do not bother to enumerate specific combinations of

25    prior art that comprise a 103 or obviousness position,

1    because they know if they did that, Your Honor, then

2    under the Model Order and under Your Honor's order, it

3    would constitute a specific reference, and they would

4    have to use it within their limits.  They don't do it.

5    They keep it wide open.

6              So, for the first time at trial, what

7    would happen is if they're not finding success like

8    they want with their anticipation references or don't

9    think that they're -- they're -- from an evidentiary

10   standpoint are able to make the anticipation case,

11   then they're going to have Dr. Wicker start to combine

12   references or combine references with his knowledge at

13   trial, and it's going to be the first time that we

14   learn of a specific obviousness combination and then

15   we're expected to break that down immediately and deal

16   with it.  And that's not how this works.  You can't

17   simply grab a tactical advantage through

18   non-disclosure, and that's what they're doing with the

19   report.

20             And so the relief we're seeking, Your

21   Honor, is make them stick with their enumerated bases

22   of invalidity, which they choose to -- to go forward

23   with nine anticipation references and arguments for

24   the '459 and six for each of the other two patents,

25   and these -- these amorphous references to -- to

```
 1   obviousness that are -- that are in this that do not

 2   specify any obviousness combination, and worse, make

 3   no attempt at any sort of analysis relative to

 4   obviousness that we can respond to.

 5                    THE COURT:  All right.  Thank you.

 6                    Response.

 7                    MR. OUTLAND:  Thank you, Your Honor.

 8   Let me just start by saying that the motion before you

 9   is not seeking to strike any part of Dr. Wicker's

10   report.  In fact, the plaintiff specifically says that

11   they're not seeking to strike anything.  It was just a

12   motion to enforce the court orders.

13                    But aside from that, if you look at

14   Dr. Wicker's report, he goes into painstaking detail

15   to establish what the state of the art was at the time

16   these patents were filed.  So he has hundreds of pages

17   devoted to -- to establishing through references that

18   were out there, through deposition testimony of fact

19   witnesses, including the inventors which have talked

20   about what the state of the art is when these patents

21   were filed.

22                    Dr. Wicker is not planning and Huawei

23   is not planning to have him ambush the plaintiff at

24   trial with any combinations that are not disclosed in

25   his report.  What Dr. Wicker will do instead is just
```

```
 1    to say that the knowledge of a -- of a person of

 2    ordinary skill in the art would be this, and to the

 3    extent that the -- the patents in this case are

 4    dealing with conceptual concepts and items that were

 5    ubiquitous in the art, then it's a perfectly

 6    legitimate approach to invalidity and obviousness to

 7    use single reference obviousness that was approved by

 8    the Federal Circuit in SIBIA and in Randall.

 9                   In fact, in Randall, Your Honor -- I'm

10    sure you've looked at the case we cited in our

11    response -- the Board of Patent Appeals and

12    Interferences looked only at the specific references

13    that were cited and -- and refused to look at the

14    background art that the -- one of the petitioners in

15    the other parties' reexam brought forward.  The

16    Federal Circuit said that was error, because you have

17    to look at the background of a person of ordinary

18    skill in the art and the knowledge that person would

19    have based on the state of the art at the time.

20                   So, defendants are not planning on

21    having Dr. Wicker testify outside the scope of his

22    report.  Every opinion that he -- he plans on giving

23    is in his report.  We are not planning on having him

24    ambush the plaintiffs with any specific combinations,

25    but it is certainly legitimate for Dr. Wicker to say,
```

1    for example, Let's talk for a minute just about

2    specifics like -- let's talk about the '459 patent.

3              The -- Mr. Barr has come back and said

4    that, at least for some -- one or two of the

5    references, that the only thing missing is a

6    selectable page which needs to be in HTML or some

7    markup language.  Well, we don't agree that -- that

8    the claims even require a markup language.

9              But aside from that, Dr. Wicker has

10   already set forth in his report numerous times that

11   HTML was well known in the art at the time.  So he

12   should be able to testify at trial in rebuttal that

13   even if HTML is a requirement, that was in the art and

14   a person of ordinary skill would recognize it.

15             I want to mention a couple of other

16   things that occurred during the meet and confer on

17   this issue which I think are important.  The specific

18   language that they showed you at the end of the '459

19   patent is, I'll admit, inartfully worded, and it does

20   appear that Dr. Wicker might attempt to combine

21   certain references with others.

22             If you look at the way this was worded

23   with -- in the context of the '316 patent, which

24   was -- was cited in our response on page 6 -- actually

25   starting at 5 and going to 6, that is what Dr. Wicker

1    intends to do.  And we offered to the plaintiff to

2    withdraw that language and -- and explain that

3    Dr. Wicker was just going to rely on the references

4    that we have cited under 102 as well as -- as well as

5    what Dr. Wicker has established as the knowledge of a

6    person of ordinary skill in the art at the time the

7    patents were filed.

8                    Now, those references that we have

9    cited under 102 certainly are part of the knowledge of

10   ordinary skill in the art, but Dr. Wicker is not going

11   to say, for example, I'm going to combine the silent

12   communicator with the Apple Newton.  That is not the

13   intent here.  We don't believe the Model Order is

14   trying to limit a defendant's invalidity theories.

15                   And let me explain it this way.  The

16   Model Order says that every obviousness combination

17   counts as a reference, but these are not obviousness

18   combinations.  This is a single reference that could

19   be modified based on the knowledge of a person of

20   ordinary skill in the art at the time, just like the

21   Federal Circuit discussed in SIBIA.  It's a

22   legitimate invalidity theory.

23                   THE COURT:  Well, there's nothing that

24   I see that prevents you from doing that, but the --

25   the problem is that you have to have a base of

1    tangible substantive knowledge to talk about

2    obviousness, whether it be some sort of device or a --

3    a publication or a patent or whatever.

4              And there would be nothing that would

5    prevent you from taking reference A and saying it

6    anticipates, and then taking reference A and saying,

7    well, even if it doesn't have something, based on

8    knowledge of skill in the art, you could modify that,

9    here's why you would modify that, here's why you would

10   come up with what is in the particular patent at

11   issue.  But that's a reference.

12             So, I don't -- what you're saying

13   substantively I think is acceptable, but it still

14   requires -- and this is why -- what I'm -- I'm

15   somewhat baffled by is how you can think you're going

16   to go through in a one-week trial nine prior art

17   references as to particular patent, anticipating

18   references, going through each element and all of

19   these references and then present some sort of

20   obviousness defense, you know, with -- I'm not quite

21   sure I understand how you're going to do it.

22             So, I think this -- what I need you to

23   respond is to this Model Order statement that each

24   obviousness combination counts as a separate prior art

25   reference.  Now I know it says combination, but the

1    point is, is that you can use a reference, but you've

2    got to -- that's a reference, for lack of a better way

3    of putting it, so...

4                    MR. OUTLAND:  Well, let me say that

5    when we met and conferred on this issue, we actually

6    asked SmartPhone, we said, okay, if we withdrew one of

7    our anticipation references and said that we're going

8    to use the knowledge of a person of ordinary skill in

9    the art combined with whichever references we chose,

10   would that be acceptable.  And they said no, it

11   wouldn't solve the problem.

12                   So, we actually tried to make an effort

13   to resolve this issue and deal with the issue of --

14   that you're explaining -- that the knowledge of a

15   person of ordinary skill in the art would be a

16   reference.  We tried to deal with that, but it wasn't

17   acceptable to SmartPhone, so we ended up here.

18                   THE COURT:  Well, you know, I don't

19   think it's sufficient, at least based on what I have

20   here, for your expert to say based on knowledge of one

21   of skill in the art, this particular claim is obvious.

22   In other words, he -- he's got to base that on

23   something and point to something.  And so that's what

24   I'm trying to get at is, is he's got to point to

25   reference A.  It can be a single reference, could be A

1   and B, a combination you put together, but it could be

2   a single one.  But he's got to rely on -- on

3   something, not just sort of this amorphous, you know,

4   knowledge of skill in the art.

5                   Now -- so what I'm saying is, is that

6   your references that your validity -- invalidity

7   defense is based upon, you've got a total of nine of

8   them and -- and that's it.  You know, it sounds like

9   to me -- and these are all anticipatory, then, you

10  know, that's it.  I guess I can open the door if

11  there's some sort of agreement that could be reached,

12  but you're limited to nine, and they've got to be

13  firmly based in -- in something.

14                  MR. OUTLAND:  So you're saying that we

15  have to actually give two references?

16                  THE COURT:  No.  I'm not saying two.

17  It can be one, but you're limited to -- to nine.

18                  MR. OUTLAND:  And the one could be a

19  knowledge, so you're saying that --

20                  THE COURT:  Well, I'm not really

21  considering knowledge of -- the whole thing is based

22  on knowledge of skill in the art.  I understand

23  obviousness has its particular component where you --

24  you put things together in the art and it would have

25  been known and obvious to one and -- but it's all

1    based on that.  Everything the guy is saying is based

2    on that.

3                So, when I get -- when I go to the

4    trouble to say, and this Model Order says, you get a

5    certain number of references, you know, that's got to

6    mean something.  Okay?  And it's -- it's -- you have a

7    limited amount of time, you've got to explain it to a

8    jury.  And just to beat them up -- to death about --

9    they're not going to know what you're talking about at

10   some point.  You've got to base it in particular

11   tangible things that the expert can talk about and

12   explain and undergird that with his knowledge of skill

13   in the art.

14               So, I don't know else to say it, but

15   you've got nine references and that's it.  So, the

16   motion to enforce the order is granted.  You got your

17   nine references and that's it.  Okay.

18               MR. OUTLAND:  Thank you, Your Honor.

19               THE COURT:  All right.

20               All right.  Let's move on to the next

21   motion.  It's a motion on Ms. Riley's expert report.

22               MR. KANTER:  Good morning, Your Honor.

23               THE COURT:  Good morning.

24               MR. KANTER:  Bob Kanter for Huawei and

25   Futurewei.  I deposed Mrs. Riley a few months ago.

1    She agrees that the plaintiff in this case is only

2    entitled to recover if it prevails on the particular

3    patents with regard to the reasonable royalty for

4    those specific patents.  It is not entitled to recover

5    based on patents that are not asserted in the case.

6              At the same time, she told us that the

7    primary basis for her opinion is a set of portfolio

8    licenses that SmartPhone has entered into with, I

9    think, approximately 12 or 13 companies covering

10   literally hundreds of patents and applications.  These

11   are global licenses, worldwide licenses covering a

12   plethora of patents.

13             She testified in her deposition -- and

14   our damage figure, by the way, is 2.50.  I probably

15   should ask -- they've left, though.  I had some client

16   representatives.  There was an issue raised with

17   regard to confidential information.  They've left the

18   courtroom.

19             Anyway, getting back to Mrs. Riley's

20   deposition testimony, she says it's 2.50 for what are

21   now three patents-in-suit and zero, repeat, zero for

22   all of the other patents in the portfolio licenses on

23   which she bases her opinion.  She's made no effort

24   whatsoever to evaluate whether any of those other

25   patents actually have value or not.  She's not asked

```
 1    the technical expert for the plaintiff to render any

 2    opinion on which she could rely with regard to whether

 3    any of those other patents have any value or not.

 4    She's not -- she's not asked anybody at SmartPhone to

 5    tell her that.

 6                Interestingly enough, to show how

 7    arbitrary she's being, Your Honor, this case started

 8    with eight patents being asserted against us.

 9    Literally, when Mrs. Riley rendered her opinions in

10    this case, there were four.  One of them's been

11    dropped.  So, literally, in the space of a day in

12    which Mrs. Riley dropped -- or -- excuse me --

13    SmartPhone dropped one of the patents-in-suit, that

14    patent went from being worth $17 million in damages to

15    zero.  It moved into the zero column.

16                Another example of the arbitrariness of

17    this opinion is that they've now sued us with respect

18    to other products that are not at issue in this case,

19    asserting not only the patents in this suit but

20    another patent.  So what they're telling you in this

21    case is the three patents-in-suit here have $2.50 per

22    phone value.  Everything else is worthless, zero.  But

23    we're going to sue Huawei on a patent that we're

24    claiming in this case is worth zero, and I presume

25    they're going to seek damages in that case.
```

1    Presumably, that patent is going to have some value.

2                    The law on this, Your Honor, besides

3    the fact that they can't -- it's black letter law that

4    they cannot recover based on patents that are not in

5    suit.  They're proceeding in this fashion.  And I'm

6    not saying -- I want to make my position clear -- I'm

7    not saying she -- we're not challenging today the

8    reliance on settlement agreements, and most of these

9    are settlement agreements.

10                    What we're saying is, if she's going to

11   use those licenses, she's either got to have some

12   basis, reliable basis, for saying they're worth zero

13   or she's got to make an adjustment.  And what

14   plaintiffs typically do, what the courts appear to

15   require, is that they make an adjustment.

16                    In our briefs, Your Honor -- I just

17   want to refer to a couple of cases.  In our briefs,

18   Your Honor, we referred the Court to a case --

19   relatively recent case out of the District of

20   Delaware, which we all know handles lots of patent

21   cases.  And the situation there was very similar.

22                    To paraphrase -- and I'm referring to

23   page 3 of -- page 3 of the opinion in AVM, the court

24   says, This is a single patent case.  In contrast,

25   three of the four license agreements AVM relies on

```
 1   gave Intel a license to entire patent portfolios that

 2   included dozens of licenses -- dozens of patents.  No

 3   reasonable juror could consider these broad portfolio

 4   license agreements to be comparable in scope to a

 5   license for only the '547 -- '547 patent, which was in

 6   suit.

 7               Now, on this particular case, the court

 8   decided -- and you'll see it in the final paragraph of

 9   the opinion -- that it wanted to hear from the expert

10   first.  And in fact, when we checked the docket sheet,

11   the court did have a hearing in which Mr. Evans

12   appeared, and he abandoned his approach of using the

13   portfolio license which the court had questioned in

14   its opinion.

15               This court, Judge Davis, in an opinion

16   they cite in their brief -- and this -- this opinion,

17   Your Honor -- as I say, it's cited in their brief --

18   it's Ericcson, Inc. versus D-Link Systems, decided

19   August 6th, 2013.  And again, I just -- I want to go

20   directly to the point.  And I'm on page 13 of 22.

21               The five patents in this case are not

22   the entirety of Ericcson's 802.11 portfolio.  They are

23   only a subset of it.  Mr. Bone's second level of

24   apportionment factors this into account.  Mr. Bone

25   reduced his rates to account for the fact that we're
```

1    only dealing with five patents.  This is Judge Davis

2    acknowledging as part of his reasoning for upholding

3    the plaintiff's damage award in this case that they

4    had adjusted the portfolio licenses so that the expert

5    was testifying as to how much of that value went to

6    the patents-in-suit.  SmartPhone refuses to do that or

7    is unable to do that.

8                 Finally, I received from counsel for

9    SmartPhone yesterday another opinion I want to comment

10   on briefly.  It's the -- the Oracle America versus

11   Google case, Your Honor, decided -- this is a Northern

12   District of California case, 2012.

13                In this particular case, a

14   court-appointed expert wanted to -- or provided to the

15   court three bases for the use of portfolios license.

16   It's interesting how his report begins.  And again,

17   forgive me for reading, but the words that he used

18   state this better than I could articulate it myself.

19                He begins by saying, Set -- Setting

20   aside what the law may require, my best economic

21   advice is that there are economic reasons, in essence,

22   to use portfolio licenses setting aside what the law

23   may require.

24                That's what they're asking you to do.

25   They're asking you to set aside the black letter law

1    that you can't recover except for what's in the case.

2                In this particular case, he gave three

3    reasons.  One, that if the parties knew at the time of

4    the hypothetical negotiation that the IP in suit would

5    have driven the negotiations, the aggregate value of

6    the license in question is attributable to this

7    subset.

8                Second, he said, If the parties did not

9    know what subset of the IP in the portfolio would be

10   most useful, then Google would have licensed an

11   option.  The licensee would have -- would have

12   insisted on an option to acquire the other patents.

13               And third, he said they would have

14   taken a license to the whole thing as an insurance

15   policy.  Interestingly enough -- and this is the

16   opinion they cite -- the court granted the defendant's

17   motion to strike the first -- excuse me -- the -- two

18   of these.  It granted the -- forgive me, Your Honor.

19   I just got this yesterday.  They got -- it granted the

20   motion with respect to two.  And with regard to the

21   first one, it granted 2 and 3 -- strike 2 and 3.

22               With regard to the first one, it said,

23   It is unclear whether he actually opines that the IP

24   in suit was understood in 2006 to be the most relevant

25   to the 2006 negotiations.  If so, he said, The parties

 1  haven't adequately briefed the issue.  And the motion

 2  was denied without prejudice.

 3              So, the opinion on which they're

 4  relying didn't even definitively decide the issue as

 5  they would suggest this court should decide it.  And

 6  as I say, I think any report that begins with the

 7  statement, Setting aside what the law may require,

 8  must be viewed with extreme skepticism.

 9              When it boils down, Your Honor, what --

10  what their expert is relying upon, what Mrs. Riley is

11  relying upon in this case, is a conversation with a

12  witness, Matt Vella, who owns an interest in Acacia

13  which owns SmartPhone, an interested witness, that

14  gee, the patents-in-suit drive the negotiations.

15              And that's the sole basis for her

16  saying 2.50 for the patents-in-suit, which change from

17  time to time and which may be asserted in another

18  case, and zero for everything else.  That's not a

19  reliable basis.  It's not what Judge Davis relied upon

20  in the Ericcson case, and it's not what the Delaware

21  court relied upon in AVM.  That's point number one.

22              Point number two, Your Honor, boils

23  down to this is an entire market value rule issue.

24  And I know my time is getting a little short.  The

25  court issued an opinion in the HTC case.  The court

1    said -- and I'll refer specifically to a couple of the

2    statements.  We -- I am obviously at a disadvantage of

3    operating with a redacted copy of the order, but some

4    of the -- the specific statements and what I have

5    available to me make it pretty clear what the

6    requirements are.

7                    On page 5 of the court's order in HTC,

8    the court said, Moreover, Ms. Riley's income approach

9    looks at the per-unit selling price of the accused

10   products, C, and it cites a report.  These methods do

11   not distill the accused devices down to the smallest

12   saleable patent practicing unit.

13                   On the following page, Therefore

14   Mrs. Riley's method of, one, using the average monthly

15   operating profit and, two -- and this is the important

16   part -- the per-unit selling price of the accused

17   products improperly invokes the entire market value

18   rule.

19                   And let me -- let me add to this.  What

20   she did in this case, Your Honor, it's interesting.

21   When they're -- when they're responding to our first

22   point, they want to talk about the real world.  When

23   they're responding to the second point, the last thing

24   they want to do is talk about the real word.  Because

25   what Mrs. Riley's has done, every one of the licenses

 1    on which she relies is a lump-sum payment license.

 2                    What she's done with arbitrary criteria

 3    is convert what the parties agreed to into a per-unit

 4    number.  She makes no effort whatsoever, however, to

 5    attribute the per-unit number to the specific accused

 6    technology.  And it's particularly important in this

 7    case.  You know well from the HTC and other cases

 8    there are literally hundreds of patents out there that

 9    relate to SmartPhones.  They have hundreds of patents

10    that allegedly relate to SmartPhones.

11                    Mrs. Riley agrees there are patented

12    items in this case and there are lots of unpatented

13    items in this case, but she's made no effort

14    whatsoever to attribute the value to a particular

15    portion or aspects of the accused products.  And that

16    is demonstrated by the fact she has a "one size fits

17    all" opinion.

18                    In other words, if they prove

19    infringement of one claim under the '316, $17 million.

20    If they prove infringement of a different -- entirely

21    different claim under a different patent, the '459,

22    $17 million.  '275, $17 million.  If she had done what

23    she's supposed to have done, she would have made an

24    analysis of exactly what is the technology that's at

25    issue with regard to the individual patents, and she

 1    has not done that.  She has not complied with the

 2    entire market value rule.

 3                    They have no marketing study, no

 4    survey.  They've made no effort whatsoever to show

 5    that these particular features drive demand.  None.  I

 6    don't think that's disputed.

 7                    Finally -- I know my time is short --

 8    we had a third basis; that is, she cites -- but to be

 9    candid with the court, she really doesn't rely upon

10    some Huawei licenses.  We think that if she is relying

11    on those, that's improper simply because by her own

12    admission, she's made no effort whatsoever to link the

13    technology covered by the other Huawei licenses to the

14    technology in this case.

15                    And I think as you well know, a

16    plaintiff must show, when they're relying upon

17    licenses, that there's an economic comparability and a

18    technical comparability.  She's done none of that.

19                    So, for all of those reasons, Your

20    Honor, we're asking the Court to strike Mrs. Riley's

21    opinions in this case.

22                    THE COURT:  All right.  Thank you.

23                    Let me hear from ZTE on their motion.

24                    MR. HUTZ:  Good morning, Your Honor.

25    Eric Hutz on behalf of ZTE.  I think from our

 1    perspective -- and I think I really can't add a whole

 2    lot to what Mr. Kanter said because I think a lot of

 3    the issues, if not all of the issues, that are

 4    reflected in Huawei's motion are the same with respect

 5    to our motion.

 6              I have not seen Ms. Riley's report in

 7    the Huawei case, but I would hazard a guess that the

 8    two reports are, essentially, identical with a few

 9    numbers and a few other things changed.  So, we would

10    adopt all of the reasons that Mr. Kanter just elicited

11    as to why the report in both cases should be stricken.

12              There are a few discrete items that I

13    think are unique to our motion, which I'll cover very,

14    very briefly, one being we did raise the issue with

15    respect to the house report.  That's something we're

16    content to rest on the papers and does not need to be

17    belabored here at this point.

18              With respect to comparability, we do

19    have one situation that I think does require at least

20    brief discussion and that is with respect to one of

21    the ZTE agreements that Ms. Riley relies on in her

22    report.

23              Now, they say she's not relying on the

24    report to set what she calls a reference range.  But

25    the agreement is apparently being used as a check, or

1    as she put it, a reasonableness test to match up or

2    presumably to show that the $2.50 per-unit rate that

3    she selected in connection with the litigation is

4    somehow reasonable, because at some point ZTE agreed

5    with another party to assert an amount on a per-unit

6    basis and that somehow that shows that her report or

7    her $2.50 value is reasonable.

8                    And she admits in her report that she's

9    not aware of any evidence showing that that agreement

10   is in fact comparable, and reliance -- she is relying

11   on it, at least to the extent she's doing it, to show

12   that this other amount is a legitimate amount.

13   There's no comparability analysis.  The two agreements

14   are completely different.  And from that standpoint,

15   if that is where she is intending to go with that

16   agreement, then we do not believe that that's proper.

17                    And with that, Your Honor, I will turn

18   it over to the plaintiffs.

19                    THE COURT:  Thank you.  Response.

20                    MR. SIMON:  Good morning, Your Honor.

21   Tony Simon.

22                    THE COURT:  Good morning.

23                    MR. SIMON:  It's good to be back in

24   your court.  I want to talk a little bit about --

25   first, with respect to both arguments, I'll address at

1    the same time.  What the defendants are doing here is

2    they've got the shotgun approach to attack Ms. Riley's

3    report.  And while they say they're not challenging

4    her use of the prior settlement licenses, that's

5    exactly what they're doing.

6              We have to start -- or Ms. Riley had to

7    start and the plaintiff in this case had to start from

8    the following starting point; one, we try and use this

9    hypothetical negotiation which presumably occurs, in

10   fantasy, sometime prior to infringement, and we try an

11   use real world activities of each of the negotiators

12   in that hypothetical negotiation to try and

13   hypothesize what those parties would have agreed to

14   had they come to a license on the patent-in-suit.

15             So, on the one hand, we've got

16   SmartPhone as one of those real -- one of the

17   negotiators in this case, because at the time of the

18   hypothetical negotiation, SmartPhone would have been

19   the negotiator, and then we have each of the

20   defendants.  So what we're trying to do is replicate

21   as best we can what would have happened in August 2010

22   for Huawei -- and I think it's 2011 for ZTE -- this

23   hypothetical negotiation.

24             Now, it's important to note that the

25   law doesn't say, as the defendants would have us

 1  believe, that in every hypothetical negotiation, no

 2  matter what the real world facts are, this is what you

 3  have to do.  In fact, each hypothetical negotiation is

 4  analyzed on a case-by-case basis and differs from case

 5  to case, because what we're really doing is we're

 6  looking at what really happened in real life with

 7  these two negotiators and then putting them in this

 8  fantasy situation and trying to guess what they would

 9  do based on what they actually have done in the past.

10  Now -- so that's the first point.  We have to deal

11  with the hypothetical negotiation.

12              The second point is, this Court held --

13  and I'm quoting from your order -- Consequently, the

14  only relevant evidence of a reasonable royalty in this

15  case is the settlement licenses that deal with the

16  patented features.  So the only relevant evidence of a

17  reasonable royalty in this case -- now that was the

18  HTC case.  And HTC acts as the patent owner, would

19  have been negotiator.

20              Here, it's even more compelling that

21  that's the only relevant evidence, because SmartPhone

22  would be the negotiator in that hypothetical

23  negotiation.  So that's the second point of reference

24  we have to start with.

25              So we're going to look at what

1    SmartPhone did in the past in those only relevant

2    settlement licenses and try and determine -- and look

3    at what they actually did and then apply it to this

4    hypothetical negotiation.  So, that's exactly what

5    Ms. Riley did.

6                  She said, Well, I talked to Mr. Vella,

7    he's the chief negotiator, and I know they have some

8    complaints about, well, he makes -- he makes money

9    from the company because he's employed by the company.

10   That's, of course, cross-examination.  The jury will

11   hear from Mr. Vella.  They can judge his credibility.

12   They can cross-exam him and Ms. Riley.

13                 But he said -- she asked him, What did

14   you look at when you -- when you did those 13

15   licenses?  And he said what drove the dollar amounts

16   in those settlements, the lump sum amounts, was the

17   patents in those suits and the accused U.S. sales of

18   the defendant because they were litigation licenses.

19   And that makes sense.  That's naturally what does

20   drive litigation settlements.  The parties look at

21   their potential exposure, what could I get if I win,

22   discounting it because of litigation uncertainty,

23   those kind of things, so what drove those licenses.

24                 Now, they specifically asked him -- and

25   we cite this testimony in our response -- they asked

 1    Mr. Vella in his deposition, and Ms. Riley cites this,

 2    Did you look at all the other portfolio -- all the

 3    other licenses in the ACCESS portfolio, all the other

 4    licenses SmartPhone looked at in trying to assess the

 5    value, he said no.  That's not what we knew about.  We

 6    knew about there were litigation settlements, we knew

 7    about the patents-in-suit, we knew about the accused

 8    products, and we were asserting the best patents in

 9    the portfolio.  So, that's actually happened in real

10    life.

11              So, the other thing Ms. -- Ms. Riley

12    said -- and she said this in her deposition when Mr.

13    Kanter asked her -- she actually testified and said,

14    No, no, no.  You're misunderstanding my point.  This

15    is on pages 102 and 103 of her deposition.  She

16    said -- he asked, Do you think it's realistic that you

17    would just -- Apple would pay $38 million to settle

18    that case and not look at all the other patents?

19              And she says, I think when you're

20    trying to settle a case, you want coverage for as much

21    as you can get.  When you're talking about the numbers

22    that are driving the settlement, it tends to be driven

23    by what the parties know.  That makes sense to me.

24    That makes sense to me in negotiating settlement

25    agreements.

 1                     So the parties say, Apple says I sold

 2     122 million units in the U.S.  This number fits my

 3     understanding of my liability.  That's what the

 4     parties know the most about.  They don't know as much

 5     about the patents that aren't in suit.  They haven't

 6     done the claim charts on those.  They haven't mapped

 7     them to the accused products.  There haven't been all

 8     these depositions and reports written by experts.

 9                     So, in real life, in the 13 settlements

10     that are the only relevant evidence that we have to

11     use, what SmartPhone actually did in those

12     negotiations was said, Hmm, what can I get -- let's

13     focus on the patents-in-suit in those cases and the

14     accused products in the U.S., what's my potential

15     liability, and came to some kind of settlement.  So

16     we're still trying to decide what would SmartPhone do

17     in this hypothetical negotiation.

18                     There's an impractical part of their

19     argument as well.  What they're saying by this in

20     every hypothetical negotiation, you disregard the

21     facts if the parties -- the true negotiators wouldn't

22     have looked at all these other patents.  And you have

23     to do a value assessment of all those patents.

24                     What that means is -- and Mr. Kanter

25     said it again today -- Ms. Riley would have to look at

```
 1    all those patents, 200 patents.  We'd have to hire

 2    technical experts for all 200 patents.  We'd have to

 3    go through an analysis of all of Apple's products,

 4    HTC's products, Huawei's products, ZTE's products, not

 5    just the products in suit, and try and come up with

 6    some value of all these patents, even though it didn't

 7    happen in real life, and then try and assess how much

 8    each patent is worth.  That's not the law, and the

 9    reason it's not the law is because you try and

10    replicate in the hypothetical negotiation what

11    happened in real life.

12                So, I will point out one other point.

13    With respect to the ACCESS patents, again, the

14    evidence is undisputed.  ACCESS owns some hundred

15    patents that it gave licenses to the defendants in

16    those 13 licenses and didn't get a single penny for

17    it.  They got what was called a defensive termination.

18    So, essentially, if Apple or Samsung sues ACCESS

19    later, that license is gone and ACCESS has that to

20    assert -- those hundred patents to assert back.  There

21    was no consideration paid for those.  That's

22    undisputed.  So there certainly doesn't need to be

23    valuation for that.

24                With respect to the other patents, the

25    evidence is undisputed by Mr. Vella that what we did
```

```
 1    was come up with a number based on the

 2    patents-in-suit.

 3                    So, to recap, we want to look at how

 4    the licenses were negotiated to settle litigation,

 5    because that's what the focus has to be, and it has to

 6    be based on what actually happened in real life, and

 7    that's exactly what Ms. Riley did.  All of the cases

 8    they cite, all of the cases they cite deal with

 9    portfolio licenses negotiated at arm's length.

10                    And I'll submit I agree that if in

11    those cases -- for example, in this Ericcson case that

12    Mr. Kanter just talked about, in the Ericcson case

13    there were portfolio licenses negotiated at arm's

14    length.  And the facts in those cases were that the

15    parties probably did go and try and assess the value

16    of the patents in that portfolio.  That's what the

17    patentee probably did back then, Ericcson.

18                    That's not a settlement -- litigation

19    settlement analysis.  They weren't bound by what we

20    have to do in this case, which is use those actual

21    settlement licenses to see how those agreements were

22    negotiated.  In fact, the AVM case that Mr. Kanter

23    points out, in the AVM case there's -- there's a great

24    way to distinguish it and make our point even better.

25    Intel's the defendant.
```

```
 1                    The plaintiff in that case is saying,

 2      Intel, you previously settled litigation for different

 3      patents, and I want to use those -- those litigation

 4      settlements in this case to say what you would have

 5      agreed to.  And the court says, no, no, no, no, no,

 6      you have to show because those aren't the

 7      patents-in-suit that Intel -- that those patents are

 8      comparable in order to give you some insight as to

 9      whether the settlements in those cases tell you what

10      Intel, the defendant, would do in the hypothetical

11      negotiation.

12                    That's the opposite here.  SmartPhone

13      is the negotiating party.  SmartPhone settled those --

14      those 13 prior settlements.  SmartPhone did the

15      negotiations.  So what we're looking at the 13

16      settlements are, is we don't need to look at the other

17      patents in the portfolio because SmartPhone didn't

18      look at them.  We're not saying that Huawei would have

19      done what SmartPhone did in those -- in those previous

20      negotiations.  That's telling us what SmartPhone would

21      have wanted in that negotiation.

22                    Now, on the other side of the equation,

23      we have what would Huawei and ZTE do.  So again, what

24      Ms. Riley did is -- they have 40, 50 licenses -- she

25      looked at arm's length licenses, and she looked at
```

1    those licenses to determine -- try and determine in

2    this hypothetical negotiation what has Huawei done in

3    the past, what has ZTE done in the past and applied

4    that in this particular case.

5                Now, mindful of your order, she didn't

6    say those licenses are relevant.  Those licenses would

7    drive the settlement amount.  Instead what she did is

8    she said here are those license, and I'm going to

9    reduce them to a per-unit royalty just to see if the

10   number I came up with, this $2.50, is within the realm

11   of reason of what Huawei would have agreed to.

12               Obviously, if they've never agreed to a

13   license more than, you know, 25 cents, it's hard to

14   say they would have paid 2.50 here just because

15   previously that's not what they did.  So she did go

16   through that analysis of their other licenses.

17   However, that's not what she said were the relevant

18   license and that's not what she tried to do where she

19   tried to equate it here.

20               I want to point out is -- and this is

21   the case we came across late and I wanted -- I filed

22   it yesterday, this Google versus or Oracle case.  And

23   I think it's instructive in our situation.  In that

24   case, Oracle sues Google, and there's a prior

25   negotiation, not in litigation between Oracle and

 1   Google, and the court on its own appoints an expert --

 2   this isn't one of the party's experts -- and this

 3   independent economic expert appointed by the court

 4   comes up and says, You know what, I think if we go

 5   back in time when they were negotiating for a

 6   portfolio license in 2006, if Google would have known

 7   that the only patents that really matter to it are the

 8   ones that are in this suit, then the value of that

 9   portfolio license would be the value of the

10   patents-in-suit.

11              Now, the court didn't accept that from

12   the hypothetical negotiation standpoint.  And in that

13   case it shouldn't because in that 2006 negotiation,

14   there wasn't prior litigation.  That wasn't what the

15   facts were in that case.  But what the court did say,

16   and the part that didn't get stricken in this Oracle

17   case, is -- is the judge said -- and this is on page 3

18   of the order -- Dr. Curl's first explanation that if

19   Sun and Google understood that the subset of Sun's

20   Java portfolio most relevant to the negotiations was

21   composed of the now in-suit patents, the value of the

22   portfolio is the value of the patents.

23              And that's exactly what happened here

24   in real life, and that part didn't get stricken.  So

25   what the court said there was, you know, even if

1   you're negotiating portfolio license, if the only

2   thing that's really relevant to you are a few patents,

3   you could see how even though you get a license of the

4   whole portfolio, the real value is just in those few

5   patents that you really need a license for.  And this

6   was come up with by an independent expert in a case,

7   and this was come up with -- and this was approved by

8   the judge in this case, even though the facts didn't

9   make it in that case.

10                  Now, in our case, we specifically have

11  SmartPhone saying here's what drove how much money I

12  would take in those 13 other settlements, the

13  patents-in-suit for the same kind of products, for the

14  same kind of features.  And that's how Ms. Riley gets

15  value here, and that's how she comes up with the value

16  for the inventions.

17                  I want to address quickly the entire

18  market value rule.  What's confusing to me is that

19  there's a number of cases, including from this court,

20  that say if you're not basing your revenue -- you're

21  not using as a revenue base the market value of the

22  products, you don't implicate the entire market value

23  rule.  He cites your order in our HTC case.  That's

24  what Huawei cites.  However, in that case, she -- you

25  found she was using the entire market value rule which

 1    is why you said, no, you need to use the settlement

 2    licenses because they're the most relevant.

 3                    And that brings me to this lump sum

 4    versus per-unit royalty.  So, we said at the beginning

 5    we're faced with a hypothetical negotiation, so we

 6    have to look at real world facts.  We've got 13

 7    settlement agreements, and we have to use those to

 8    come up with a royalty rate in this case.  All 13 of

 9    those were lump sum, so we have to find a way to make

10    them comparable to the facts in this case.

11                    And contrary to what defendants argue

12    in the wordsmith case which is citing Lucent, the

13    Federal Circuit said, Running royalty agreements can

14    be relevant to lump sum damages, but some basis for

15    comparison must exist and the evidence presented to

16    the jury.

17                    So that's what she tried to do.  She's

18    trying to take these lump some payments that Apple and

19    HTC and all these companies sign and put them in a way

20    that she could fit into the facts of this case so she

21    could make them comparable.  And for a practical

22    reason, that was another reason she had to do it,

23    because we're only entitled to damages in this case

24    for the actual units sold by Huawei.  At the time of

25    the report, it was X number of units.  By the time we

```
 1    get to trial, it will be Y number of units.  We have

 2    to adjust that accordingly.  So we -- so Ms. Riley

 3    needed some way to do that comparison.

 4                   So, sure, there were lump some

 5    payments, but they were converted into per-unit

 6    royalty just so we could make them comparable in

 7    accordance with the Federal Circuit law and make them

 8    relevant to what we think would be the damages in this

 9    case.

10                   And by the way, that's what their

11    expert does, too, Mr. Bakewell.  He uses -- you know,

12    he uses market share.  Well, what is market share?

13    How many phones they sold in a given time period

14    compared to, you know, the market as a whole.  So,

15    where all the experts are trying to use a way to take

16    these other lump sum licenses and come up with a

17    number in this case.

18                   The last thing I want to mention, Your

19    Honor, is the use of other licenses.  Again, what

20    Ms. Riley is trying to do is take the real world past

21    licenses of ZTE and Huawei and use that to hypothesize

22    what they would have agreed to in a hypothetical

23    negotiation.  We got the SmartPhone side.  We're

24    trying to get the Huawei side.

25                   In the HTC order, the same issue came
```

 1    up, and there was no comparability test of all the

 2    other patents.  And what you stated was, Despite loose

 3    relation to the patented technology, the licenses and

 4    cross-licenses of defendant may be relevant to the

 5    Georgia-Pacific analysis.  And that's how she uses

 6    them here.  Again, she doesn't say, well, in these 10

 7    licenses, you paid a dollar-fifty a phone and that's

 8    why the royalty would be a dollar-fifty a phone here.

 9              She goes to the Georgia-Pacific

10    factors, which she must, and assesses, well, what are

11    the types of licensing activities by Huawei and ZTE so

12    we can try and hypothesize what would happen in the

13    hypothetical negotiation.

14              Your Honor, unless you have questions,

15    that's all I have.

16              THE COURT:  Okay.  Mr. Simon, let me

17    ask you a couple of questions.  First is this -- on

18    this issue of portfolio licenses.  Now, wouldn't it

19    make sense that there would be some account given to

20    the fact that the particular license at issue is to an

21    entire portfolio, an entire array of patents, rather

22    than just to these particular patents-in-suit?

23              You know, to say, at least in part, it

24    may be small, but the fact that a licensee was able to

25    obtain a license to this wide array of patents, it

 1    accounts for something.  And what I'm understanding

 2    from the arguments here that your expert's position is

 3    for purposes of what she's going to present to a jury

 4    is, is that is zero, that it meant nothing.  And

 5    wouldn't it make sense that it meant something?

 6                    I find that hard to wrap my mind around

 7    that you've got parties A and B, and party B is taking

 8    a license, even in litigation, and the -- but the fact

 9    that they're getting more than, say, the three

10    patents-in-suit, it sort of diffuses what is

11    attributable to those particular patents.  I

12    understand those are the patents in litigation.

13                    But when you're trying to hone in on

14    what those particular patents are worth, wouldn't it

15    make sense to say there's some reduction in that value

16    of those patents because the license -- the licensee

17    got all this other stuff?

18                    MR. SIMON:  Well, first, I would say

19    Ms. Riley didn't testify that they're worth zero.

20    Okay.  What she said was the monetary aspect of those

21    license, the money given, was calculated based simply

22    on the patents-in-suit.  So when your order says the

23    most relevant licenses are those, we need to determine

24    what would the money be.  We're looking at the money;

25    we look at the patents-in-suit.

 1                Second is I disagree that no matter

 2    what the other patents are about, there's some value

 3    there.  Certainly, there's a little bit of value in

 4    that the parties want peace and won't be sued.  But

 5    give an example, let's assume you have in the -- in

 6    the HTC settlement a hundred patents that relate to

 7    making ice cream, and HTC doesn't make ice cream, and

 8    at the end of the negotiation when they -- we decide

 9    on the amount of money, we say, Oh, by the way, we

10    want to license all your patents, we don't want to be

11    in court with you ever again, is getting a license to

12    a bunch of patents that cover ice cream -- making ice

13    cream --

14                THE COURT:  But that's not really what

15    we have here.  We've got a -- a plaintiff, your

16    client, that, as I understand it, holds a patent --

17    has a -- holds a portfolio full of -- for lack of a

18    better way of describing it -- SmartPhone patents.

19                So, I understand this is a litigation

20    license, but if you're going back to a hypothetical

21    negotiation, while I agree that to some extent the --

22    the more substantial weight when talking about the

23    negotiation is probably going to center around the

24    patents-in-suit.  But if you're talking about a

25    hypothetical negotiation, the fact that you're getting

 1   other SmartPhone patents, I just -- it's hard for me

 2   to see how that -- it's not ice cream patents.  It's

 3   SmartPhone patents.

 4              MR. SIMON:  I agree.  I was trying to

 5   make an analogy because my next step was going to be

 6   this, that's not the facts in this case.  They're not

 7   ice cream patents.  But the facts in this case are

 8   true that SmartPhone didn't ever in any of those

 9   negotiations, based on the testimony, of those

10   litigation settlements, say, by the way, I've got

11   these other patents so pay me a little more.  And the

12   other side never said --

13              THE COURT:  Well, now -- now let me

14   stop you there.  Their position is, is that you have a

15   particular patent you assert, and you say it's, you

16   know, generated $17 million in damages, and then when

17   it drops out, it's worth nothing.

18              Now, what -- you know, what's your

19   position on that, number one; and number two, what

20   would you say if they're allowed to ask that -- as to

21   why a patent's worth $17 million and now it's zero --

22   to your expert at trial?

23              MR. SIMON:  Well, in the hypothetical

24   negotiations, it's presumed infringed and valid.

25   That's not the case at trial.  Okay.  So if it's

 1    proved invalid, it is worth nothing.  But the -- but

 2    the fact of the matter is, again, we're looking at a

 3    hypothetical negotiation between SmartPhone who

 4    negotiated these licenses.

 5              So we look at what they did, and what

 6    they did previously is they said whether you infringe

 7    one patent or five patents, here's what we want for a

 8    license.  And they use it in their damages' assessment

 9    in those litigation matters, and then they ended up,

10    after they agreed on a number, granted a license to

11    the other patents and -- and gave zero additional

12    consideration for it in those terms.

13              So we're faced with, What do we do

14    here?  Logically, you would assume that one would pay

15    something more for all these other patents, especially

16    if they have to with SmartPhones.  But what do we do?

17    Do we ignore the facts in real life, which is the

18    whole basis of RescueNet?  It said let's look at what

19    really happened in this case.  If a plaintiff really

20    licensed these, even in litigation for X, that's

21    relevant.  So we can't make up facts.  We can't change

22    the facts.

23              So, is the next step we've got to go

24    through and do a valuation assessment of all these

25    patents?  I mean, that will cost millions of dollars

1    of expert time, because I guarantee you if Ms. Riley

2    said, Well, I equate 10 percent of those prior

3    settlements to the rest of the portfolio, they would

4    be in here saying, Strike that.  What do you -- what

5    do you base that on?  Did you hire experts?  You're

6    not a technical person.  How did you get that?

7                 That's not what was agreed on these

8    negotiations.  It's contrary to the facts.  So what

9    we're stuck with is, we have to use these settlement

10   licenses, we know how the dollar amounts were

11   calculated, we know that there really wasn't

12   consideration paid, so we've got to come up with new

13   consideration and -- and say, well, some of that was

14   for that even though the parties in that negotiation

15   didn't do it.

16                 I mean, we'd have to hire experts on

17   all those patents.  And not just on the patents, we'd

18   have to go to Apple and say, What other products did

19   you have that might have been implicated by all these

20   other hundred patents?  And what other patent --

21   products that maybe Apple knew about that were going

22   to come out that they might have assigned a value to.

23                 I'm not quite sure how there's a

24   practical way to do that without running afoul of all

25   the other bases that an expert has to have.  I mean,

1    truly, you know, to the extent he's saying this is

2    arbitrary, I think in reading all these cases

3    preparing for this hearing, the waters in patent

4    damages are very murky, and we're all trying to deal

5    with that.

6                 But -- but -- but there's no question

7    that we have to use a hypothetical fantasy

8    negotiation, and we have to use these prior litigation

9    settlements, and then what do we plug into that

10   analysis otherwise without spending millions of

11   dollars on expert witnesses.

12                THE COURT:  Okay.  Well, let me ask you

13   another question.  This entire market value issue,

14   isn't the problem similar to what I talked about in my

15   prior opinion that Ms. Riley is taking the entire

16   unit, she's saying, Okay.  Well, I'm not going to go

17   on, you know, the revenue generated by the -- the

18   phone.  I'm going to go by the per unit.

19                Is she still not drilling down to what

20   the -- it seems to me what she's doing is she's

21   saying, well, they settled these cases on these

22   patents for this much, this defendant sold this many

23   units, so divide that out, and that's 2.50 a unit.

24   She's still taking the unit as a whole and not

25   figuring out what is it -- what is it worth, these

1    patented features.  What is it worth, what are they

2    worth, not what the phone as a whole that -- again, as

3    I said in my prior opinion -- has many features to it,

4    but what are the patented features worth.  Is it

5    another way of just saying, I'm not going to take the

6    cost of the phone?  I'm going to take the phone as a

7    whole, as a unit, as a tangible unit?  Isn't that the

8    same thing?

9              MR. SIMON:  Well, no, it's not, for a

10   couple of reasons.  First, she has to get the value of

11   the invention.  And what she said in her

12   depositions -- her depositions, she -- in both of

13   them, she said, The damages I calculated are

14   attributable to the invention because they're based on

15   licenses for the patents-in-suit to other SmartPhone

16   manufacturers.

17              So if the basis of the amounts paid was

18   Apple's being sued about these patents-in-suit among

19   others, and HTC's being sued on these patents, so what

20   did these competitors, what did they value these

21   inventions.  Okay.  So she's not taking the unit as a

22   whole.  So, she's got a lump sum number, and the point

23   is, how does she make that lump sum number comparable

24   to what Huawei and ZTE are doing in a way that she can

25   apply it to the -- only the accused products in

 1    this -- in this case.

 2                Now, we -- we have sued them in another

 3    case, same three patents, an additional patent that

 4    was in reexam, but for different products.  Okay.  So

 5    we've got to apply to the units sold in this case.

 6    How do you apply that to the units in this case,

 7    because this hypothetical negotiation tells us a

 8    number, but it doesn't really get them a license.

 9    It's as if they would have gotten a license, what they

10    would have paid for it.

11                So I'm not sure that I've answered your

12    question, so I'm going to go -- I'm going to go back

13    to it, and -- and this is what I would say.  In the

14    HTC case, there was this cost approach, this loss

15    opportunity cost.

16                And she said, I'm going to take the

17    revenue that you would have made and the profits you

18    would have made, and it would have taken you so many

19    months to recover that, and so I'm going to reduce

20    that using the total revenue you lost.

21                And I think that's where she may have

22    run afoul or where you -- I understood you found she

23    ran afoul of the entire market value rule.  But, what

24    difference does it make -- I mean, how do you

25    implicate that entire market value rule when she's not

1    talking about the value of the product?  What she did

2    is she took the value of what the other defendants

3    paid to settle litigation for the patents-in-suit and

4    she tried to put that in a per-unit amount based on

5    Apple and HTC and the number of phones they sold and

6    where they are in the marketplace.

7               And there was a case cited by -- by the

8    parties by Judge Davis and -- and where he -- it was

9    a -- it was a motion to compel discovery about the

10   negotiation, and what he pointed out was in that

11   particular case, there were defendants who had bigger

12   market share that settled for less and other -- so

13   maybe it wasn't really the value of the patents here.

14              THE COURT:  Well, let me -- let me ask

15   you this.  The -- if you look at the Court's prior

16   opinion, it says at the top of the -- of page 8, The

17   only relevant evidence of a reasonable royalty in this

18   case -- and this was this particular case, HTC -- is

19   the settlement licenses that deal with the patented

20   features.

21              Now, in these licenses you're talking

22   about, is there discussion of the fact, well -- I

23   don't know, I guess one of the licensees is Apple?

24              MR. SIMON:  Correct.

25              THE COURT:  Okay.  So if Apple -- does

1    it say Apple has sold 40 million phones and we're

2    going to pay you this many dollars, so that comes out

3    to, you know, per unit.  So I think what you have to

4    take is, is that, for example, this licensee is

5    licensing this on the patented features.  Okay.  Maybe

6    that's what they felt they were worth.

7                    But, to translate that over to another

8    defendant on a pure per-unit basis is concerning to

9    me.  You know, Apple may have felt or HTC may have

10   felt a way about these things, but how does this

11   defendant feel about them, or at least some, you know,

12   basis to opine about how they would negotiate on this

13   basis for the patented feature, so...

14                   MR. SIMON:  It's a predicament we're

15   in, Your Honor.  I mean, I agree with you, it's a

16   predicament.  We're being told that we have to use the

17   amount Apple paid and the amount SmartPhone took in

18   the Apple negotiation as one of the relevant licenses.

19   Now we've got to translate this to the hypothetical

20   negotiation.  Certainly that translates to what

21   SmartPhone would take.  And we look at -- we look at

22   the -- she looked at in order to -- in order to

23   translate to a per-unit number.

24                   She asked Mr. Vella, When you were

25   accepting these numbers, what -- what was the horizon?

1    Did you look at ten years?  Five years?  And he said

2    about two years because that's the life of a

3    SmartPhone.

4                    And you can look at RIM and Blackberry

5    and where they are now.  HTC had a 30 percent market

6    share and within a few years went to a 5 percent

7    market share, so he said two years was reasonable.

8                    But we do have to translate that.  Now

9    we have to also translate it to what would Huawei

10   take.  Are these patents of the same value as -- as --

11   to Huawei or ZTE as they are to Apple and HTC?  I

12   don't know.  We can look at Huawei's other licenses,

13   which is what she tries to do and they complain about

14   that.  We -- you know, I'm not sure if Huawei would

15   think of the same thing as Apple would.

16                   But once we're forced to use litigation

17   settlements, how are we supposed to determine that?

18   That's the predicament we're in.  So we're doing our

19   best to try and deal with this hypothetical

20   negotiation, which we must, and these prior settlement

21   agreements, which we must, which were lump sum

22   licenses.  And even if we were to say a lump sum,

23   we're just going to pick a lump sum out of thin air?

24                   We have to have some way to -- to say,

25   well, compared to Apple, Huawei is this; compared to

 1   Apple and HTC, ZTE is this.  We have to have some way

 2   to compare.  So using product volume, market share,

 3   that's -- that's what we're using.

 4              THE COURT:  All right.  Thank you.

 5              All right.  I'm going to take a break

 6   here for -- take 10-minute break and then resume back

 7   here with '273, the motion on copying, and then we'll

 8   finish up with the motion on the -- the counterclaim.

 9   So, in recess for about ten minutes.

10              (Break.)

11              THE COURT:  Please be seated.

12              MR. SIMON:  Your Honor, may I make one

13   point?  First, at the break there was a question about

14   whether I misrepresented something.  I want to make

15   sure it's clear.  What I said was Michele Riley did

16   not say those patents are worth zero.  What she said

17   was, I accepted as true what happened in those

18   negotiations where they told me they didn't assign any

19   consideration to them.  So I just want to correct

20   that.

21              The other thing I'd point out is, on

22   the break, I was thinking about your question, and

23   the -- the company that's in the best position to say

24   those patents are worth a different amount to Apple

25   and -- than they are to ZTE and Huawei, they're ZTE

```
 1    and Huawei, and they have every opportunity to do that

 2    at trial.

 3                    THE COURT:  All right.  Thank you.

 4                    All right.  Let's move to the '273.

 5                    MR. NELSON:  Your Honor?

 6                    THE COURT:  Yes.

 7                    MR. NELSON:  That's -- that's obviously

 8    Huawei's motion, but argument on this may be mooted by

 9    Your Honor's ruling on the -- the motion at the outset

10    on the -- on the obviousness references, because they

11    only have anticipation references, and this motion

12    deals with rebuttal evidence from our validity expert,

13    secondary considerations, and particularly copying.

14    And if there isn't going to be presentation of

15    obviousness positions because it's not in the expert

16    report of Dr. Wicker, then --

17                    THE COURT:  Okay.

18                    MR. NELSON:  -- then our expert has no

19    need to present that evidence.

20                    THE COURT:  Response.

21                    MR. DAVIS:  Let me just -- I guess what

22    I need to know from the plaintiff still is, aside from

23    the issue of obviousness, is this question about

24    copying of Google going to come up in any other

25    context in the trial.
```

```
 1                    THE COURT:  Okay.  Is it going to come

 2   up in any other context in the trial?

 3                    MR. SIMON:  Your Honor -- this is Tony

 4   Simon -- potentially rebuttal.  If -- you know,

 5   there's some things in their expert damages report

 6   that talks about why ACCESS failed and Palm failed and

 7   so the patents had little value because those

 8   companies failed; and part of that relates to, well,

 9   if Google took all their employees away, that's why we

10   failed.

11                    THE COURT:  Okay.

12                    MR. NELSON:  Just in rebuttal to that,

13   if they're going to make that argument.

14                    MR. DAVIS:  I guess what I would say,

15   Your Honor, is if you will indulge me five minutes to

16   just explain the issues so it's on the record --

17                    THE COURT:  All right.

18                    MR. DAVIS:  -- and if it comes up at

19   trial in some context, then --

20                    THE COURT:  Okay.  Go ahead.

21                    MR. SIMON:  And we wouldn't -- that

22   wouldn't be presented with the invalidity expert,

23   obviously.

24                    THE COURT:  Okay.  All right.

25                    Go ahead.
```

```
 1                    MR. DAVIS:  Well, the point I want to

 2    make is simply this, in -- in whatever context whether

 3    obviousness or otherwise, it -- it seems that what the

 4    plaintiff may present in this case is an assertion

 5    that the allegedly infringing invention as allegedly

 6    found in the Android operating system came from Palm

 7    and from these employees that -- that plaintiff just

 8    mentioned having left Palm to go to Google.

 9                    So, the relevant issue here is simply

10    has any analysis been done in the case by anyone.  And

11    it came up -- particularly in the context of Mr. Barr,

12    their invalidity expert -- about whether they have

13    actually proven any sort of theft or copying of the

14    invention and whether this -- this story between

15    employees leaving Palm to go to Google has any

16    relevance to this case at all.

17                    And the points here are very

18    straightforward.  It's not as involved as the last

19    argument about Ms. Riley.  For them to prove that that

20    story has any relevance, the issue would be have they

21    shown that Google copied the invention or took the

22    invention from Palm, and there has not been any

23    analysis in the case on that.

24                    I just point to Exhibits E and C in our

25    response that I believe are the Barr deposition
```

1    transcript and the Hoffman deposition transcript.

2    They speak for themselves as far as the lack of

3    analysis.  At most what they attempt to say is say

4    that certain concepts or features were borrowed

5    from -- from Google -- from Palm for Google, and

6    that's not enough to be, you know, relevant in this

7    case for -- for that type of evidence to be

8    admissible.

9           And so I don't want to pre-but a lot of

10   other context in which this -- this might come up, but

11   I just want to -- I want to raise that point with --

12   with the Court and the fact that -- it's obviously

13   Patent Law 101 -- that for them to prove that there's

14   some relevance here as far as taking the invention or

15   copying, they would have to do an analysis comparing

16   the claims to what was taken.

17          To the extent that they're saying,

18   well, the reason the invention failed is some other

19   reason just because employees from Palm left Google,

20   well, I assume that the -- the premise still is that

21   Palm allegedly had the invention, and that's not an

22   allegation that's supported in this case.

23          They have never shown that Palm or any

24   of the employees at Palm or Mr. Hoffman actually had

25   what is the '316 patent invention.  To do that, they

 1    would have to do the entire analysis.  And I think

 2    that the Federal Circuit analysis as far as what you

 3    have to show as far as copying of the invention for

 4    non-obviousness and secondary indicia would be equally

 5    applicable and persuasive as far as any allegation of

 6    copying of the invention in any other context, damages

 7    or whatever they might raise.  And that would include

 8    copying of a specific product as required by the

 9    Federal Circuit and -- and so on and so forth.

10              The only other thing I'd point out to

11    Your Honor -- and I'll sit down because I know that

12    we've had a lot of argument already today -- is that

13    in paragraph 460 -- excuse me.  Let me just reference

14    real quick, Your Honor.

15              In paragraph 467 of -- of Mr. Barr's

16    report, which is kind of the context in which all this

17    has arisen, that's his kind of an ultimate conclusion

18    where he says, As a result, many of the key

19    Corsica/Rome framework features, which is this -- this

20    Palm development development -- developed at

21    PalmSource, including -- and they list a bunch of

22    items -- were copied by Ms. Hackborn's Google team

23    largely composed of former PalmSource and ACCESS

24    Systems American -- ACCESS Systems America employees

25    who worked under Mr. Hoffman as they designed and

1    built Android.  As sort forth in Dr. Green's

2    infringement report, Android's use of these features

3    infringes the asserted claims of the '316 patent.  In

4    other words, infringing features of the Android

5    operating system used in Huawei's products were copied

6    directly from PalmSource, later ACCESS Systems

7    America.

8                   So my point is, what their expert has

9    said in this case so far, whether in the context of

10   obviousness or otherwise, is simply that certain

11   features were copied from Palm to Google, not that the

12   invention was copied from Palm to Google.

13                  And one final point on this is, is

14   this -- Mr. Simon indicated, this did indeed come up

15   in the context of rebuttal to invalidity.  There's

16   going to be in limine issue as far as the fact that we

17   haven't had the opportunity and never had the

18   opportunity to depose Google or get Ms. Hackborn's

19   side of the story, and so on and so forth, because Ms.

20   Hackborn wasn't identified in the initial disclosures

21   of plaintiff.  Google wasn't identified.  This theory

22   didn't come out during discovery.

23                  So that's one of the things they

24   critique Huawei on in their responses, saying, well,

25   Huawei doesn't disagree with all the facts about what

 1    happened.  We never had an opportunity to do any

 2    investigation of that given when this came out at

 3    the -- the point in the case.  So again, that's

 4    something for another day to resolve, but I just

 5    wanted to put that on the record as an additional

 6    factor as far as this line of argument and however it

 7    may come up at trial or otherwise.

 8                    THE COURT:  All right.  Thank you.

 9                    MR. DAVIS:  Thank you, Your Honor.

10                    THE COURT:  All right.  Response.

11                    MR. LATIMER:  Brannon Latimer for

12    plaintiff SmartPhone.  Just a couple of points very

13    briefly.  I feel like our opposition brief made our

14    points fairly clearly, and I don't want to regurgitate

15    everything for the Court here.

16                    But, first of all, you know, Huawei

17    spends a lot of time saying that -- that Mr. Barr

18    didn't form any analysis, and that's simply incorrect.

19    His -- his deposition testimony and his report made

20    clear that he considered lots of evidence, including

21    Mr. Hoffman's testimony, Mr. Schlesinger's testimony,

22    Dr. Green's expert report.

23                    He brought his own expertise and source

24    code level of knowledge of Android to bear on all

25    this.  And he looked at PalmSource technical

1    documentation -- documentation and he saw -- he looked

2    at public admissions from current Google employees

3    acknowledging that they did work at PalmSource for

4    Mr. Hoffman and attributing the specific infringing

5    components of Android to Mr. Hoffman and PalmSource.

6    That's all part of his analysis, and the snippets that

7    you find in Huawei's briefing making it sound like

8    Mr. Barr didn't do any of that is -- is irreconcilable

9    with the broader picture of his testimony and his

10   report.  So, that's the first point.

11            The -- I guess the way to -- all this

12   evidence -- there was a point made by Mr. Davis about

13   whether specific features are the invention, and I

14   guess I'm a little unclear perhaps on what the point

15   he's trying to make is, but Mr. Barr's analysis is

16   that the invention is embodied in those specific

17   features of Android, activities and intents, and the

18   package manager and activity manager.  And those

19   things work together.  They are an embodiment of the

20   invention.

21            Those specific features are exactly

22   what are described in the technical documents, and

23   they are exactly what Mr. Hoffman explains that he

24   invented at PalmSource.  So there's a direct

25   evidentiary -- evidentiary link between the embodiment

1    of the invention in Huawei's products and their

2    genesis as -- at PalmSource.  That's -- that's that

3    point.

4              And then just one more point, Your

5    Honor.  I think ultimately Huawei's conclusions, once

6    you get -- their arguments, once you get past the

7    rhetoric, their argument is really that they critique

8    Mr. Barr for not studying a copy of the Corsica/Rome

9    product to do an infringement analysis and confirm

10   that it looks just like Android.  And while that would

11   be optimal, that's not -- that wasn't available to

12   him.

13             But that doesn't mean that he can't

14   fairly conclude that the invention was copied, because

15   he -- a reasonable person can conclude that something

16   was copied even without a copy of the original.  They

17   can talk to the people who made the original, they can

18   look at other evidence describing the original, and

19   they can compare that evidence with what they see in

20   the replicated version, and they can look at public

21   admissions by the person who did the copying and see

22   that copying did occur.

23             So unless Your Honor has any other

24   questions, that's -- that's all I have.

25                       THE COURT:  So, to the extent that the

 1    issue is, is Mr. Barr from a technical standpoint

 2    saying that the invention itself would -- what he

 3    considers to be the invention was copied by or brought

 4    over to Google who then copied it as part of, I guess,

 5    the Android system, you would say that it is

 6    technically based.  It is based in an engineering or a

 7    scientific -- there's an engineering or scientific

 8    grounding in it.

 9                MR. LATIMER:  I don't think a lay

10    person could possibly evaluate the evidence that he

11    did and -- and come to the conclusion he did because

12    it's a technical question.  We're talking -- we're

13    talking about a thing called activities and intents

14    and these other attendant functions that are discussed

15    in Dr. Green's report to embody the invention.

16                That -- those are specific, unique

17    features of Android.  They're terms of art.  And --

18    and it's not -- it's important to understand, I guess,

19    the role they play in the overall operating system.

20    These are the engine that the application model uses

21    to pass information from one component to another.

22    It's not some remote functionality.

23                And if you Google those phrases, you're

24    going to -- what's going to come up is Android.

25    They're terms of art that are uniquely associated with

1    Android, and he appreciates all that as an expert.

2    And so when he speaks of Mr. Hoffman, when he reviews

3    those documents, when he takes in all this information

4    and evaluates it, he brings all that to bear in

5    interpreting, okay, this -- this isn't just a widget

6    that we see here -- and he says he invented a

7    widget -- this is a really unique feature of this

8    operating system.

9                And there's compelling evidence tracing

10   it directly back to this origination point.  Even

11   though he doesn't have the -- the original product to

12   inspect and confirm, all the evidence is consistent

13   and show that link.  So yes -- yes, it's based on his

14   technical knowledge.

15               THE COURT:  Okay.  Mr. Davis, let me

16   ask you here as we wrap up this motion.  You know, you

17   always ask these questions and it's sort of, you know,

18   puts counsel in opposing counsel's shoes, I guess, or

19   opposing expert's shoes, but, I mean, what is it that

20   you think is missing here from -- I know you disagree

21   with it, but that in this expert's opinion, this --

22   this particular -- it appears to be a copying of this

23   particular imagine.  And what is it scientifically

24   or -- or from a technical standpoint that would need

25   to be done?  Now I think they admit they don't have

1    the actual components, I guess, and -- and -- you

2    know, but they -- they think they have enough based on

3    the facts, and then the expert looking at them and

4    coming to a conclusion.

5                    What is it that's missing from your

6    perspective?

7                    MR. DAVIS:  Well, two things, and one

8    is it's not necessarily a technical issue so far as a

9    legal issue.  I mean, there's -- there's both in play

10   here.  But legally -- it's obviously patent 101 -- to

11   prove what the invention is you would have to take the

12   claims as construed by Your Honor and compare them to

13   whatever this evidence is that Mr. Latimer's referring

14   to.  And we are certainly not saying that they had to

15   only have source code, they couldn't also talk to

16   Mr. Hoffman, they couldn't also have done other

17   investigations and other evidence.

18                   But, it's well accepted that the

19   scientific analysis of an expert would be to take that

20   body of information and then to apply expert analysis

21   that would be in the report to -- to reach a

22   conclusion that our expert, Dr. Wicker, could rebut

23   that would say here's this evidence, here's how I've

24   shown that the first limitation of the claim is

25   satisfied.  Here's this evidence.  Here's how I can

 1    show the second limitation.

 2                 And so I would suspect the reason that

 3    hasn't been done here is not simply because this is a

 4    fairly old product and there may not be all this

 5    necessary evidence to do so.  It also is because they

 6    can't actually prove that this is the invention as

 7    Your Honor has construed the claims.

 8                 And the claims for the '316 patent in

 9    particular require many different things.  It requires

10    multiple protocol handlers, it requires multiple

11    content handlers, it requires a specific shell that

12    does certain things, and so on and so forth.

13                 So, if -- we -- we don't disagree that

14    the expert is applying technical expertise in so far

15    as he can obviously understand Mr. Barr, these

16    documents, more than a lay person.  That's without

17    question he could.  He understands it better than me

18    or probably anybody else in this room.

19                 The question is, has he done a

20    scientific analysis, the type of thing that Daubert

21    demands to reach the end point, that being the

22    conclusion that the invention was copying and met all

23    the legal prerequisites to show that as a matter of

24    law.  That, Mr. Barr, is without a doubt not done.

25                 And not only that, but that is where

1      the Federal Circuit has said there are very specific

2      things you have to do in order to show copying.  There

3      has to be an actual real product, he would have to

4      actually show what the features of those products are,

5      he would actually have to compare the claims, and at

6      the end of the day, he would have to show that --

7      that -- that the claims meet the product and that

8      those features then went over to Google and exactly

9      how that occurred.  None of that is here.

10                 So that's one of our major complaints,

11     is if you read Mr. Barr's report -- and this is again

12     born out by Exhibits C and E that actually are the

13     deposition testimony of the witnesses -- it's more or

14     less an I trust them, I -- I talked to Mr. Hoffman, I

15     found some stuff that corroborates that Google may

16     have borrowed certain concepts, therefore because I'm

17     an expert, copying occurred.

18                 Well, that's not proper or complete

19     reliable expert analysis.  And there's nothing for

20     our witness, Dr. Wicker, can do then to rebut that

21     because there's nothing where he can say, well, I just

22     disagree.  I look at the same stuff and my credibility

23     assessment of all this evidence is no copying

24     occurred.  There's nothing -- there's no target for

25     him to shoot at here.

```
 1                    THE COURT:  Okay.  All right.  Thank

 2    you.

 3                    All right.  Let's move on to the last

 4    motion, 275.

 5                    MR. ASKEW:  Good morning, Your Honor.

 6                    THE COURT:  Good morning.

 7                    MR. ASKEW:  Ben Askew on behalf of

 8    plaintiff SmartPhone.  Huawei's counterclaim 15 is for

 9    enforcement of rights as a third-party beneficiary of

10    the exclusive license agreement between SmartPhone and

11    ACCESS Co. Ltd.  Section 11.3 of the ELA is

12    dispositive of this issue.  Section 11.3 expressly

13    states the contracting parties' intent to have no

14    third-party beneficiaries.  The parties went above and

15    beyond to be clear and explicit about their intent.

16                    Section 11.3 states, Nothing in this

17    agreement, whether expressed or implied, shall be

18    construed to give any person a right, remedy, or claim

19    as a third-party beneficiary.  Huawei's -- Huawei

20    wants the Court to do just that.  Huawei wants the

21    Court to construe the agreement in a way opposite to

22    the -- a clear intent of the parties.  A contract must

23    be interpreted to give effect to the intention of the

24    parties at the time of contracting.  And to create a

25    third-party beneficiary, the parties' intent must be
```

1    evident in the contract.

2              And California law requires that that

3    intent is to be determined, if possible, solely from

4    the language of the contract.  And 11.3 -- Section

5    11.3 unambiguously states the parties' intent.  So

6    Huawei's left with relying on Section 2.1 of the ELA,

7    which they -- they twist the language of Section 2.1

8    and make various arguments under Section 2.1.

9              But, Judge Guilford in the Central

10   District of California was presented with those same

11   arguments on a motion to dismiss where Huawei's

12   allegations are deemed true to the extent they're not

13   belied by the exclusive license agreement.

14             And Judge Guilford on page 10 -- this

15   is Exhibit 7 to SmartPhone's motion, page 10 -- Judge

16   Giulford states, Although such contractual protection

17   against enforcement actions would likely be considered

18   a benefit by ACCESS' customers, the mere existence of

19   a benefit to a third party does not make that third

20   party an intended beneficiary.  The issue is whether

21   the parties intended to benefit the third-party, and

22   the terms of the contract make that intent evident.

23             Then Judge Guilford goes on to state,

24   The language of the exclusive license agreement

25   clearly expresses the contracting parties' intention

 1    that the ELA not create any third-party beneficiaries.

 2    Therefore the court found that Huawei failed to state

 3    a claim.

 4                    And, essentially, Huawei's argument

 5    requires this court to ignore Section 11.3 and the

 6    evidence of the parties' intent at the time of

 7    contracting and rewrite Section 2.1.

 8                    THE COURT:  Well, what this boils down

 9    to is -- and just tell me your position on this -- is

10    they say, well, notwithstanding that, we're a customer

11    of ACCESS and you can't pursue us because you're

12    standing in the shoes of ACCESS.  And so in that

13    sense, we are third-party beneficiary -- well, that

14    may be the wrong phrase -- but we're just simply

15    precluded from suit precluding -- you're precluded

16    from pursuing us because we're a customer of ACCESS.

17                    MR. ASKEW:  Right.  And -- and assuming

18    for the sake of argument that Huawei is a customer --

19    I mean, Huawei's Chinese parent company, according to

20    deposition testimony, purchased an unspecified web

21    browser from an ACCESS entity.  To the extent that

22    makes the defendants a customer under their

23    interpretation of Section 2.1, that still does not

24    confer third-party beneficiary rights on all ACCESS

25    customers.  So, the third-party beneficiary status has

1     to be expressly stated in the contract.

2              The contract, it states the exact

3     opposite and applies to all provisions in the

4     contract.  And ACCESS -- there's no support in the

5     briefs.  There's been lots of briefs in three

6     different courts on this issue.  Huawei cannot cite to

7     any authority that an entity that purchase --

8     purchases any product or service from a company

9     therefore obtains an express license or any

10    third-party beneficiary argument regardless of whether

11    that product practices any patent-in-suit.

12             So, the patents-in-suit in this case

13    and -- and SmartPhone's infringement contentions in

14    this case have nothing to do with my ACCESS product or

15    service.  So Huawei has not put forth any evidence to

16    state which web browser was apparently purchased,

17    but -- and there's certainly no evidence that that web

18    browser is -- is covered by any patent-in-suit or

19    substantially similar to any -- to any claimed

20    invention.

21             But -- there's just no support for an

22    argument that ACCESS -- or that Huawei automatically

23    becomes an express licensee to the entire SmartPhone

24    portfolio just because a -- a Huawei entity purchased

25    any product from ACCESS.  There's just no support, and

 1   it's contrary to the plain reading of Section 2.1.

 2   And regardless, Section 2.1 cannot be enforced by

 3   Huawei because they're not an intended third-party

 4   beneficiary.

 5                    THE COURT:  Okay.  All right.  Anything

 6   else?

 7                    MR. ASKEW:  Not at this time, Your

 8   Honor.

 9                    THE COURT:  All right.  Response.

10                    MR. DAVIS:  I get double duty today,

11   Your Honor, unfortunately.  Or fortunately.

12                    All right.  Your Honor did hit the nail

13   on the head with your initial question, which is

14   really, if you boil down to it, Are we immune to suit

15   because we're a customer of ACCESS.  And the answer to

16   that is yes.

17                    As a starting point, I don't think that

18   there's any question that there is at least a genuine

19   issue of material of fact.  In fact, we think it's

20   plain that Huawei is an ACCESS customer.  We cite

21   Mr. Narasaki's testimony and we cite testimony from

22   Huawei's corporate 30(b)(6) witness, we've attached

23   documents demonstrating that we purchased NetFront

24   browsers from ACCESS, and so that question I think is

25   off the table.  Or for the purposes of summary

 1    judgment, Your Honor, we believe you have to assume

 2    that we are an ACCESS customer, reviewing the evidence

 3    most favorably to us as the summary judgment standard

 4    requires.

 5              So, this question of the interplay of

 6    Section 11.3 and 2.1 -- I guess the most direct way to

 7    get at this is a couple of ways.  Their -- their

 8    theory that Huawei, even if it is a licensee or immune

 9    to suit, can't assert that because of Section 11.3,

10    would violate a couple of legal tenets.  The first one

11    is SmartPhone has to be the party with all substantial

12    rights in the patent to have standing to sue, and your

13    Honor's already addressed that issue in the case.

14              What they're really saying is they're

15    saying, look, there's two worlds.  There's the world

16    in which we sue an ACCESS customer and ACCESS decides

17    to step in and stop it, and there's another world

18    where ACCESS sues another one of our customers and

19    ACCESS decides not to stop it.  And Huawei, you are

20    helpless, because even though under the undisputed

21    facts you're a customer, you can't control your own

22    fate.  Our fate is still in the hands of ACCESS.

23              Well, at that point ACCESS is a

24    license -- or has the power to grant a license because

25    depending on if ACCESS steps to the plate and defends

1    Huawei in litigation, then ACCESS can either

2    effectively grant us a license or enforce the

3    provision of 2.1 or it can't.  That doesn't make any

4    sense.

5              We also have black letter law that says

6    you can't contract around patent license as an

7    exhaustion.  So, I don't think anyone would seriously

8    argue that in all of the various patent licensing

9    agreements, settlement agreements and so on in the

10   world where it's very standard to put these disclaimer

11   of third-party rights clauses, then nonetheless

12   licensees can enforce those on their own behalf.

13             And that's really what the Federal

14   Circuit was getting at on the appeal in the California

15   case when it pointed out the fact that, look, this

16   Section 11.3 third-party beneficiary issue, it's not

17   an all or nothing issue.  It's not that it applies

18   across the board to every provision or not.  And that

19   Huawei in enforcing this isn't just doing it for the

20   heck of it of its own right, but it's doing it because

21   under Section 2.1, it's been given a specific benefit.

22   And under the applicable law, Huawei has to be allowed

23   to enforce that benefit.

24             And that's actually consistent with the

25   applicable California law which says you look at the

```
 1   agreement as a whole, you look at the interplay

 2   between all the various provisions.  You determine how

 3   to give effect to all those provisions under their

 4   plain and ordinary reading; and in doing so, if you

 5   have a more specific benefit that trumps a more

 6   general clause, and we're going to give that effect.

 7   And that's exactly what's happening here.

 8              Section 2.1 -- and it does specifically

 9   name, by the way, Huawei because we are a customer.

10   And Section 2.1 says you cannot sue indirect or direct

11   customers or inducers.  So it's expressly in there.

12   That -- that clause which was written by SmartPhone in

13   Acacia, which are clearly very sophisticated licensing

14   entities who deal with patents all the time, if they

15   didn't want this to say that, all they would have

16   needed to do is stop at basically the first sentence.

17              And all they would have had to do is

18   say we agree that ACCESS' NetFront browsers, any

19   ACCESS product or service is licensed under all of our

20   patents, period, stop, done.  And they know that as a

21   matter of law, it -- automatically taking on the force

22   of law, that is all that any customer would be

23   entitled to as a license.

24              And not only that, but they would also

25   know that they need not even mention a customer is a
```

1    beneficiary in the clause, and instead they did the

2    opposite.  They expressly put in their -- they

3    expressly put in the agreement in Section 2.1 you

4    cannot sue direct or indirect customers or end users,

5    and that was very deliberate on their part.

6              Another related point is, is it's

7    entirely plausible -- excuse me -- entirely plausible

8    to believe that the point of Section 2.1 in the

9    additional language in the agreement is because ACCESS

10   does not want SmartPhone to cause problems with its

11   customers which may upset other commercial or business

12   relationships that come back to bite ACCESS.

13             That's an entirely plausible reason to

14   have more protection than just simply you can't

15   infringe -- you can't accuse our customers of

16   infringing our patents, but you can go after our

17   customers for anything else.  Because, of course, we

18   find out these are ACCESS' patents.  We might get mad

19   at ACCESS, we might, you know, do other things in

20   response, you know, Huawei being upset with the fact

21   that it's getting sued as ACCESS customer.

22             And again, Mr. Narasaki's testimony

23   bears that out when he talks -- certainly he does say,

24   you know, you shouldn't go sue our customers on our

25   patents.  But even more broadly, he says in the first

 1    part of his answer, The fact of the matter is we -- we

 2    don't want our customers getting sued, or at least

 3    that's a plausible interpretation.  It's enough for

 4    there to be a fact question for the jury on exactly

 5    what does Section 2.1 mean and does it have this

 6    broader meaning or not.

 7                    THE COURT:  Well, you mentioned for the

 8    jury.  So, would it be your position that -- what

 9    would the jury be asked on this point?

10                    MR. DAVIS:  They could be asked, for

11    example, a special interrogatory on what was the --

12    based on the totality of the evidence, what was the

13    import of Mr. Narasaki's testimony about does -- does

14    ACCESS want its customers sued.

15                    THE COURT:  Okay.

16                    MR. DAVIS:  And that would be a fact

17    question.  That would be a credibility question based

18    on the record and all the other evidence.  And, of

19    course, that would ultimately go to the Court, and the

20    Court would have to take that into account with, you

21    know, ultimately construing the contract as a matter

22    of law.  But, factual disputes about the credibility

23    of witnesses and evidence and so on and so forth,

24    that's still to be resolved by the jury, genuine

25    material factual disputes.

```
 1                    THE COURT:  Okay.

 2                    MR. DAVIS:  It -- I'm sorry, Your

 3      Honor.

 4                    THE COURT:  Did you have some more on

 5      that?

 6                    MR. DAVIS:  No, no.

 7                    THE COURT:  Okay.  On this point

 8      about -- it's raised that what's at issue here is this

 9      web browser.  Now, there's some discussion about,

10      well, what effect does that have, you know?  It's -- I

11      guess my question is, was the extent of the customer

12      relationship discussed in the agreement, the ELA?  You

13      know, in other words, you're a customer for web

14      browsing but they're suing you on particular patents

15      that had nothing to do with web browsing, you know.

16      I'll just throw that out there.

17                    But -- and they also say, you know, you

18      need to prove that this has no reasonable

19      non-infringing use and -- I mean, what's the

20      relationship between what you're a customer for with

21      ACCESS and what we're talking about here.  They seem

22      to be bothered by the fact that even if you are a

23      customer, that doesn't give you the right to practice

24      patented -- patents that they own for any use for all

25      time.  It just gives you carte blanche in their
```

 1    opinion to just in -- infringe with impunity because

 2    you purchased a web browser at some point, you know,

 3    many years ago.

 4                MR. DAVIS:  A few points on that.

 5    First is if that was their intent, they could have

 6    clearly written that in, again, by stopping at the

 7    first sentence of Section 2.1.  Your products are

 8    licensed all the way down the supply chain.  End of

 9    story.  At that point, no dispute that they could

10    never sue Huawei, ACCESS -- or -- excuse me -- Huawei

11    or any other customer or person who ends up with one

12    of these browsers.  Okay.  They added the additional

13    language.

14                Second point is, again, these were

15    sophisticated parties and they have amended this

16    agreement a number of times.  So I think it's very

17    plain that SmartPhone knows exactly what business

18    ACCESS is in.  SmartPhone knows exactly that ACCESS'

19    primary product is this NetFront web browser, and that

20    when they included that in connection with language,

21    what they were saying was we at least understand that

22    patents that are connected to web browsers might be

23    implicated by this clause, and so at least those

24    patents have to be covered here.  It can't just be

25    that, you know, that in connection with -- you know,

1    it does have some force and effect.  It's in the --

2    it's in the agreement, so we do think they knew about

3    that.

4              Now, they do try and make their whole

5    argument turn on the fact of, well, we didn't, you

6    know, sue here on infringement of the ACCESS web

7    browser, but there's still a connection there.  And --

8    and our position still turns out to be fundamentally

9    that under the first clause of the independent clause

10   of the third sentence of Section 2.1 that they cannot

11   pursue licensing of Huawei as a direct or indirect

12   ACCESS customer.

13             So giving force and effect of that

14   clause, despite the additional second dependent clause

15   and the -- the common -- the additional language is

16   what they rely on, that first independent clause is

17   good enough here, that first independent clause that

18   says you cannot pursue licensing of a direct or

19   indirect ACCESS customer.  And we are clearly that.

20             And it's interesting because there is

21   some interplay here between the Riley issues that they

22   discussed earlier today on damages just in this sense.

23   They've essentially said that, well, really all these

24   litigations, even though we're only asserting a few

25   patents, ultimately the end game here is a portfolio

```
 1    license.  You're going to, at the end of the day, have

 2    to take a bunch of our patents, even stuff that we

 3    don't think you practice or we haven't told you

 4    exactly about.

 5              So, SmartPhone's pursuit of licensing

 6    its patents as a whole is a different activity than

 7    the specific enforcement action of only certain of

 8    those patents that it chooses for litigation purposes.

 9    So that's why we think that giving that first clause

10    force and effect where it says you cannot pursue

11    licensing of a -- of an ACCESS direct or indirect

12    customer -- and we're clearly that as Huawei --

13    that -- that that's the end of the story.

14              But if there does have to be this

15    connection, as Your Honor points out, with the web

16    browser, we've pointed out in our briefing there is

17    connection to the patents that are on a web browser.

18    There's no dispute about that.  And again, if you look

19    at the evidence in our favor on the summary judgment

20    standard, you would have to find there's at least some

21    connectivity between the asserted patents here and

22    the -- the NetFront browser by ACCESS.

23              THE COURT:  Okay.  All right.  Let me

24    hear back from SmartPhone for a moment.  What's the

25    point of 2.1?
```

1             MR. ASKEW:  Section 2.1 is a grant back

2    license to ACCESS.  The -- the beneficiary of that

3    provision is ACCESS.  There's no intent in Section 2.1

4    to give an express license to any customer of any

5    ACCESS entity that buys any particular product is now

6    licensed to -- to practice all SmartPhone patents in

7    any future product.  And that reading is -- that

8    reading is -- is absurd.

9             And Section 2.1 speaks for itself.  The

10   clause that they're -- that they're most concerned

11   with is the third sentence that says, SmartPhone shall

12   not pursue the licensing of the patents with ACCESS'

13   direct or indirect customers and end users, and will

14   not institute enforcement actions against such

15   customers of ACCESS and end users, comma, in

16   connection with ACCESS' products or services.

17            This lawsuit is not in connection with

18   ACCESS' products or services.  They don't even know

19   what web browsers -- there's no evidence of what web

20   browser they -- they purchased, apparently one version

21   of a NetFront web browser.  But even if they did know

22   what product or -- or service they purchased from

23   ACCESS, it's undisputed that no ACCESS products or

24   service is incorporated or used in any accused product

25   in this case.

 1                    SmartPhone's infringement contentions

 2      have nothing to do with an ACCESS product or service.

 3      This case is not in connection with an ACCESS product

 4      or service.  That's the plain reading of Section 2.1.

 5      And regardless, getting back to the -- to the initial

 6      point, defendants cannot enforce Section 2.1 because

 7      Section 11.3 expressly states the parties' intent.

 8                    And in the Central District of

 9      California, Judge Guilford assumed the customer

10      allegations to be true.  So all this dispute over the

11      customer allegations, he is -- those allegations were

12      assumed to be true and still stated that Huawei could

13      not state a claim for third-party beneficiary status.

14                    And I'll just make one more point on

15      that particular issue, because their sur-reply made

16      new arguments and attached new exhibits.  There's

17      three agreements that purport to further expound on

18      this customer allegation that even if it was assumed

19      true is -- is irrelevant.  But one's a statement of

20      work.  There's no evidence that statement of work was

21      ever implemented from 2005.

22                    One is a document that is an unsigned,

23      undated -- they're saying it's an agreement, but

24      there's no signature date.  And it says in that

25      agreement, I believe, that -- that any -- to the

 1    extent it was ever executed, which there's no evidence

 2    of that, that the rights given to Huawei in that

 3    agreement only go to the Huawei Chinese parent

 4    company.  It can't go to any of its subsidiaries.

 5                    So, and then the third argument -- the

 6    third agreement is a document in Chinese that they

 7    have not produced a translated copy, yet they tell

 8    Your Honor they want to submit it at trial to the jury

 9    even though there's no fact question for the -- for

10    the jury here.

11                    So, I think the -- the plain reading of

12    Section 2.1 goes against Huawei's interpretation.

13    It's a baseless interpretation.  It's commercially

14    unreasonable.  Regardless, Section 11.3 expressly

15    states the parties' intent.  That is why many courts

16    in California, including in the Pegasus case, reject

17    arguments such as Huawei's.

18                    In Pegasus, the court said, there's no

19    authority to get rid of an express third-party

20    beneficiaries clause.  There's no authority to support

21    this argument.  So the parties stated their intent,

22    that intent must be respected, and there's no

23    authority to throw out such an express provision.

24    Balsam, Pegasus, Trustees of the Screen Actors Guild,

25    GECCMC, multiple cases rejecting these types of

1    arguments.  The reason why parties put in a provision

2    like Section 11.3, that nothing should be construed to

3    provide any third-party beneficiary rights is to avoid

4    arguments such as this.  They knew what they intended.

5    It's expressly stated in the contract that nothing

6    should be construed to -- to go against their express

7    intention.

8                    THE COURT:  Okay.  All right.  Thank

9    you.

10                   All right.  I'm going to wrap up here.

11   Anything further from the plaintiff?

12                   MR. NELSON:  I don't think we have

13   anything further, Your Honor.

14                   THE COURT:  All right.  Anything

15   further from the defendants?

16                   MR. KANTER:  No, sir, for Huawei.

17                   MR. HUTZ:  No, sir.

18                   THE COURT:  All right.  Thank you for

19   your arguments.  We'll get you rulings on these as

20   soon as we can.  We're adjourned.

21                   (Hearing adjourned.)

22

23

24

25

1                          CERTIFICATION

2              I HEREBY CERTIFY that the foregoing is a

3      true and correct transcript from the stenographic

4      notes of the proceedings in the above-entitled matter

5      to the best of my ability.

6

7      _____          June 1, 2014

8      JILL E. McFADDEN, CSR
       Deputy Official Reporter
       State of Texas No.:  3392
9      Expiration Date:  12/31/14

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25